## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within 14 days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

**SHORT CAPTION**: Warren Havens, et al. v. Mobex Network Services LLC, et al.

**USCA NO.**: 14-4043

**LOWER COURT or AGENCY and DOCKET NUMBER**:
United States District Court for the District of New Jersey; 2:11-cv-0093-KSH-CLW

**NAME OF JUDGE**: Honorable Katharine S. Hayden, U.S.D.J.

**Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:**

(1) Plaintiffs-Appellants, an individual and five entities owned and controlled by him, allege, inter alia, that defendant Maritime Communications/Land Mobile, LLC and four other companies engaged in an unlawful, manipulative and anti-competitive scheme of nationwide as well as regional scope to acquire and maintain certain radio spectrum licenses issued by the Federal Communications Commission ("FCC") in violation of various FCC rules and provisions of the Communications Act of 1934 as amended ("FCA") with the unlawful goal and effect of restraining and harming plaintiffs' related FCC licenses and nationwide business based on, among other things, intelligent transportation systems. The complaint and pleadings assert claims under the FCA and the Sherman Antitrust Act.

(2) The parties to this appeal are: Appellants: Warren Havens; Skybridge Spectrum Foundation; Telesaurus VPC, LLC; AMTS Consortium, LLC; Intelligent Transportation & Monitoring, LLC; and Telesaurus GB, LLC.
Appellees: Maritime Communications/Land Mobile LLC ("MCLM"); Mobex Network Services, LLC; and Mobex Communications, Inc. (herein below, "Mobex" means both of the aforementioned Mobex entities). Defendants Paging Systems, Inc. ("PSI") and its affiliate Touch Tel Corp. ("Touch Tel") were dismissed from the case by an order of the court, the consequences of which decision plaintiffs contest insofar as documents required to be produced by the settling defendant were never delivered even though the other terms of the settlement agreement covering license transfers to plaintiffs from the settling defendants were complied with.

(3) Relief involved includes: injunctive relief and damages for violations of the FCA, as permitted under 47 U.S.C. §§206-07 and 401(b); damages for violations of the Sherman Act, 15 U.S.C. §§1-2; reasonable attorney fees; and revocation of licenses of MCLM under 47 U.S.C. §313.

(4) All Judgments and Orders of the United States District Court, District of New Jersey, in this action, including, but not limited to, (i) its Opinion and its Order and Final Judgment entered on September 2, 2014, dismissing Plaintiffs' claims under § 1of the Sherman Act; and (ii) its Opinion and Order entered on December 22, 2011, dismissing Plaintiffs' claims under the FCA and § 2 of the Sherman Act.

**LIST and ATTACH a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.**

(1) Order and Final Judgment of Judge Hayden dated and filed on September 2, 2014 (attached as Ex.1);
(2) Opinion of Judge Hayden dated and filed on September 2, 2014 (attached as Ex. 2);
(3) Order of Judge Hayden dated and filed on December 22, 2011 (attached as Ex. 3); and
(4) Opinion of Judge Hayden dated and filed on December 22, 2011 (attached as Ex. 4).

**Provide a short statement of the factual and procedural background, which you consider important to this appeal:**

This action, commenced in 2008, initially included claims against Defendants Mobex, MCLM, PSI and Touch Tel. Plaintiffs contended that Defendants, acting in concert and in violation of the FCA and the Sherman Act, engaged in a scheme to acquire and illicitly "warehouse" radio spectrum licenses in major U.S. markets with the intent to unlawfully block competition by, inter alia, thwarting Plaintiffs' efforts to acquire new licenses, impeding Plaintiffs' use of their acquired licenses, maintaining sham licenses and refusing to cooperate and share license contour information with Plaintiffs in violation of FCC rules and orders. Following extensive litigation and the dismissal after motion practice of Plaintiffs' FCA and § 2 Sherman Act claims, a nine day bench trial was held on Plaintiffs' § 1 Sherman Act claim. Only Plaintiffs and MCLM appeared at the trial. The two Mobex defendants had default entered against them before trial; however, at the beginning of the trial, the Court denied without prejudice Plaintiffs' motion for default judgment against Mobex. PSI and Touch Tel settled with Plaintiffs and did not appear at the trial. Following trial, the Court entered Final Judgment and an accompanying Opinion against Plaintiffs and in favor of MCLM, and dismissed the Complaint against Mobex. It is also important to this appeal that plaintiffs have asserted challenges to certain of defendants' licenses with the FCC, and proceedings before the FCC relating to the validity of MCLM's licenses remain active and ongoing.

**Identify the issues to be raised on appeal:**

(1) The District Court erred in granting final judgment in MCLM's favor and against Plaintiffs on Plaintiffs' claim under § 1 of the Sherman Act claim, and dismissing this claim and the Complaint as against the Mobex defendants, finding that Plaintiffs' did not carry their burden to prove that MCLM or the Mobex defendants violated §1 of the Sherman Act.
(2) The District Court erred in granting defendants' motion to dismiss Plaintiffs' claims under the FCA and § 2 of the Sherman Act.
(3) The District Court erred in denying plaintiffs' motion for leave to file a third amended complaint.
(4) The District Court erred in ordering the dismissal of defendants PSI and Touch Tel without requiring to be produced to plaintiffs by the settling defendants documents that were never produced even though the other terms of the settlement agreement, covering license transfers to plaintiffs from the settling defendants, were complied with.

This is to certify that this Concise Summary of the Case was mailed to the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record this day  16  of October, 2014 .

_____s/ Sean R. Kelly_____.
Signature of Counsel

00978533.DOCX

# Exhibit 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WARREN HAVENS, et al. | |
| Plaintiffs, | |
| v. | Civ. Action No. 11-993 (KSH) |
| MOBEX NETWORK SERVICES, LLC, et al., | |
| Defendants. | **ORDER** |

**Katharine S. Hayden, U.S.D.J.**

This matter having come before the Court on a motion to dismiss brought by defendants [D.E. 3]; and having considered the written briefs of both parties; and good cause shown;

It is on this 22nd day of December, 2011, hereby

**ORDERED** that defendants' motion to dismiss is **granted** as to plaintiffs' claims under the Federal Communications Act and Section 2 of the Sherman Act; and it is further

**ORDERED** that defendants' motion to dismiss is **denied** as to plaintiffs' claim under Section 1 of the Sherman Act.

/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

# Exhibit 2

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WARREN HAVENS, et al. | |
| Plaintiffs, | |
| v. | Civ. Action No. 11-993 (KSH) |
| MOBEX NETWORK SERVICES, LLC, et al., | |
| Defendants. | **OPINION** |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I. Introduction**

    This matter arises from a dispute over Federal Communication Commission ("FCC") licenses that permit the operation of Automated Maritime Telecommunications System ("AMTS") radio frequencies. Plaintiffs Warren Havens, Skybridge Spectrum Foundation, Telesaurus, VPC, LLC, AMTS Consortium, LLC, Intelligent Transportation & Monitoring, LLC, and Telesaurus GB, LLC (collectively "plaintiffs") assert that defendants Mobex Network Services, LLC, Mobex Communications, Inc., Maritime Communications/Land Mobile LLC, Paging Systems, Inc., and Touch Tel Corporation, are engaged in a scheme to hoard certain types of AMTS licenses, in violation of FCC regulations, with the goal of harming plaintiff's business. To that end, plaintiffs assert claims under the Federal Communications Act of 1934 and the Sherman Antitrust Act. In this motion to dismiss, defendants allege that plaintiffs' claims are

barred under res judicata and collateral estoppel, and that plaintiffs' complaint fails to put forth

an adequate claim on each of its three counts.

## II. Factual Background and Procedural History

### A. The Facts as Pleaded

The following facts are derived from plaintiff's second amended complaint.

Plaintiff Warren Havens is in the business of obtaining FCC Geographic licenses in the

AMTS radio service. (Second Am. Compl. ¶ 2.) He is "the founder, majority owner, manager,

and president of the other Plaintiffs." (*Id.*) Those plaintiffs are each either limited liability

companies or nonprofit corporations in the business of obtaining FCC licenses for AMTS radio

service "to provide spectrum and wireless telecommunications services to governmental and

non-governmental entities within the State of New Jersey and other states." (*Id.* ¶¶ 3–7.)

The case involves three defendants. The first, Paging Systems, Inc. ("PSI"), is the holder

of "Site-Based" AMTS licenses, including some with stations designated for location in New

Jersey. (*Id.* ¶ 10.) The second, Touch Tel Corp. ("Touch Tel"), constructs and operates PSI's

AMTS stations across the country. (*Id.*) Although the complaint equivocates as to precisely

who owns each company, that issue is not relevant for purposes of this motion, and it suffices to

say that Robert and Susan Cooper, husband and wife, together own and operate the companies in

their joint operations. (*Id.*) The third and fourth defendants are Maritime Communications/Land

Mobile, LLC ("MCLM")[1] and Mobex Network Services LLC ("Mobex"). MCLM is the holder

of site-based licenses in New Jersey, which it obtained upon its purchase of Mobex. (*Id.* ¶ 8–9.)

---

[1] Because of ongoing bankruptcy proceedings in the Northern District of Mississippi, the
litigation is presently stayed as to MCLM. MCLM figured in the parties' submissions on the
motion to dismiss because those submissions were filed prior to the entry of the stay order. The
stay precludes anything in this opinion from affecting MCLM at this time.

The sole owner of MCLM is Rev. Sandra Depriest, though plaintiffs allege that her husband, Donald Depriest, actually controls MCLM's operations. (*Id.* ¶ 8.)

This case revolves around FCC-issued ATMS licenses. "AMTS is a common-carrier Commercial Mobile Radio Service . . . licensed throughout the United States, which provides when in operation voice and communications to customers." (*Id.* ¶ 16.) Originally created for the benefit of maritime customers along costal and navigable water routes, it has expanded to include land service along the Northeast Corridor. (*Id.*) AMTS licenses fall into two categories: Site-Based and Geographic. A Site-Based license is a "license issued by the FCC on a first-come, first-served basis, at no cost (except for nominal application processing fees)." (*Id.* ¶ 17.) These licenses provide for operation only at a specific station whose location is provided in the license. (*Id.*) Until 2004, all AMTS licenses were Site-Based. (*Id.* ¶ 18.)

The second type of license is a Geographic license, which is "issued by the FCC to a high bidder in a public auction, which authorizes to the licensee exclusive use of specified radio frequencies to construct and operate wireless telecommunications stations within a defined wide geographic area." (*Id.* ¶ 17.) The FCC began auctioning AMTS Geographic licenses in 2004. (*Id.* ¶ 18.)

To protect Site-Based license holders whose licenses incorporate areas located within the same area granted in a Geographic license, FCC regulations provide that Site-based stations are entitled to "continue their station operations without excessively close-spaced co-channel Geographic-Licensed Stations that may cause radio interference." (*Id.*) To that end, "the Geographic Licensee [may] build and operate stations no closer than a certain range of lawful stations operated under a valid co-channel (same frequencies) Site-based AMTS license." (*Id.* ¶ 21.) That distance is the shorter of 120 kilometers and the actual transmitting distance of the

3

Site-Based station as determined through a specific, technical formula. (*Id.* (citing 47 C.F.R. § 80.385).) If a Site-Based license is terminated, revoked, or found invalid, its covered radio frequencies will revert to the overlapping Geographic license for that area. (*Id.* ¶ 18.)

The plaintiffs in this case collectively hold AMTS Geographic Licenses covering a majority of the United States, including New Jersey. (*Id.* ¶ 19.) Defendants hold the AMTS Site-Based licenses in various places across the country including New Jersey. (*Id.* ¶ 20.) Plaintiffs assert that Site-Based licensees are expected to provide information to the overlapping Geographic licensees so that the Geographic licensees may calculate the Site-Based station's transmitting distance. (*Id.* ¶ 22.)

Plaintiffs and defendants are competitors, and plaintiffs complain that defendants have failed to provide them with the necessary information to allow them to know the protected contour of the defendants' stations. (*Id.* ¶ 23.) Defendants have refused to provide this information notwithstanding three FCC "Cooperation Orders" and the FCC's regulatory disclosure requirements. (*Id.*)

Plaintiffs assert that defendants are "motivated by an anticompetitive purpose and intend to block and restrain Plaintiffs as competitors." (*Id.* ¶ 27.) Specifically, plaintiffs allege that even though FCC regulations require Site-Based AMTS licensees to construct stations within two years of obtaining a license, defendants have not actually constructed those stations and are therefore refusing to disclose their stations' operating contours because such disclosure would reveal that the stations do not exist, thereby resulting in the Site-Based license rights reverting to plaintiffs as the Geographic licensees for the relevant region. (*Id.* ¶¶ 27–30.) This practice is known as "warehousing," and it "occurs when a party acquired spectrum licenses without the

intent to utilize them lawfully" and instead "squat[s]' on the spectrum until a buyer is found." (*Id.* ¶ 31.)

In the course of discussions with defendants, Havens learned that PSI and the company now known as Mobex were cooperating on management of their licenses, such as that they would locate their stations at the same sites to reduce costs, and that Mobex held an option on PSI's licenses. (*Id.* ¶¶ 36–39.)

Plaintiffs' first count demands an injunction under 47 U.S.C. § 401(b) to require defendants to disclose the information necessary to calculate the contours of their Site-Based stations. (*Id.* ¶¶ 46–54.) Plaintiffs' second count seeks damages for violations of the Federal Communications Act, as permitted under 47 U.S.C §§ 206–07. (*Id.* ¶¶ 55–63.) Plaintiffs' third count seeks damages for violations of the Sherman Act, 15 U.S.C. § 1–2. (*Id.* ¶¶ 64–73.)

## B. The California Litigation

In 2005, plaintiffs (except for Skybridge Spectrum Foundation) filed a complaint in California Superior Court against Mobex and MCLM, claiming interference with prospective economic advantage, fraud, negligent misrepresentation, unfair competition, and breach of contract. (Friedman Cert., Ex. A.) Defendants removed the case to the Northern District of California, and the plaintiffs filed an amended complaint and later voluntarily dismissed the action. (Friedman Cert., Exs. A & B.)

In 2007, plaintiffs (except for Skybridge Spectrum Foundation) filed another complaint in California Superior Court against Mobex, MCLM, and PSI, this time alleging a violation of the Cartwright Act (a California state antitrust law), two counts of interference with prospective economic advantage, two counts of fraud, negligent misrepresentation, two counts of unfair competition, intentional interference with contracts, and two counts of conversion. (Mauriello

5

Cert., Ex. I.)  On June 2, 2008, the California state court dismissed the action, holding that the claims were preempted under the Federal Communications Act ("FCA"), *see* 47 U.S.C. § 332(c)(3)(A), because determination of the matter would require the court to assess whether defendants violated the FCA.  (Mauriello Cert., Ex. J.)

### C.  Procedural History

On June 20, 2008, plaintiffs filed a complaint in the District of New Jersey, originally under civil docket number 08-3094.  On October 14, 2008, plaintiffs filed a first amended complaint.  After the California matter concluded and defendants filed a motion to dismiss on February 7, 2011, plaintiffs submitted a second amended complaint under docket number 11-993.  Defendants filed a motion to dismiss.

On August 4, 2011, defendants MCLM and Mobex Network Services, LLC submitted to the Court a Notice of Bankruptcy Case Filing.  On August 10, 2011, the Court entered an order staying this matter as to those defendants pending the disposition of the bankruptcy matter.  On November 7, 2011, the Court lifted the order as to Mobex because only MCLM actually filed for bankruptcy.

### III. Standard of Review

*Federal Rule of Civil Procedure* 8(a)(2) provides that a claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although a plaintiff need not submit "detailed factual allegations" to plead a case, the *Rule* requires that the complaint include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" unless the complaint contains "sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at

556–57, 570). Ultimately, the complaint must contain sufficient facts to allow "the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also*

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

When a court decides a motion under *Rule* 12(b)(6), it "must accept as true all of the

allegations contained in a complaint," provided that they are factual allegations and not masked

legal conclusions. *Iqbal*, 129 S. Ct. at 1949–50.

## IV. Discussion

Defendants argue first that the Court is barred from deciding this case under principles of

res judicata and collateral estoppel.  They then argue that plaintiffs have failed to state a claim on

each of the three counts in the complaint.

### A. The California Litigation

### 1. Res Judicata

Defendants argue that res judicata applies because the facts underlying this case are the

same as the facts upon which the now-dismissed California state litigation was based.

The purpose of res judicata is to "promote[] judicial economy and protect[] defendants

from having to defend multiple or nearly identical lawsuits by 'bar[ing] not only claims that were

brought in a previous action, but also claims that could have been brought.'" *Morgan v.*

*Covington Twp.*, 648 F.3d 172, 177 (3d Cir. 2011) (quoting *In re Mullarkey*, 536 F.3d 215, 225

(3d Cir. 2008)) (third alteration in original).  To that end, a second suit is barred "when there

exists '(1) a final judgment on the merits in a prior suit involving (2) the same parties or their

privies and (3) a subsequent suit based on the same cause of action.'" *Id.* (quoting *Mullarkey*,

536 F.3d at 225).  Res judicata applies whenever "there is an 'essential similarity of the

underlying events giving rise to the various legal claims.'" *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir 1999) (quoting *United States v. Anthlone Indus.*, 746 F.2d 977, 984 (3d Cir. 1984)).  In other words, res judicata will prevent a party from re-litigating not only the precise theory of recovery, but also any other theory invoking the same underlying facts.

The doctrine, however, is not without its limitations.  "Ordinarily, a party will not be precluded from raising a claim by a prior adjudication if the party did not have the opportunity to fully and fairly litigate the claim." *Id.* at 197 (citing *Restatement (Second) of Judgments* § 26(1)(c)).  A claim will not be extinguished if "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on subject matter jurisdiction of the courts." *Restatement (Second) of Judgments* § 26(1)(c).

Here, the complaint alleges claims under the Federal Communications Act ("FCA") and the Sherman Act.  Both of these statutes explicitly limit a plaintiff's recourse in court to federal district courts.  *See* 15 U.S.C. § 15(a); 47 U.S.C. § 207.  These claims could not have been brought to the California state court in the previous action.  Defendants acknowledge as much, arguing that "Plaintiffs conveniently ignore that they could have filed (but did not) the California Action in federal district court rather than state court."  (Defs.' Reply Br. Supp. Mot. Dismiss 3.) This argument twists the res judicata exception for exclusive federal jurisdiction into a requirement that plaintiffs either bring their initial claims to the federal forum or forfeit their federal counts.  Plaintiffs could have sought relief in federal court, but they did not.  Instead they brought their claims in a state court that lacked jurisdiction to entertain the FCA and Sherman Act claims.  Therefore, res judicata cannot apply.

8

## 2. Collateral Estoppel

Defendants argue that collateral estoppel precludes re-litigation of the following issues because they were decided in the motion to dismiss the California case:

> (1) plaintiffs failed to establish a predicate wrong under the Communications Act because they failed to allege facts sufficient to show that the FCC has finally determined that Defendants wrongfully retained cancelled licenses; (2) alleging that certain licenses have 'automatically terminated and were subsequently identified by the FCC as cancelled' is not sufficient to establish a predicate wrong under the Communications Act; and (3) the determination of whether there was a predicate wrong under the Communications Act is a question for the FCC, not a court of law.

(Defs.' Br. Supp. Mot. Dismiss 18.)

Collateral estoppel provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Howard Hess Dental Labs., Inc. v. Detsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).  Application of collateral estoppel requires the satisfaction of four elements: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Id.* at 247–48 (quoting *Szehinskyj v. Attorney Gen. of the United States*, 432 F.3d 253, 255 (3d Cir. 2005)).[2]

Here, the claim for collateral estoppel fails on the first element because the identical issue has not already been decided.  The California court dismissed the case because "the claims set

---

[2] The parties cite the five-factor test articulated in California courts. *See Lucido v. Super. Ct. of Mendocino Cnty.*, 795 P.2d 1223, 1225 (Cal. 1990), *cert. denied*, 500 U.S. 920 (1991).  Because the tests are substantively the same in all respects relevant here, the different articulations do not change the outcome.

forth in the [Second Amended Complaint] come within the express preemption clause of the

Federal Communications Act ("FCA") at 47 U.S.C. § 332(c)(3)(A)." (Mauriello Cert., Ex. J, at

3, 4.)  The court's decision was relatively narrow, and defendants overstate its depth.  For

example, although the court found that plaintiffs' allegation "that certain licenses have

'automatically terminated and were subsequently identified by the FCC as cancelled'" was

insufficient to demonstrate that the FCC has made a final decision on the matter, the court

addressed that claim only in the context of making certain that the FCC had not decided

potentially preempted claims.  (*See id.* at 3, 4.)  Moreover, the court never said that the

determination of a predicate wrong is strictly one for the FCC; rather, it simply observed that

state courts are precluded from addressing such questions under 47 U.S.C. § 332(c)(3)(A).  (*See

id.*)

The California court determined that state courts lack jurisdiction to hear certain claims

under the FCA.  Because this Court is not a state court, that determination is irrelevant and does

not bar this Court's consideration of the issues presented in that prior litigation.

**B.  Availability of Relief Under 47 U.S.C. § 401(b)**

Defendants argue that plaintiffs are not entitled to relief under 47 U.S.C. § 401(b)

because that provision does not provide a private right of action in these circumstances.  Section

401(b) provides that

> [i]f any person fails or neglects to obey any order of the
> Commission other than for the payment of money, while the same
> is in effect, . . . any party injured thereby . . . may apply to the
> appropriate district court of the United States for the enforcement
> of such order. If, after hearing, that court determines that the order
> was regularly made and duly served, and that the person is in
> disobedience of the same, the court shall enforce obedience to such
> order by a writ of injunction or other proper process, mandatory or
> otherwise, to restrain such person or the officers, agents, or

10

representatives of such person, from further disobedience of such
order, or to enjoin upon it or them obedience to the same.

Plaintiffs' complaint seeks to have the Court enter an order "directing Defendants . . . to

comply with the Cooperation Orders and 47 C.F.R. 80.385(b)(1), and specifically requiring

Defendants to provide Plaintiffs the required information to enable Plaintiffs to calculate the

protected contour of Defendants' Site-Based AMTS stations and thus the portions of Plaintiffs'

same-channel Geographic licenses they may use." (Second Am. Compl. ¶¶ 32–33.) Defendants

counter that neither the "Cooperation Orders" nor 47 C.F.R. § 80.385(b)(1) constitute "orders"

within the meaning of the FCA.

The definition of the term "order" has generated a circuit split and the Third Circuit has

yet to address the question. In *New England Telephone & Telegraph Co. v. Public Utilities

Commission of Maine*, 742 F.2d 1, 4 (1st Cir. 1984) (Breyer, J.), the First Circuit held that an

FCC decision that arose via the Commission's rulemaking authority was not an "order" under

section 401(b). The court based its reasoning on several factors: first, the Administrative

Procedure Act defines the word "order" as including "final dispositions . . . in a matter other than

rulemaking," *New Eng. Tel. & Tel. Co.*, 742 F.2d at 5 (quoting 5 U.S.C. § 551(6)); second, a

broad definition of the term "order" would threaten the principle that enforcement should be left

to the FCC, *id.*; third, a broad definition would "threaten[] the sound development of a coherent

nationwide communications policy," *id.*; fourth, given that review of an FCC decision is

obtained through the courts of appeals, "the Act's statutory review provisions can be read more

fairly and coherently if 401(b) is construed narrowly" to limit the ability of district courts to

engage in interpretation of agency decisions, *id.* at 6; fifth, other provisions of the

Communications Act "use the word 'order' in a way that seems to envision Commission

11

decisions requiring specific actions of specific carriers," *id.* at 7; and sixth, a narrower view of

the definition helps avoid "issue splitting and procedural complexity," *id.* Accordingly, the court

concluded that the term "order" in section 401(b) refers only to "adjudicatory" orders. *Id.* at 9.

At the other end, in *Hawaiian Telephone Co. v. Public Utilities Commission of State of Hawaii*, 827 F.2d 1264, 1271 (9th Cir. 1987), the Ninth Circuit explicitly rejected the First

Circuit's interpretation. Specifically, the Ninth Circuit saw no reason to import definitions from

the Administrative Procedure act into section 401(b) and did not share the First Circuit's concern

that the broader definition of the word "order" would hinder the FCC's enforcement role.

*Hawaiian Tel. Co.*, 824 F.2d at 1271–72. The court ultimately reserved judgment on the issue of

"whether every rule, order, or regulation promulgated by the FCC is an enforceable order under

§ 401(b)," holding that the order immediately at issue met the necessary criteria because it

"require[d] particular actions be taken by [defendant] and private carriers providing service to

Hawaii." *Id.* at 1272.

In its only case confronting this issue, the Third Circuit concluded that "an agency

regulation should be considered an 'order' if it requires a defendant to take concrete actions."

*Mallenbaum v. Adelphia Commc'ns Corp.*, 74 F.3d 465, 468 (3d Cir. 1996). The court

recognized the circuit split but held that it did not need to take sides because the "order" at issue

did not require "a particular action to be taken by the defendant." *Id.* at 468 & n.5.

Here, plaintiffs' section 401(b) claim seeks an order requiring defendants to disclose "the

protected contour of [their] Site-Based AMTS stations." To that end, plaintiffs point to three

orders. The first order is a response to MCLM's request for clarification on FCC rules. (Second

Am. Compl., Ex. 1.) The Commission granted the request in part and denied it in part. With

regard to one part of the request for clarification, the Commission held that a "geographic

licensee's co-channel interference protection obligations" should be based on "actual operating

parameters" rather than "maximum permissible operating parameters." (*Id.*) In a footnote to this

remark, the Commission cited a prior order in another case and added that "[a]s we noted in that

decision, we expect incumbent AMTS licensees 'to cooperate with geographic licenses in order

to avoid and resolve interference issues. This includes, at a minimum, providing upon request

sufficient information to enable geographic licensees to calculate the site-based station's

protected contour.'" (*Id.*)

     The second order addressed an application that touched on PSI's site-based AMTS

license at the World Trade Center. (Second Am. Compl., Ex. 2.) The Commission noted that

the petitioner in that case "had to make certain assumptions regarding Station WQA216's

technical parameters, given the destruction of the WTC on September 11, 2001." (*Id.*) In a

footnote to that statement, the Commission again stated that "AMTS site-based incumbents are

expected to cooperate with geographic licensees in order to avoid and resolve interference issues.

. . . This includes, at a minimum, providing upon request sufficient information to enable

geographic licensees to calculate the site-based station's protected contour." (*Id.*)

     The third order is a motion for reconsideration regarding the earlier co-channel

interference decision. The Commission declined to reconsider its decision to "abandon the use

of actual ERP for determining co-channel interference protection," again observing that "AMTS

site-based licensees are expected to cooperate with geographic licensees in avoiding and

resolving interference issues and that this obligation requires, at a minimum, that the site-based

licensee 'provid[e] upon request sufficient information to enable geographic licensees to

calculate the site-based station's protected contour.'" (Second Am. Compl., Ex. 3.)

The Court need not decide which circuit's definition of the term "order" is correct because the cited orders fall short under either definition.  In each of the three orders, the FCC discussed matters related to the interplay between Site-Based licenses and Geographic licenses, but the FCC never explicitly confronted the question of how much cooperation is necessary.  To be sure, each order offered interpretive guidance, but the orders never required defendants engage in any particular disclosure.  Rather, the FCC addressed the cooperation requirements in terms of "expectations," not specific mandates capable of judicial enforcement.  Similarly, 47 C.F.R. § 80.385(b)(1) also does not "require[] a particular action to be taken by a defendant," *Mallenbaum*, 74 F.3d at 468, because it dictates only where a Geographic licensee may locate its stations, not what technical details the Site-Based licensees must disclose.  In the absence of an FCC order against defendants on this issue, the Court may not enter an injunction requiring defendants' compliance, and plaintiffs have failed to state a claim.

C.  **Private Right of Action under 47 U.S.C § 201(b)**

Plaintiffs seek recovery for damages under 47 U.S.C. § 207, which provides that

> [a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

With regard to liability for damages in general, a common carrier such as defendants, who "do[es], or cause[s] or permit[s] to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or . . . omit[s] to do any act, matter, or thing in this chapter required to be done," is "liable to the person or persons injured thereby for the full amount of damages

sustained in consequence of any such violation of the provisions of this chapter." 47 U.S.C.
§ 206.

In substance, plaintiffs claim that defendants violated 47 U.S.C. § 201(b), which states:
"All charges, practices, classifications, and regulations for and in connection with [a common
carrier] communication service, shall be just and reasonable, and any such charge, practice,
classification, or regulation that is unjust or unreasonable is declared to be unlawful." Therefore,
if defendants' alleged conduct is "unjust or unreasonable," then it is unlawful and plaintiffs have
stated a claim.

Notwithstanding the grant of jurisdiction in section 207, courts are constrained in what
they may and may not find to be a violation. Specifically, "the lawsuit is proper if the FCC
could properly hold that [the challenged practice] is an 'unreasonable practice' deemed unlawful
under § 201(b)." *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S.
45, 52–53 (2007). Accordingly, as the Ninth Circuit stated in a case on which both parties rely,
"[I]t is within the Commission's purview to determine whether a particular practice constitutes a
violation for which there is a private right to compensation." *N. Cnty. Commc'ns Corp. v. Cal.
Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010). If a party asks a court to find a violation
of section 201(b) in the absence of an FCC determination that the defendant's conduct generally
violates that provision, then it is a request "that the federal courts fill in the analytical gap," and
such a request cannot be granted because it would "put interpretation of a finely-tuned regulatory
scheme squarely in the hands of private parties and some 700 federal district judges, instead of in
the hands of the Commission." *Id.* (quoting *Greene v. Spring Commc'ns Co.*, 340 F.3d 1047,
1053 (9th Cir. 2003) (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 253 (2d Cir. 2001))).

15

To support its claim that it is a violation of section 201(b) to "warehouse" AMTS licenses, plaintiffs cite to FCC determinations that it is a violation of section 201(b) for a party to "warehouse" toll free numbers without identified subscribers. *See, e.g.*, *In re Toll Free Serv. Access Codes*, 12 FCC Rcd 11162 (1997); *Patients Plus, Inc. v. Long Distance Telecomm. Serv.*, 12 FCC Rcd 13258 (1997). Although these determinations support the proposition that the FCC has found warehousing to be disfavored in one particular context, the determinations do not address the precise type of conduct at issue in this case, or even a sufficient number of similar types of conduct for the Court to infer the FCC's distaste for warehousing as a general practice. The Court cannot risk disturbing the delicate regulatory framework that the Commission is tasked with maintaining. Cf. *Hoffman v. Rashid*, 388 F. App'x 121, 123 (3d Cir. 2010) ("[I]t is within the purview of the Federal Communications Commission, not [plaintiff], 'to determine whether a particular practice constitutes a violation for which there is a private right to compensation.'" (quoting *N. Cnty. Commc'ns Corp.*, 594 F.3d at 1158)).[3]

For the foregoing reasons, plaintiffs' claims under the Federal Communications Act fail, and are dismissed.

---

[3] Defendants assert that plaintiffs' section 207 claim is time-barred under 47 U.S.C. § 415(b). Having found that plaintiffs failed to state a claim under section 207, the Court need not address this issue in depth. The Third Circuit has spoken on the issue, holding that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). Here, plaintiffs' claim is that the defendants' unjust and unreasonable practice is the continuing disregard of Commission regulations and orders, and the continued warehousing of AMTS licenses. Because these are ongoing activities, the statute of limitations has not yet started to run.

16

## D. Sherman Act

### 1. Preemption

Defendants argue that the FCA established an elaborate framework under which the FCC regulates radio frequency allocation, and that the FCA therefore preempts Sherman Act claims because those claims may interfere with FCC radio frequency determinations. Absent from defendants' argument, however, is any authority to suggest that a court should abstain from hearing a case within its jurisdiction merely because it touches on an area subject to sophisticated agency regulation. *Cf. Raritan Baykeeper v. Edison Wetlands Ass'n, Inc.*, 660 F.3d 686, 691 (3d Cir. 2011) (in context of primary jurisdiction doctrine, noting that "[w]hen 'the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility'" (quoting *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1004 (3d Cir. 1995) (further citations omitted))).

More to the point, defendants' argument ignores 47 U.S.C. § 152, in which an uncodified amendment states that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." Pub. L. No. 104-104, § 601(b)(1) (1996). The amendment further clarifies that the term "antitrust laws" includes the Sherman Act. Pub. L. No. 104-104, § 601(e)(4). The legislative history of this amendment clarifies that when Congress enacted the Telecommunications Act of 1996, it sought to ensure that the FCC could not "confer antitrust immunity" through the course of its decisionmaking. See S. Rep. No. 104-230, at 178–79 (1996) (Conf. Rep.). Thus, Congress envisioned a system in which the FCC could consider antitrust matters when reaching decisions, but that the FCC's decisions would not preclude the operation of independent antitrust statutes.

17

See *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004) (holding that notwithstanding arguments for implied immunity, "the savings clause preserves those claims that satisfy established antitrust standards" (citation and quotation marks omitted)). Accordingly, the FCA does not preempt plaintiffs' Sherman Act claim.

## 2. Standing

To establish standing, plaintiffs must show that they suffered an antitrust injury, meaning an injury that is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). This injury must "reflect[] an activity's anti-competitive effect on the competitive market," and "an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. *Id.* (citations omitted).

Defendants suggest that plaintiffs are complaining about injury to their status as competitors rather than an injury suffered by the overall competitive market. But plaintiffs' complaint pleads a broader injury than that. After recounting defendants' course of conduct, the complaint states that "[t]hese acts produced anti-competitive effects within the relevant geographic market for AMTS, are manifestly anticompetitive and constitute a per se violation of the Sherman Act." (Second Am. Compl. ¶ 66.) The complaint further alleges that the conduct "had a wider impact on the relevant AMTS market." (*Id.* ¶ 69.) These statements are not mere "labels and conclusions," nor are they "a formulaic recitation of the elements of the cause" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949

18

(quoting *Twombly*, 550 U.S. at 555, 557). Rather, they are the logical and plausible inferences to be drawn from plaintiffs' factual allegations. Plaintiffs allege that defendants have refused to provide necessary information about the contours of their Site-Based stations (Second Am. Compl. ¶ 25), that they have done so to avoid the loss of their licenses (*id.* ¶ 30), and that their ultimate goal is to "warehouse" the licenses to make the neighboring Geographic licenses "less economically viable to competitors in upcoming auctions, so that [defendants] as the 'Incumbent' Station licensees could succeed in the auctions with less competition and at lower prices" (*id.* ¶¶ 31–33). These allegations, accepted as true, present not only allegations that plaintiffs themselves have suffered harm, but also that defendants' conduct affects the overall competitive market for AMTS frequencies. Accordingly, plaintiffs have established antitrust standing.

### 3. Sherman Act Section 1 Claim

A claim under section one of the Sherman Act, 15 U.S.C. § 1, consists of four elements: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action[ was] illegal; and (4) . . . [plaintiff] was injured as a proximate result of the concerted action." *Howard Hess Dental Labs., Inc.*, 602 F.3d at 253 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)). Defendant alleges that the complaint fails to satisfy the first element because it does not allege that defendants "conspired or agreed to act in concert with any other party, let alone the other defendants." (Defs.' Br. Supp. Mot. Dismiss 39.) *See also Twombly*, 127 S. Ct. at 1961 (in antitrust case, insufficient to allege "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action").

19

The facts here, however, are distinguishable from the facts in *Twombly*. Here, plaintiff has stated sufficient facts to "allow[] the court to draw the reasonable inference that" defendants had the requisite intent to act in concert. *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 127 S. Ct. at 556). First, plaintiff alleges specific reasons for the defendants' decisions to act in concert, such as that the defendants made a spectrum-splitting arrangement to allow each to share in the benefits of the AMTS licenses. (*See* Second Am. Compl. ¶ 36.) Moreover, Havens learned through communications with PSI that PSI and Mobex were cooperating and had an intertwined financial stake in the AMTS spectrums at issue. (*Id.* ¶ 38.) Cooperation could also be seen in other areas, such as Mobex and PSI locating stations at the same sites in order to reduce costs. (*Id.* ¶ 39.) This cooperation extended beyond physical interactions, as Mobex and PSI jointly petitioned the FCC on certain matters regarding the licenses. (*Id.* ¶ 41.)

The complaint alleges a history of cooperation and interactions between the companies on the very licenses at issue in this case. This makes plausible plaintiffs' allegation of concerted action, and plaintiffs have therefore stated a claim on which relief can be granted.

### 4. Sherman Act Section 2 Claim

Under 15 U.S.C. § 2, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." Plaintiffs alleging a conspiracy to monopolize must demonstrate four elements: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs.*, 602 F.3d at 253. To plead monopolization, "a plaintiff must allege: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Crossroads Cogeneration Corp. v. Orange & Rockland Cntys. Util., Inc.*, 153 F.3d 129, 141 (3d Cir. 1998) (quoting *Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 412–13 (3d Cir), *cert. denied*, 522 U.S. 977 (1997)). Similarly, to claim attempted monopolization, "a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Schuykill Energy Res.*, 113 F.3d at 413).

Plaintiffs' complaint specifically cites the "essential facilities doctrine," which requires demonstrating: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996) (quoting *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995)).

Here, even assuming that the contour information is an "essential facility," plaintiffs' claim falls short because the complaint does not set forth a case that defendants are monopolists, have established a monopoly, or are attempting to establish a monopoly. Indeed, a claim of attempted monopolization is largely inconsistent with the overall theory of plaintiffs' case. The complaint does not allege that defendants were warehousing AMTS spectrum in order to generate a monopoly. Instead, the complaint states that defendants' goal in warehousing the Site-Based licenses was to make the remaining licenses less attractive to competitors, or to create an opportunity to reap a profit by selling or leasing their licenses to the adjacent Geographic licensees. (Second Am. Compl. ¶ 33.) (Notably, if this were defendant's plan, it apparently failed, as plaintiffs won the auctions for the Geographic licenses and now own them across most

21

of the country.) Although this practice, if true, may serve to give defendants an edge in the market, it does not lay any meaningful groundwork for the establishment of a monopoly, especially because plaintiffs own most of the Geographic licenses for New Jersey and would therefore appear to have a comparable bargaining position to that of defendants. Additionally, the FCC tightly regulates the distribution of the pertinent licenses and could be made aware of any potential abuses. *Cf. Verizon Commc'ns, Inc.*, 540 U.S. at 412 ("One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm."). Accordingly, plaintiffs have failed to set forth a claim under section two of the Sherman Act.

### E. Administrative Exhaustion and the Primary Jurisdiction Doctrine

Defendants last argue that the Court should dismiss the complaint because plaintiffs have not exhausted their administrative remedies and because the primary jurisdiction doctrine suggests that the matter should be heard by the FCC. Because the Court has determined that plaintiffs failed to state a claim under the FCA, and because the FCC does not have jurisdiction over claims under the Sherman Act, 15 U.S.C. § 15(a), the Court need not address that argument.

## V. Conclusion

For the foregoing reasons, the motion to dismiss is granted as to plaintiffs' claims under the FCA and section 2 of the Sherman Act, and the motion is denied as to plaintiffs' claim under section 1 of the Sherman Act.

/s/ Katharine S. Hayden

December 22, 2011                 Katharine S. Hayden, U.S.D.J.

# Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

WARREN HAVENS; SKYBRIDGE
SPECTRUM FOUNDATION; TELESAURUS
VPC, LLC; AMTS CONSORTIUM, LLC;
INTELLIGENT TRANSPORTATION &
MONITORING, LLC; and TELESAURUS GB,
LLC,

> *Plaintiffs,*

v.

MARITIME COMMUNICATIONS/LAND
MOBILE, LLC, et al.,

> *Defendants.*

Civ. Action No. 11-993 (KSH) (CLW)


**ORDER AND
FINAL JUDGMENT**


For the reasons expressed in the opinion filed herewith,

**IT IS** on this 2nd day of September, 2014,

**ORDERED** that the Clerk of the Court shall enter final judgment in favor of defendant
Maritime Communications/Land Mobile, LLC; and it is further

**ORDERED** that the Clerk of the Court shall enter final judgment against plaintiffs Warren
Havens, Skybridge Spectrum Foundation, Telesaurus VPC, LLC, AMTS Consortium, LLC,
Intelligent Transportation & Monitoring, LLC, and Telesaurus GB, LLC; and it is further

**ORDERED** that the complaint is dismissed against Mobex Communications, Inc. and
Mobex Netwok Services, LLC.

The Clerk of the Court is directed to close this case.


/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

# Exhibit 4

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WARREN HAVENS; SKYBRIDGE SPECTRUM FOUNDATION; TELESAURUS VPC, LLC; AMTS CONSORTIUM, LLC; INTELLIGENT TRANSPORTATION & MONITORING, LLC; and TELESAURUS GB, LLC, | |
| *Plaintiffs*, | Civ. Action No. 11-993 (KSH) (CLW) |
| v. | |
| MARITIME COMMUNICATIONS/LAND MOBILE, LLC, et al., | **OPINION** |
| *Defendants*. | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.     INTRODUCTION**

Warren Havens and five entities he controls—Skybridge Spectrum Foundation; Telesaurus VPC, LLC; AMTS Consortium, LLC; Intelligent Transportation & Monitoring, LLC; and Telesaurus GB, LLC (collectively, "plaintiffs")[1]—have sued Maritime Communications/Land Mobile, LLC ("MCLM") and four other companies, alleging in substance that they conspired to exclude plaintiffs from the market for a certain type of radio license issued by the Federal Communications Commission ("FCC"). Following extensive litigation and the dismissal after motion practice of all but one of plaintiffs' claims, the Court held a nine-day

---

[1] Telesaurus VPC, LLC is now known as Verde Systems, LLC, and AMTS Consortium, LLC is now known as Environmentel, LLC. (T2 26:17-19; T4 74:20-21; T4 98:21-23 [Havens].) The Court uses the entities' names as they were pleaded.

1

bench trial on the one remaining claim, which was brought under Section 1 of the Sherman Act for conspiracy to restrain trade against MCLM, at that point the only active defendant.[2] Following trial, the parties submitted proposed findings of fact and conclusions of law for the Court's consideration.

## II.   BACKGROUND & PROCEDURAL HISTORY

As the Court noted in its December 2011 dismissal opinion, this matter arises from disputes over FCC-issued licenses that afford the right to use a particular type of radio frequency: the so-called Automated Maritime Telecommunications System, or AMTS. Plaintiffs contend that the defendants in this action, as well as other persons and entities not named as defendants here, have engaged in a long-running scheme that had the effect of precluding Havens and his companies from using AMTS spectrum licensed to them in the ways they envision. Plaintiffs allege that the scheme began decades ago with an agreement between settled defendant Touch Tel Corporation's president Robert Cooper and non-party Regionet's principal Fred Daniel to divide up between them the market for AMTS licenses. According to plaintiffs, this agreement was perpetuated over the years as personnel from Regionet were hired by defendant Mobex Network Services, LLC and later by MCLM. Plaintiffs further allege that evidence of the agreement can be found in the way certain entities have conducted themselves that is not consistent with the business interests of true competitors.

Plaintiffs believe that AMTS-allocated spectrum has a variety of applications in fields such as intelligent transportation systems. (*See, e.g.*, T2 23:6-13, 24:15-18 [Havens].) Havens, who considers himself a pioneer in this area [T2 130:12-14], testified about a two-part business plan, described further below, under which portions of his companies' AMTS licenses would be

---

[2] Two defendants bowed out via settlement and two others, defunct companies, defaulted.

sold or leased to railroads and utility or energy companies for their infrastructure and communications needs, while plaintiffs would retain control over the remaining spectrum for a nationwide location-monitoring system that would result in efficiencies in fields as diverse as environmental conservation and traffic-accident avoidance.

Havens and his companies have acquired geographic AMTS licenses around the country and have vigorously challenged other licensees, both before the FCC and in various courts. As a recent opinion, cited by both sides, by FCC Administrative Law Judge Richard L. Sippel demonstrates, long-running FCC proceedings on these issues remain active and ongoing. *See In the Matter of Maritime Communications/Land Mobile, LLC*, 2014 WL 2767313 (F.C.C. June 17, 2014).[3]

MCLM holds both site-based and geographic AMTS licenses. As explained in further detail below, the FCC initially issued AMTS licenses on a site basis. Then in the mid-2000s the agency began to issue licenses for broad geographic regions, each of which encompassed various sites that had been parceled out under the old system. The FCC permitted site-based licensees to continue their operations and required geographic licensees to provide them with a level of interference protection.

Plaintiffs, who among them hold geographic AMTS licenses,[4] assert that MCLM combined with others to keep them from getting AMTS licenses or, with respect to AMTS licenses plaintiffs do own, deprive them from putting the licenses to use in the manner they

---

[3] Another indication of the robust activity in the FCC is plaintiffs' August 22, 2014 letter to the Court [D.E. 287] reporting a filing by MCLM – specifically, interrogatory responses – in ongoing proceedings before the FCC.

[4] Telesaurus GB, LLC and Havens do not hold AMTS licenses. (T3 9:1-8; T4 123:16-20 [Havens].)

intended. In 2008, plaintiffs filed the instant lawsuit against MCLM, Mobex Communications, Inc.,[5] Mobex Network Services, LLC, Paging Systems Inc., and Touch Tel Corporation. (*See* D.N.J. Civ. Action No. 08-3094, D.E. 1.) The case was stayed from October 2009 until early 2011 as Havens appealed an adverse decision entered in a separate action that he and all but one of the entity plaintiffs had filed in California state court. (Civ. Action No. 08-3094, D.E. 44 (staying action), D.E. 50 (addressing steps involved in resumption of active litigation).) After the United States Supreme Court denied certiorari, the instant litigation resumed. Plaintiffs filed an amended complaint under a new docket number and the defendants moved to dismiss it. (D.E. 1; D.E. 3.)

Plaintiffs' second amended complaint [D.E. 1], filed on February 18, 2011, asserted claims under the Federal Communications Act of 1934 and the Sherman Act. Plaintiffs contended that the defendants failed to construct infrastructure required to retain their licenses, refused to provide information about their stations' transmission contours and operating parameters that plaintiffs purportedly needed to ensure they did not interfere with the defendants' operations, and were parties to an anticompetitive market-allocation scheme. The complaint's first count sought an injunction under 47 U.S.C. § 401(b) requiring the defendants to provide plaintiffs information assertedly necessary to calculate the protected contour of defendants' site-based AMTS stations, per FCC regulations and what plaintiffs characterized as "cooperation orders" issued by the FCC; the second count, damages for violations of the Federal Communications Act and associated regulations, as permitted by 47 U.S.C. §§ 206 and 207; and

---

[5] Mobex Communications was not named in the original complaint, but was later included as a defendant in the operative second amended complaint [D.E. 1].

the third count, damages under §§ 1 and 2 of the Sherman Act, for an agreement in restraint of trade and monopolization, respectively.[6]

In December 2011, this Court dismissed all but the Sherman Act § 1 claim [D.E. 30, 31], and in August 2012 it denied plaintiffs' motion for reconsideration [D.E. 98, 99].

On April 22, 2013, MCLM moved for summary judgment; plaintiffs opposed and cross-moved under Fed. R. Civ. 56(d), seeking in effect to reopen discovery. Meanwhile, the other defendants stopped actively litigating: the Mobex defendants, now defunct, had default entered against them in February 2013 [D.E. 152], and on April 12, 2013, Paging Systems and Touch Tel advised that they had entered into a settlement agreement with Havens and a number of his companies [D.E. 164].

While MCLM's motion and plaintiffs' cross-motion were pending, Magistrate Judge Waldor held final pretrial conferences and entered the proposed final pre-trial order submitted to the Court on July 17, 2013, leaving open the issue of the number of trial exhibits plaintiffs could offer -- at the time, they were seeking to admit over 6,500 exhibits. (D.E. 197; D.E. 240.) Contemporaneously, plaintiffs' attorney moved to withdraw, citing discord in his relationship with Havens. (D.E. 188.) This request was initially denied. (D.E. 197.) Also while the summary judgment motions were pending, Paging Systems and Touch Tel moved to enforce their settlement agreement with plaintiffs. (D.E. 203.)

In reviewing the submissions on the summary judgment motions, the Court recognized that there were disputed issues of fact regarding the linkage between and among the named defendant companies and their representatives. Therefore, on March 20, 2014, the Court denied

---

[6] With respect to the § 1 claim, plaintiffs now also ask the Court to enter an order revoking MCLM's AMTS licenses to "send a message" about the consequences of non-compliance with the antitrust laws in this industry. (Pls.' CL ¶¶ 105-06.)

summary judgment and set the matter down for trial. (D.E. 206.) The Court directed the parties

to appear before Judge Waldor to finalize the nature and number of trial exhibits. (*Id.*) Again,

plaintiffs' attorney moved to withdraw. (D.E. 209.) Ultimately, plaintiffs obtained new counsel;

the issue of how many trial exhibits plaintiffs would present was resolved; and this Court granted

Paging Systems' and Touch Tel's motion to enforce the settlement [D.E. 250; D.E. 251].

    The bench trial began on May 20, 2014, and concluded on June 10, 2014. Six witnesses

testified, two of them as experts on plaintiffs' side. The first was Dr. Raja Sengupta, a professor

in the Department of Civil and Environmental Engineering at the University of California at

Berkeley [T1 56:11-14], who was examined about "[a]ccident avoidance in passenger . . .

transportation on roads and highways across the country" [T1 57:8-10]. Plaintiffs' other expert

was Ronald Lindsey, who developed a train-monitoring system called positive train control and

offered opinions on matters of interoperability in the railroad industry and on accident avoidance

in railroad systems [T1 98:25-99:1, 99:23-100:1]. Warren Havens testified as a plaintiff and on

behalf of each of the other plaintiff entities, of which he is a senior official. The remaining live

witnesses were Donald DePriest, Sandra DePriest, and John Reardon, all affiliated in some way

with MCLM.[7] The parties have further submitted selected deposition testimony of David Kling,

an engineer who works for Touch Tel; David Predmore, formerly an in-house attorney for

---

[7] As the Court held a bench trial, to accommodate MCLM's interest in making a motion under
Fed. R. Civ. P. 52(c) at the close of plaintiffs' case in chief, several of these witnesses, while
called by plaintiffs, could be described as defense witnesses, and the Court afforded the parties
latitude in determining how to present their respective cases. (*See* T1 33:7-34:2; T5 89:9-17
(permitting flexibility as to leading questions); T6 110:7-15 (dispensing with formality of labels
for certain witnesses that both sides intended to call).)

Mobex Communications and Mobex Network Services; and Robert Cooper, president of Touch Tel.[8]

After hearing the testimony at trial, reviewing the exhibits admitted into evidence and the deposition testimony designated by the parties, and considering the parties' post-trial proposed findings of fact and conclusions of law,[9] the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## III.   FACTS

Generally, plaintiffs and MCLM do not dispute the relevant factual background of plaintiffs' claims.  They vigorously disagree, however, on the meaning and implications of those facts.  The facts set forth below may be deemed the Court's findings.

### A.      **The Named Parties**

The plaintiffs in this action are Havens, an individual, and five entities he controls.  Three of them, Telesaurus VPC, LLC; AMTS Consortium, LLC; and Intelligent Transportation and Monitoring Wireless, LLC, are limited liability companies formed by Havens.  (T2 25:9-22 [Havens].)  All three companies obtained geographic AMTS licenses through one or both of the FCC auctions of geographic AMTS licenses held in 2004 and 2005.  (T3 7:11-13, 7:24-8:6, 8:8-23 [Havens]; P294, Att. A; P297, Att. A.)

---

[8] The Court granted Touch Tel's pre-trial motion to quash subpoenas that MCLM directed to Kling and Cooper. (D.E. 260; D.E. 261.)

[9] On July 16, 2014, plaintiffs filed their proposed findings of fact ("Pls.' FF") [D.E. 283] and proposed conclusions of law ("Pls.' CL") [D.E. 283-1], and MCLM filed in a single document [D.E. 282] its proposed findings of fact ("MCLM FF") and proposed conclusions of law ("MCLM CL").   On July 23, 2014, plaintiffs filed their supplemental proposed findings of fact and conclusions of law ("Pls.' Supp. FF/CL") [D.E. 286], as did MCLM ("MCLM Supp. FF/CL") [D.E. 285].

Plaintiff Skybridge Spectrum Foundation is a Delaware non-profit corporation with tax-exempt status under 26 U.S.C. § 501(c)(3). (T2 6:10-12, 14:5-8, 15:10-11 [Havens].) It was formed in 2006 or 2007 by Havens, who is its president, and it owns portions of AMTS licenses that were assigned to it by other plaintiffs. (T2 6:10-12, 10:15, 12:2-12, 15:8-11; T3 7:1-10 [Havens].)

Plaintiff Telesaurus GB, LLC is another limited liability company formed by Havens.[10] (T2 25:9-13, 21 [Havens].) It currently owns no AMTS licenses, and has never owned any [T3 9:1-8; T4 123:10-15 [Havens]], but purportedly "has business relations with the other plaintiff LLCs in relation to their AMTS licenses" [Pls.' FF ¶ 6].

Havens himself likewise owns no AMTS licenses, though he applied for site-based licenses and has challenged the denial of those applications. (T4 123:16-20 [Havens].) In addition to serving as president of Skybridge Spectrum Foundation, Havens is a "senior officer" of the LLC plaintiffs. (T2 6:6-9 [Havens].) By his own testimony, Havens can be described as the chief executive officer of each of the LLCs. (T2 20:15-18 [Havens].)

Defendant MCLM, a limited liability company, was formed in Delaware in February 2005 by Sandra DePriest (T6 7:12-14 [S. DePriest]; D2.) Sandra DePriest owned 100% of the stock in a company called Communications Investments, Inc., which was the general partner of a partnership called SRJW, which in turn "owned or was the managing member of MCLM." (T6 8:15-19 [S. DePriest].) MCLM purchased site-based AMTS licenses from defendant Mobex

---

[10] This entity is sometimes referred in the record to as Telesaurus Holdings GB, LLC. The Court uses the entity's name as it appears in the caption of the operative complaint and as Havens referred to it during trial. (T2 25:21 [Havens].)

Network Services, LLC in 2005 pursuant to an asset purchase agreement. (P104.)[11] MCLM also placed winning bids for four geographic AMTS licenses in the second of the two FCC license auctions. (P294, Att. A.) On August 1, 2011, MCLM filed a petition in bankruptcy in the United States Bankruptcy Court for the Northern District of Mississippi. (T5 75:11-15 [Havens]; T7 5:15-16 [Reardon].) Sandra DePriest is a lawyer licensed in Mississippi and Washington, D.C., and allowed her Indiana license to lapse within the last year or two. (T6 5:21-6:5 [S. DePriest].) Early in her career, she practiced telecommunications law. (T6 23:22-25-13 [S. DePriest].) In 1999 she obtained a Masters of Divinity degree and is an ordained Episcopalian priest. (T6 6:16-7:7 [S. DePriest].) Her current legal practice is limited to pro bono work. (T5 115:10-17 [D. DePriest].) Her husband, Donald DePriest, has been involved in the communications business since the 1980s, and has held positions or interests in a variety of companies operating in that arena, including one that he founded and for which he was the chairman, CEO, and president before selling it in the 1980s. (T5 89:22-90:6, 116:22-23, 119:12-22 [D. DePriest].)

Defendant Mobex Communications, Inc. was a Delaware corporation that dissolved in 2006. (D4; T9 49:12-14, 20-22 [Reardon].) At its height, it had a number of affiliated or subsidiary companies, not all of which were involved with AMTS licenses. (T7 24:4-6, 38:6-8, 40:7-13, 77:4-5, 13 [Reardon].) It had over 100 shareholders and had a number of private equity investors. (T8 59:22-60:14 [Reardon].) Neither Sandra DePriest nor Donald DePriest was ever a shareholder in Mobex Communications, and while Reardon at one time had options in the company, he did not exercise them and they were ultimately cancelled. (T8 60:15-23 [Reardon]; T6 110:20-25 [S. DePriest]; T6 119:10-22 [D. DePriest].) Between 2001 and 2004, as

---

[11] As detailed below, Mobex Network Services did not participate in either auction of geographic licenses; its only AMTS licenses were site-based.

shareholders sought returns on their investment, Mobex Communications divested itself of various of its businesses, and by 2004 Mobex Network Services, LLC was one of its last remaining affiliates. (T8 69:9-70:12 [Reardon].) Reardon joined Mobex Communications in 1997 as general counsel, and in 2001 became president and chief executive officer of the company and its affiliates. (T7 6:15-16, 7:1-2, 9:21-25, 38:2-3; T8 17:10-13 [Reardon].) Previously, he had practiced in the area of FCC regulatory law for approximately two years at a law firm. (T7 6:6-11 [Reardon].) Reardon joined MCLM in early 2006, after the asset purchase agreement closed. (T6 17:3-10 [S. DePriest].)

Defendant Mobex Network Services, LLC was a Delaware limited liability company that dissolved in 2006. (D3; T9 49:17-19 [Reardon].) As one of the subsidiaries or affiliates of Mobex Communications, the company was created to hold AMTS licenses. (T7 7:4-18 [Reardon].) Mobex Communications held an 85% interest in it and Nextel Data Corp. held the remaining interest. (T7 7:15-18; T8 62:23-63:1 [Reardon].) Back in 2000 or 2001, Mobex Network Services had acquired site-based[12] AMTS licenses and associated equipment of Waterway Communications, as well as of Regionet Wireless License, LLC and Regionet Wireless Operations, LLC. (T7 7:19-9:4; T8 17:23-18:11 [Reardon].)

Default was entered against Mobex Communications and Mobex Network Services in this action on February 19, 2013, and their answer was stricken. (D.E. 152.)

---

[12] The first auction of geographic licenses was not held until 2004 so the only AMTS licenses available were site-based.

Defendant Paging Systems, Inc. is owned by Susan Cooper. (Cooper Dep. 14:21-25.)[13] It placed the winning bid in the FCC's 2004 auction for the B-block geographic AMTS license for the Great Lakes region, and in the 2005 auction for the B-block geographic AMTS license for Hawaii. (P297, Att. A; P294, Att. A.) Defendant Touch Tel Corporation is owned by Robert Cooper. (Cooper Dep. 14:9.) Paging Systems and Touch Tel share office space in Burlingame, California, and Touch Tel owns and operates the equipment from which Paging Systems' AMTS frequencies transmit. (Cooper Dep. 24:4-25:15, 52:8-23.) Paging Systems and Touch Tel were dismissed with prejudice as defendants in this action in June 2014 after the Court granted their motion to enforce their settlement with plaintiffs. (D.E. 281; D.E. 250; D.E. 251.)

### B.   The Nature and Licensing of AMTS Spectrum

The frequencies in the AMTS range of the electromagnetic spectrum were initially dedicated to communications between land and vessels in navigable waterways. (*See* T2 35:3-16 [Havens]; T7 16:9-17:7 [Reardon]; D7 (Jan. 22, 2007 Order ¶ 2).) These frequencies are located at 217-218 MHz and 219-220 MHz. (T2 38:4-19 [Havens].) For licensing purposes, the FCC divided each of these 1 MHz ranges into an "A block" and a "B block." (*See* T2 34:24-25, 38:4-19 [Havens].) A-block AMTS spectrum is located at 217.5 to 218 MHz and 219.5 to 220 MHz, while B-block spectrum is located at 217 to 217.5 MHz and 219 to 219.5 MHz. (T2 38:4-19 [Havens]). Havens testified that FCC created this division of spectrum into A and B blocks to provide additional licensing opportunities in a given area, and that initially applicants could only apply for one of the two blocks available for a site unless they demonstrated a need for the other block. (T2 35:18-36:7 [Havens].)

---

[13] The term "Cooper Dep." refers to the transcript of the deposition of Robert Cooper dated March 21, 2013, jointly-designated portions of which the parties submitted as evidence following trial.

11

Originally the FCC issued licenses to use AMTS-designated frequencies on a site-based system. Consistent with the function of AMTS as providing "ship-to-shore communications similar to a cellular phone system" for maritime vessels, AMTS licensees had to provide service within a certain area and with a required continuity of service determined by reference to the site location and waterway proposed to be served. (D7 (Jan. 22, 2007 Order ¶ 2); *see also* T4 27:1-15 [Havens].)[14] Then the FCC transitioned to issuing AMTS licenses on a geographic basis through a competitive bidding process. (D7 (Jan. 22, 2007 Order ¶ 3); T2 32:1-3, 71:10-15 [Havens].) As part of the transition from the site-based to the geographic licensing regime, in 2000 the FCC stopped issuing site-based licenses. (T2 71:13-18 [Havens].)

Under the geographic licensing regime, the FCC divided the United States into 10 regions, and undertook to issue licenses for the A-block and B-block AMTS frequencies in each region. (*See* D100; D101.) The agency held auctions for geographic AMTS licenses in 2004 and 2005, designated respectively as Auction 57 and Auction 61. (T2 27:13-14 [Havens]; P294; P297.)

In Auction 57, plaintiffs AMTS Consortium and Telesaurus VPC, between them, placed the winning bids for eight B-block geographic licenses: Northern Atlantic, Mid-Atlantic, Southern Atlantic, Mississippi River, Southern Pacific, Northern Pacific, Alaska, and Mountain. (P297, Att. A.) Paging Systems placed the winning bid for the B-block Great Lakes license, and a non-party, Thomas Kurian, placed the winning bid for the A-block Mountain license. (*Id.*)

---

[14] Both sides (plaintiffs in their proposed findings of fact (¶ 25) and MCLM through its exhibit D7, a 2007 FCC order) cite to a former version of 47 C.F.R. § 80.475(a) as indicating that site-based AMTS applicants were required to serve a navigable inland waterway less than 150 miles long in its entirety; a navigable inland waterway more than 150 miles long with continuity of service along at least 60 percent of the waterway; and, along the Atlantic or Pacific Oceans or the Gulf of Mexico coastline, with continuity of service to a substantial navigational area.

Mobex Network Services, LLC was not a qualified bidder for Auction 57 as it did not submit the required deposit, and did not participate in the auction. (P296, Atts. A, C; T7 68:6-9 [Reardon].) Auction 57, which was completed on September 15, 2004 [*see* P297] pre-dated the formation of MCLM.

In response to the FCC's public notice regarding Auction 57, in a filing dated April 23, 2004, Mobex Communications requested that the start date be moved back by four months to permit potential bidders time "to understand the significant technical requirements of providing maritime service on a co-primary basis and to grasp the heavy presence of incumbents associated with this unique spectrum." (P388 at p. 1.) Paging Systems also responded to the public notice, submitting comments, in an FCC filing dated April 30, 2004, that supported Mobex Communications' position. (P389 at p.1.) In August 2004, Mobex Network Services sought to delay the auction and also to disqualify applications filed by two Havens-controlled entities. (*See* P118 ¶ 3; P119 ¶ 1; T2 44:8-45:1, T4 30:2-23 [Havens].) Just before the auction began, Paging Systems wrote to the FCC, supporting Mobex's requests. (P118 ¶ 4; T2 44:8-45:6 [Havens].) The auction proceeded on schedule, however, and was completed on September 15, 2004. (P119; P297 p.1; T4 30:2-11 [Havens].)

Paging Systems sought to have the FCC set aside the outcome of Auction 57, and permit Mobex Network Services to submit a short-form application and allow the other applicants to select additional markets. (*See* P118 ¶ 6; T2 44:8-11, 45:8-21, 46:18-47:6 [Havens].) This filing included a petition for reconsideration of the FCC's earlier decision not to preclude Havens's commonly-controlled entities from participating in the auction. (*See* P118 ¶ 7.) The FCC denied Paging Systems' request and declined to stay further post-auction processing. (P118.)

In Auction 61, the 2005 auction, MCLM placed the winning bid for four A-block geographic licenses, which covered the Mid-Atlantic, Mississippi River, Great Lakes, and Southern Pacific regions.  (P294, Att. A.)   MCLM held site-based licenses within regions for which it obtained geographic licenses. (T6 65:20-21 [S. DePriest]; T7 127:20-128:5 [Reardon].) Havens's AMTS Consortium and Intelligent Transportation & Monitoring Wireless placed the winning bids for five A-block licenses: Northern Atlantic, Southern Atlantic, Northern Pacific, Hawaii, and Alaska. (P294, Att. A.)  Paging Systems placed the winning bid for the remaining license involved in the auction, the B-block license for Hawaii.  (P294, Att. A.)  In sum, of the 20 geographic AMTS licenses available, entities controlled by Havens placed winning bids for 13 of them. (P294, Att. A; P297, Att. A; D100.)  MCLM placed four winning bids, PSI two, and Kurian one.  The geographic licenses acquired by Havens's companies encompassed areas where Paging Systems and Mobex Network Services, and later MCLM, owned site-based licenses.  (T2 102:11-15, 110:6-8, 113:5-11 [Havens].)

The transition from site-based to geographic licenses introduced the potential for conflict, because site-based licenses issued prior to the auctions of geographic licenses were permitted to continue in existence.   (T2 41:19-21 [Havens].)  Thus, geographic licensees took their licenses subject to site-based licensees' rights.  Stations operating under geographic licenses must provide a specified level of interference protection to stations operating under site-based licenses.  47 C.F.R. § 80.385(b)(1); *see also Second Memorandum Opinion and Order and Fifth Report and Order*, 17 F.C.C.R. 6685, 6686, 6699-6700 (2002) (adopting rule setting co-channel interference standard to protect incumbent, or site-based, license operations).   Both types of licensees are subject to construction and service and/or coverage requirements for the licenses to remain valid. *See, e.g.*, 47 C.F.R. §§ 1.946, 1.955, 80.49(a)(3); *see also* P378; P380 (FCC audit letters to

Mobex Network Services and Paging Systems citing 47 C.F.R. § 80.49).  Under 47 C.F.R.
§ 80.385(c), "[a]ny recovered frequency blocks will revert automatically to the holder of the
geographic area license within which such frequencies are included. Any frequency blocks
recovered where there is no geographic area licensee will be retained by the Commission for
future licensing."

The defendants have not provided Havens and/or plaintiffs with operating contours or
parameters for their stations: Paging Systems and Touch Tel asserting that no request had been
made by the FCC, and MCLM on the basis that plaintiffs had not provided information regarding
where they intended to build their systems.  (Cooper Dep. 139:23-141:5 (Paging Systems and
Touch Tel); T9 67:12-21, T7 198:1-199:14 [Reardon]; T6 92:10-23 [S. DePriest] (MCLM).)

None of the three plaintiffs that obtained geographic AMTS licenses has entered into site
leases in order to construct stations.  (T4 124:23-125:15 [Havens].)  For all of their licenses they
have "some antenna and some equipment" and "various plans." (T4 98:17-18 [Havens].)

## C. The Alleged Block-Splitting Agreement Between Regionet's Fred Daniel and Touch Tel's Robert Cooper

Well before the advent of geographic AMTS licenses and auctions, Fred Daniel founded
a company that ultimately became or transferred its AMTS licenses to Regionet.[15]  (T7 10:25-
11:17 [Reardon]; *see also* D103 n.10.)  Paul vander Heyden also later joined Regionet.  (Cooper
Dep. 187:9-11.)  At trial, Reardon described Daniel and vander Heyden as the "heads" of
Regionet Wireless License, LLC. (T7 10:18-19 [Reardon].)  Robert Cooper had long known

---

[15] As discussed below, Regionet was in fact two companies: Regionet Wireless License, LLC,
and Regionet Wireless Operations, LLC.  As the parties do, the Court uses the term "Regionet"
except where it is necessary to distinguish between the two entities.

Daniel. (Cooper Dep. 187:11.) Cooper testified, in response to the question of whether he had

"any agreement with Fred Daniel in connection with applying for AMTS licenses," as follows:

> No agreement. We did not know about AMTS until a conversation with Fred
> where he said I am going to apply for part 80 AMTS licenses similar to what they
> have in the central part of the United States out there. There's another block out
> there, and only Fred can say this the way I'm going to say this: And you can do
> that if you want, you can apply for the other one because I'm not going to. And
> that's the conversation we had. But it wasn't -- that was it.

(Cooper Dep. 194:5-17.) Daniel, Cooper continued, "said he was going to apply for a block of

AMTS stuff. There's another one out there if you have any interest in it." (Cooper Dep. 194:21-

23.) Daniel's company subsequently applied for A-block AMTS licenses, and Paging Systems

applied for B-block licenses. (Cooper Dep. 194:24-195:8.) Both companies were under the

impression that a licensee could not hold both A- and B-block licenses, and according to Cooper,

Daniel was interested in the A-block licenses because he perceived that the B-block had

interference issues. (Cooper Dep. 195:12-25.)[16] According to Cooper, Daniel's approach was

that he, Daniel, had "the good block, you stay away," and that he was "going to apply for the A

block because you're going to be right next to either Channel 13 or 220 two-way radio, and

you're going to have a lot of interference problems, but that's your problem." (Cooper Dep.

195:20-25.) Cooper further testified as follows regarding whether an agreement existed:

> Q     Did you have an agreement or did Touch Tel or PSI have an agreement
> with Fred Daniel or Paul [v]ander [H]eyden or Regionet or Mobex or MCLM
> whereby you and your interest on the one hand would only bid on B block
> licenses and the others would only bid on A block licenses?

---

[16] Plaintiffs characterize the cited portion of the Cooper deposition transcript as representing a
"lengthy objection from [Paging Systems'] lawyer." (Pls. FF ¶ 64 (citing Cooper Dep. 195:12-
196:3).) Review of the excerpt suggests that the attribution to the attorney is a transcription
error. The statements plaintiffs seek to attribute to counsel could not logically have been made
by him ("That turned out not to be correct, but I didn't know it for years." "I remember . . . the
gist of the conversation out there."), and the attorney's other objections during this portion of the
examination were brief, non-speaking objections.

. . . .

> [A]    No such -- no such agreement at all. And the only reason -- the only
> reason we were interested in B block is 'cause we worked the B block. We had
> no interest in the A block. B block is what we were on, that's what we knew, and
> that's how our systems worked out there.

(Cooper Dep. 198:14-19.)  Later, when asked if Susan Cooper was involved in the conversation

between Daniel and Robert Cooper earlier referenced, Robert Cooper explained that the Coopers

and the Daniels had lunch or dinner "one day very early in the game. And Fred [Daniel] is very

much into business mode, so a conversation ensued about what possibly AMTS after there was

equipment and after it was installed might look like."  (Cooper Dep. 208:22-209:2.)  Susan

Cooper did not participate in further conversations between Daniel and her husband on applying

for either block, as the Coopers "basically got the message that -- when Fred said, you know, I'm

applying for A; if you want to, you can apply for B. That was just about the gist of the

conversation. And I don't think there was any more to it than that."  (Cooper Dep. 209:3-11.)

This conversation took place more than 25 years ago.  (Cooper Dep. 209:19.)

In fact, in connection with a strategic opportunity, Paging Systems did apply for both A-

block and B-block licenses in the Great Lakes area.  (Cooper Dep. 197:23-198:1, 199:23-24.)

This prompted a dispute with Regionet, which had (unbeknownst to the Coopers) also applied

for both blocks, and the companies engaged lawyers to file protests.  (Cooper Dep. 199:11-

200:3.)  Ultimately, Regionet was awarded the A-block license, and Paging Systems got the B-

block license.  (Cooper Dep. 200:1-2.)

### D. Mobex Network Services' Acquisition of Regionet and Watercom Site-Based AMTS Licenses

In or about late 2000, Mobex Network Services purchased the membership interests of

Waterway Communications, or "Watercom." (T7 8:12-9:3 [Reardon].)  As part of that purchase

Mobex Network Services acquired AMTS licenses, a customer base, and physical assets, which included towers, transmitters, shelters, and the land beneath the towers. (T8 65:8-20 [Reardon].) It also acquired Watercom employees and leased Watercom's office space. (T8 65:21-24 [Reardon].) Watercom held A-block and B-block AMTS licenses along the Mississippi River and its tributaries and along the coast of the Gulf of Mexico. (T7 18:18-25; T8 61:23-62:6, 62:14-19 [Reardon].)

In making the Watercom acquisition, Mobex Network Services, through John Reardon and others, reviewed the company's employee handbook, met with employees and the head of human resources, determined that Watercom was not involved in outstanding litigation, examined the parent companies and the background of the Watercom LLCs, reviewed contracts, leases, and real estate information, and had Mobex's CFO look into salaries, payroll, and rents. (T7 26:2-27:2 [Reardon].) With respect to build-out of stations pursuant to the AMTS licenses, Reardon reviewed a 1987 FCC order that purportedly denied claims that construction had not been effectuated under Watercom's licenses. (T7 27:3-25 [Reardon].) Watercom's revenue stream also showed Reardon that it was a "thriving . . . business." (T7 28:1-3 [Reardon].) This information indicated to Reardon that Watercom had constructed stations under its AMTS licenses. (T7 28:4-7 [Reardon].)

In late 2000 or early 2001, Mobex Network Services also acquired licenses from Regionet, which was actually two companies: Regionet Wireless License, LLC, which held AMTS licenses, and Regionet Wireless Operations, LLC, which owned the equipment for the licenses. (T7 7:21-8:5, 10:15-21, 11:13-17 [Reardon].) Regionet held both A-block and B-block AMTS licenses. (T8 62:7-19 [Reardon].) Mobex Communications created a subsidiary that

18

purchased the membership interests in the Regionet LLCs, and ultimately those LLCs merged into Mobex Network Services. (T7 7:19-8:7 [Reardon].)

In conducting diligence with respect to Mobex Network Services' acquisition of Regionet's licenses, Reardon spoke to Gordon Day of Day Wireless – a company that had an agreement with one of the two Regionet companies to maintain its sites from approximately San Francisco to Seattle. (T7 30:24-31:6, 31:21-32:1 [Reardon].)  Reardon reviewed and renegotiated that agreement, visited the Regionet Wireless License office in Southern California and reviewed files, reviewed the state of licenses for the Great Lakes and Atlantic coast areas and noted that their construction deadlines had not passed yet, and examined customer lists and revenues. (T7 32:2-34:24, 35:19-21, 37:13-18 [Reardon].)

For purposes of maintaining and developing the AMTS licenses, Mobex Network Services employed Paul vander Heyden to be "the one in charge of completing [the] construction [under the licenses] in time."  (T7 37:18-21 [Reardon]; *see also* T7 10:8-9 [Reardon].)  Vander Heyden reported to the head of Mobex Network Services' engineering department and oversaw completion of construction on sites on the Atlantic coast, and was involved in construction on sites in the Great Lakes area.  (T7 12:2-21 [Reardon].)  Vander Heyden worked at Mobex Network Services through 2001.  (T8 19:4-5 [Reardon].)  While he was at Regionet, he had worked with Daniel.  (T7 11:18-23.)  To Reardon's recollection, Daniel never became an employee of Mobex Network Services, though he attended a meeting with the FCC in early December 2000 on behalf of Mobex Communications.  (T7 10:8-10 [Reardon]; D105 (Bates No. 0046614).)  This meeting may have pre-dated the closing of Regionet transaction with Mobex Network Services.  (T7 10:11-22 [Reardon].)

Watercom and Regionet were separate businesses, with separate shareholders, before they were purchased by Mobex Network Services. (T9 4:6-11 [Reardon]; *see also* T7 8:15-17 [Reardon] (Watercom was a subsidiary of American Barge Lines, which was owned by CSX and American Commercial Lines).)

After Mobex Network Services acquired Regionet's assets, Reardon and Touch Tel's Cooper met once or twice a year, sometimes at an industry conference in Las Vegas. (T8 15:14-22, 18:14-21 [Reardon].) Reardon does not recall ever meeting with Cooper at the same time as with vander Heyden. (T8 18:22-25 [Reardon].) In 2004, a company called Clarity General Partners became interested in investing in Mobex Network Services (a subject discussed *infra*), and Reardon asked Cooper to meet with Clarity representatives as part of their diligence on AMTS licenses. (T8 12:3-13:15 [Reardon].) According to Reardon, the Clarity investment would have been for a particular type of technology, and Paging Systems operated their AMTS frequencies on a different type of technology. (T8 13:16-15:9 [Reardon].) The Cooper-Clarity meeting was in conjunction with Clarity's exploration of "what technology should be deployed in the band." (T8 14:12 [Reardon].)

In 2004, the FCC sent Mobex Network Services audit letters on May 26th and September 13th about the status of construction for certain AMTS facilities licensed to Mobex. (P378; P382.) The FCC indicated that it was reviewing information in its licensing database pertaining to the construction status of licensed AMTS stations, and noted that under its regulations failure to construct stations within the required time period results in automatic cancellation of the station's license. (P378; P382.) The first letter stated that the FCC had no construction information for certain stations. (P378.) The second stated that Mobex had, for certain of its facilities, "provided estimated future dates for activation and/or to begin initial tests to

commence service, rather than notification that construction had been completed by a certain date." (P382.)  In both cases, the FCC wanted the actual construction completion date or an indication that the site had not been constructed for the call signs and locations at issue, which it listed. (P378; P382.)

Mobex Network Services, through counsel, responded with dates or indication that no construction was completed for each station the FCC asked about. (P379; P383.)  The FCC's audit letters did not encompass all of Mobex Network Services' AMTS station licenses. (T3 69:1-3, 16-17 [Havens].)  Paging Systems received the same letters, and in a similar way it responded to them. (P380 (first audit letter); P381 (response); P384 (second audit letter); P385 (response).)

Mobex Network Services' offerings ran on different technology than those of Paging Systems and Touch Tel. (T8 14:6-10, 66:19-67:10 [Reardon]; Cooper Dep. 190:12-21, 317:24-318:2.)

### E.  MCLM Acquisition of Mobex Network Services' Site-Based AMTS Licenses

Before MCLM purchased Mobex Network Services' assets in 2005, Clarity General Partners was planning to invest in the latter company to permit the building-out of infrastructure that would support a repurposing of the spectrum under Mobex's AMTS licenses. (T7 55:23-56:4; T8 70:13-71:4 [Reardon].)  The Clarity transaction required FCC approval for the transfer of control over the licenses, which was granted over Havens's opposition. (T7 56:7-8; T8 71:4-6 [Reardon].)  Havens continued to protest the transaction. (T7 56:8-11 [Reardon].)  In early 2005 Clarity decided not to proceed with its investment.  (T7 56:5-11, 87:1-2; T8 71:10-11 [Reardon].)  Havens cited Clarity's withdrawal from the proposed transaction as a reason why

Mobex Network Services was unable to post the funds required for it to qualify to bid in Auction 57. (T2 67:7-15 [Havens].)

Mobex Network Services' board decided to sell the company's assets and started marketing to prospective buyers in early 2005. (T7 87:1-6 [Reardon].) It approached three prospective buyers before meeting with Donald DePriest, whose wife, Sandra DePriest, formed MCLM. (T7 87:9-89:1 [Reardon].)

MCLM and Mobex Network Services signed an asset purchase agreement in May 2005. (P104.) MCLM's agents in negotiating the agreement were Ron Fancher, who conducted diligence, and Donald DePriest. (T6 13:12-14:1, 27:13-15, 44:6-11, 84:13-20 [S. DePriest]; T5 102:20-22 [D. DePriest]; T7 72:3-73:12 [Reardon].) The transaction closed in December 2005. (T6 17:15-17 [S. DePriest].) The FCC rejected Havens's challenges to Mobex Network Services' application to assign its AMTS licenses to MCLM. (D7.) MCLM paid less for the assets of Mobex Network Services than Mobex had paid when it bought Regionet and Watercom's assets. (T7 49:21-50:12, 51:22-24 [Reardon].)

Ron Fancher was MCLM's original choice to act as general manager of the company, and he held that position until he stepped down as a result of illness. (T6 18:9-19:2 [S. DePriest].) Reardon, who had expressed interest in joining MCLM but whose position was initially to be marketing-related, took over Fancher's role in January 2006. (T6 19:7-12 [S. DePriest].) After the asset purchase agreement was signed but before he joined MCLM, Reardon assisted MCLM as needed in preparing for the transfer of assets, and answered questions. (T6 14:2-23, 16:23-17:10 [S. DePriest].) MCLM also hired several other employees from Mobex Network Services, including a longtime engineer and a bookkeeper/office manager. (T7 13:19-15:21 [Reardon].)

22

## F. __MCLM as an AMTS Licensee__

Havens and his companies began litigating against MCLM from early in its existence, starting with a lawsuit filed in California state court in 2005, before the MCLM-Mobex Network Services transaction closed. (T7 62:11-14 [Reardon].)

As available technology changed and customer demand shifted – and in particular, as use of satellite and cellular technology expanded – MCLM sought to employ its licensed spectrum for more than maritime communications. (T7 60:23-61:3, 91:12-22 [Reardon].) This "re-purposing" effort took many forms, including pursuing transactions with a satellite provider and investigating use of the frequencies in Coast Guard systems, digital billboards, and a defense contractor's container-tracking system. (T7 61:4-62:1 [Reardon].)

In 2008, MCLM began trying to sell or lease its licensed spectrum, and hired a broker, Spectrum Bridge. (T7 62:15-22 [Reardon]; P102.) MCLM subsequently reached agreements with energy companies, utilities, the New Jersey Turnpike Authority, and railroads. (T6 40:18-41:3 [S. DePriest]; T7 62:22-63:7 [Reardon].) Reardon classified MCLM's transactions into three categories: transportation, including positive train control; utilities; and oil and gas energy. (T7 93:20-94:1 [Reardon].) Havens has formally opposed or objected to all of these transactions or proposed transactions, including one between MCLM and an energy company that has also purchased spectrum from Havens. (T9 10:15-18, 14:2-6 [Reardon]; *see also, e.g.*, T7 96:16-23 [Reardon] (company will buy channels from MCLM "if and when we can get clear of Mr. Havens' objection"; in the meantime the company has leased them).) As a consequence, the transactions MCLM entered into for sale or assignment of its spectrum are either pending approval by the FCC or have been cancelled as a result of delay or opposition. (T9 10:19-20:16 [Reardon].) Havens also opposed MCLM's leases. (T9 19:17-24 [Reardon].) Additionally,

Havens has made assertions about the validity of MCLM's licenses and about proceedings before the FCC and this Court to least one of MCLM's potential customers. (D48.) He also sought to have the same energy company referenced above that has bought spectrum from him maintain neutrality in proceedings before the FCC relating to MCLM's request to assign that company certain licenses, a request Havens opposed. (D44; T5 21:14-24:2 [Havens].)

On April 19, 2011, the FCC designated certain issues to be addressed in an administrative hearing against MCLM. (P357.) The agency's hearing designation order indicated that an administrative law judge would conduct a hearing to determine whether MCLM's licenses should be revoked and its pending license applications should be denied, as a result of certain representations made by MCLM in connection with its use of a bidding credit in Auction 61. (P357.) The hearing was also to address whether MCLM "constructed or operated any of its stations at variance with sections 1.955(a) and 80.49(a) of the Commission's rules," an issue the parties have dubbed "Issue G." (P357 ¶ 62(g).)

In connection with the hearing, MCLM and the FCC's Enforcement Bureau entered into several stipulations about Issue G. (P229; P397; P464.) In a joint stipulation with the Enforcement Bureau dated May 31, 2012, MCLM indicated that it had applied to cancel or modify a number of site-based authorizations, and that various listed site-based facilities had not operated, specifying when operations ceased. (P229.) In another joint stipulation, this one dated November 28, 2012, MCLM stipulated that it had not provided "AMTS service," as that term was defined in the stipulation, to specific site-based stations as of or between certain dates, and that a location under one site-based authorization should be treated as deleted. (P397.) The FCC ultimately did not accept a third stipulation [P464], dated December 2, 2013, which indicated that MCLM was filing applications to modify certain of its site-based authorizations to delete

24

certain locations or frequencies from them. *See In the Matter of Maritime Communications/Land Mobile, LLC*, 2014 WL 2767313, at *1, 18-20 (F.C.C. June 17, 2014). Some of the site-based licenses addressed in the stipulations are for locations where MCLM holds the geographic license. (T7 128:22-129:1 [Reardon].) The proceedings before the ALJ are still going on, as ALJ Sippel's June 2014 decision, issued after trial before the undersigned concluded, illustrates. *See In the Matter of Maritime Communications/Land Mobile, LLC*, 2014 WL 2767313; *see also* D.E. 287.

Back in August 2011, MCLM had filed a bankruptcy petition in the Northern District of Mississippi. (T5 75:11-15 [Havens]; T7 5:15-16 [Reardon].) In January 2013, the bankruptcy court entered an order confirming a plan of reorganization. (D15.)

Reardon, Sandra DePriest, and Donald DePriest have had minimal to no communication with anyone associated with Paging Systems or Touch Tel. (T8 18:14-19:21 [Reardon]; T6 111:5-22, 114:10-11 [S. DePriest]; T6 119:5-9, 119:23-120:4 [D. DePriest]; Cooper Dep. 230:11-16, 294:9-15.)

### G. Plaintiffs' Interest in AMTS Spectrum

Although AMTS was developed for ship-to-shore communication in the maritime context, it has expanded into land-based uses or potential uses. As explained above, MCLM has sought to put its licensed ATMS frequencies to such uses, and Havens testified that he and his companies aim to do the same. Plaintiffs' experts testified about two ways AMTS frequencies can be deployed: cooperative high-accuracy location monitoring, which would involve using spectrum in the AMTS range to run driver-assistance systems that permit car-to-car location communication to assist in crash avoidance [T1 67:25-68:19, 79:7-80:17 [Sengupta]], and positive train control, which Ronald Lindsey testified is an "enforcement system" that can be

used to avoid railroad accidents [T1 117:20-120:25, 127:5-21 [Lindsey]].[17]  MCLM does not

dispute that AMTS spectrum can, as a general matter, be used this way.

Havens wants to use AMTS frequencies in diverse fields that include "nationwide smart

transportation, smart energy grid systems, and environmental . . . monitoring protection," based

on the licensed spectrum's usefulness in location monitoring.  (T2 24:15-18 [Havens].)  To this

end, Havens testified about his companies' "core business plan" as follows:

> First of all, the high accuracy location is the primary means for enabling on the
> US highway systems, but also for agriculture, mining, forestry, and many other
> things.  People that are visually impaired, otherwise impaired to move around far
> more safely in urban areas and wherever.  If vehicles and people can know their
> location at all times and places within certain centimeters of accuracy -- very
> reliably, then as Dr. Sengupta testified it can cut out 70 percent or more of the
> accidents.  And [Sengupta] was being very brief, but for the same reasons that
> cars can avoid accidents they can be spaced across the highway lanes and up and
> down the highway lanes to cut out 70 percent or more of the congestion, which
> causes great delays in the urban areas, it's frustrating and loss of business time,
> loss of quality of pleasure time, loss of economic productivity.  Increase in fuel
> use, pollution health problems.  It is one of the biggest problems in the urban area.
> And it can be in large part . . . solved by ubiquitous high accuracy location
> delivered to everyone.

(T2 124:25-125:18 [Havens].)  Havens sees location monitoring – "know[ing] where things are

very precisely" and "tim[ing] them very precisely" – as "a fundamental way" to address

perceived deficiencies or limitations in "basic big infrastructure, transportation, energy systems,

and . . . the natural environment."  (T2 127:8-23 [Havens].)  He proposes to accomplish these

goals through his companies, "both in the public interests and because it is a very smart

commercial opportunity," by using AMTS spectrum to "deliver location corrections to make

infrastructure safe."  (T2 128:9-10, 16-18 [Havens].)  Skybridge, the plaintiff with non-profit

status under 26 U.S.C. § 501(c)(3) and which owns licenses or portions thereof donated to it by

---

[17] MCLM had or has a contract for use of the same technology pursuant to its licenses. (T7
92:11-13 [Reardon].)

26

the other plaintiffs, would provide the "high accuracy location signals and other related wireless" at no cost, similar to how GPS is available, while the LLC plaintiffs would both support that function and would charge for services running on the portion of the spectrum within those licenses that had not been donated to Skybridge. (T4 107:11-18 [Havens].) Skybridge owns portions of B-block geographic AMTS licenses in most, but not all, of the United States. (T3 7:1-10 [Havens]; D100.) Havens's companies own the majority, but not all, of the geographic licenses across the country. (*See* D100.)

## IV.   JURISDICTION

This Court has subject matter jurisdiction over plaintiffs' Sherman Act § 1 claim under 28 U.S.C. §§ 1331 and 1337.

## V.   DISCUSSION & ANALYSIS

### A.  <u>Elements of Sherman Act § 1 Claim</u>

The sole issue before the Court, all other claims having been dismissed, is whether plaintiffs have established that MCLM, with others, violated § 1 of the Sherman Act, which provides that "[e]very contract, combination in the form of trust of otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."   15 U.S.C. § 1.  As interpreted, § 1 bars contracts, combinations, and conspiracies that amount to unreasonable restraints of trade. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir. 2003).  Thus, there are two essential components of a § 1 claim: the existence of an agreement, which is the claim's "hallmark," and that the agreement imposes a restraint upon trade that is unreasonable. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999).

A four-part test is used to evaluate whether both components are present. Under it, plaintiffs must prove "'(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that [plaintiffs were] injured as a proximate result of the concerted action.'" *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)).[18]

For certain classes of concerted action, inquiry into their anti-competitive effects and impact on the market – whether they are "unreasonable" – is unnecessary. These agreements are "thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Eichorn v. AT&T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001)) ("The *per se* illegality rule applies when a business practice 'on its face, has no purpose except stifling competition.'"). Price-fixing and market allocation by horizontal competitors are examples of agreements held to a *per se* standard. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972) ("One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.").

---

[18] The Court uses the terms "concerted action," "agreement," and "conspiracy" interchangeably as indicating an arrangement within the scope of § 1's contract, combination, or conspiracy language. *See In re Baby Food*, 166 F.3d at 117 & n.3 (stating that liability must be based on "some form of 'concerted action,'" and noting that term "is often used as shorthand for any form of activity meeting the Section 1 contract, combination or conspiracy requirement") (internal quotation marks, citation, and alteration omitted).

Other types of concerted action that "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively" are subjected to additional inquiry: *e.g.*, as to the structure of the market in question, the market power of the defendants within the market, and, ultimately, anticompetitive effects, before a § 1 violation can be found. *Copperweld*, 467 U.S. at 768. This "rule of reason" standard is "a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice." *In re Baby Food*, 166 F.3d at 118.

Under either analysis, plaintiffs must prove the existence of concerted action. *Howard Hess*, 602 F.3d at 254 ("Section 1 claims are limited to combinations, contracts, and conspiracies, and thus always require the existence of an agreement."); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (given the concerted action requirement, "'crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express'") (alteration in original); *InterVest*, 340 F.3d at 159 ("Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation."). Indeed, it is a pillar of antitrust law that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

Concerted action is defined as a "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." *Burtch*, 662 F.3d at 221 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)) (internal quotation marks omitted). "[T]wo or more distinct entities [must] have agreed to take action against the plaintiff," and illustrating concerted action "requires proof of a causal relationship

between pressure from one conspirator and an anticompetitive decision of another conspirator." *Gordon*, 423 F.3d at 207. Plaintiffs' proofs "must include evidence tending to exclude the possibility of independent action." *Twombly*, 550 U.S. at 554 (citing *Monsanto*, 465 U.S. 752).

Ultimately, to succeed, plaintiffs must prove their case by a preponderance of the evidence, which requires them to persuade the Court that it is more likely than not that the defendants, or any subset of them, entered into a contract, combination, or conspiracy with one or more other entities. Much of the authority governing § 1 claims that has been cited to the Court and/or came up in the Court's own research has addressed motions to dismiss, when a plaintiff's factual allegations must be taken as true and reasonable inferences must be drawn in its favor, or motions for summary judgment, when facts are viewed in the light most favorable to the non-moving party, all reasonable inferences are drawn in that party's favor, and matters of credibility may not be resolved. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (dismissal standard); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (summary judgment standard). Here, the Court is squarely presented with the task of evaluating whether the quantity and character of the evidence plaintiffs *have actually adduced* demonstrates to the Court that concerted action was in fact taken.

Plaintiffs' proffered evidence of concerted action is that Cooper and Daniel reached a specific agreement; that their agreement traveled through time because it was carried out by various owners of AMTS licenses; and that conduct of these various owners of AMTS licenses circumstantially revealed the agreement through parallel instances of regulatory non-compliance, identical refusals to provide information to plaintiffs, and behavior that was economically irrational unless there was a conspiracy afoot. The Court addresses plaintiffs' proofs *seriatim*, beginning with the purported agreement between Cooper and Daniel.

## B. **Plaintiffs' Proofs at Trial**

### *1. Cooper-Daniel "Agreement"*

Plaintiffs claim that an agreement was reached during a conversation between Touch Tel's president, Robert Cooper, and Regionet's principal, Fred Daniel, to divide available AMTS licenses between their companies, under which Regionet would take A-block licenses and Paging Systems and Touch Tel would take B-block licenses. (*See* Pls.' CL ¶¶ 31-32.) Plaintiffs' evidence is Cooper's deposition testimony, described earlier, that in a conversation 25 years ago Daniel told him about AMTS licenses and said that he was pursuing only A-block licenses and Cooper could pursue B-block licenses if he wanted to.

But Daniel's statements, as relayed by Cooper, illustrate a course of action that Daniel and his company intended to take, which arguably warned Cooper off of pursuing the same course. But the contents of the statement fail to reflect a unity of purpose or meeting of minds to undertake an unlawful arrangement. *Burtch*, 662 F.3d at 221 (defining concerted action). The Third Circuit has held that "vague statements such as an admonition to competitors to 'play by the rules' do not constitute direct evidence of a conspiracy." *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 490 F. App'x 492, 497 (3d Cir. 2012) (non-precedential) (citing *InterVest*, 340 F.3d at 156 n.5).

Moreover, Cooper's testimony describes what Daniel said and not what Cooper said or did before or after Daniel's statement, thus failing to establish that Cooper *agreed* to proceed as Daniel proposed. Missing is the required "causal relationship between pressure from" Daniel and "an anticompetitive decision" by Cooper and Paging Systems or Touch Tel. *Gordon*, 423 F.3d at 207 (concerted action "requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator"). Although Cooper testified

31

that he and Susan Cooper "got the message," subsequently their companies proceeded to apply for A-block licenses in the Great Lakes region, directly contradicting the plan proposed by Daniel. (Cooper Dep. 209:7-11, 197:23-198:1.)  This was "gamesmanship," as Cooper testified (Cooper Dep. 200:2-3), and prompted Daniel, whose company had before that applied for both A- and B-block licenses in the Great Lakes, to tell Cooper that "you guys can basically screw off" (*id.* 199:11-19).  Paging Systems ended up applying for both blocks, and protests ensued, with both sides lawyering up. (Cooper Dep. 199:23-200:2.)

Plaintiffs rely on *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979), a criminal case, as illustrating that a conspiracy can be found even in the absence of explicit agreement by a co-conspirator. (Pls.' CL ¶ 76.)  In *Foley*, the president of a realty company announced at a dinner party attended by other realtors and realty company representatives that his company was raising its commission rate from six to seven percent.  598 F.2d at 1327.  Thereafter, the attendees discussed the rate change, and in the subsequent months, "each of the corporate defendants substantially adopted a seven percent commission rate."  *Id.*  Six companies and three realtors were indicted and convicted under § 1 for conspiring to fix commissions. *Id.* at 1326, 1327.

One of the issues on appeal was whether there was sufficient evidence presented to allow a jury to find that a conspiracy existed. The Fourth Circuit affirmed, relying on the principle that "'[a]cceptance by competitors of an invitation to participate in a plan, the necessary consequence of which, if carried out, is a restraint of commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act, where each competitor knew that cooperation was essential to successful operation of the plan.'" *Id.* at 1331 (citation omitted).  The government's evidence showed that before the dinner party, several firms had contemplated a rate increase but chose not to implement it out of concern that they would be unable to compete with firms using the lower

rate; "[i]t was in this general climate of concern about competitive constraints" that the dinner party was held. *Id.* at 1331-32. There was evidence that following the host's announcement, the other attendees "expressed an intention or gave the impression that his firm would adopt a similar change." *Id.* at 1332. Further, based on the attendees' discussion of an earlier failed rate increase by one company, the jury could "conclude that defendants knew that their cooperation was essential." *Id.* at 1332. In the months after the dinner party, the companies raised their rates and took steps to "hold their fellows to the 'agreement.'" *Id.* at 1332-34.

Plaintiffs' proofs in support of their "agreement" theory differ in a critical respect: Regionet's and Paging Systems/Touch Tel's course of action following Daniel's statements shows that there was no "acceptance by [a] competitor[] of an invitation to participate in a plan." Whereas in *Foley* the realty companies did raise their rates, a step *consistent* with an agreement having been made at the dinner party, Paging Systems acted *contrary* to the alleged agreement by seeking A-block licenses in the Great Lakes region – where Regionet had also sought A-block licenses. Moreover, Cooper testified that he did not know about AMTS licenses until Daniel told him about them; there was no competitive concern being allayed by Daniel's statement that he would seek A-block licenses such that Paging Systems and Touch Tel were freed up to pursue a course they had previously held back on pursuing.

In their proposed findings of fact, plaintiffs mention in passing that Havens was told by Regionet's Daniel and vander Heyden that Regionet held an option to purchase Paging Systems' licenses. (Pls.' FF ¶ 71.) While presumably meant to reinforce the argument that Cooper and Daniel reached an agreement, when considered in context this evidence is at most ambiguous on that point, but it does offer insight about the dynamics of this field. Havens testified that, in 2000, he met with Daniel and vander Heyden of Regionet, which owned site-based licenses, to

33

explain that he planned to apply for geographic licenses in the anticipated FCC auctions and that, to avoid interference, he "wanted enough details about their site-based stations so our engineering could stay clear." (T4 9:3-4, 11:8-17, 13:5-12 [Havens].) Havens also testified that he applied for site-based licenses on certain inland waterways, had studied up on Daniel's unsuccessful applications for similar licenses, and "told them [he] had done a lot of research in [navigable] waterways and read all the books and hired engineers and we wanted to do it right." (T4 12:14-13:8 [Havens].)

Havens later explained the lead-up to this exchange: he had asked whether Daniel and vander Heyden would sell the company, as "they were raising more funds and they had already sold a small percentage and raised the money. They wanted to raise more money to try to expand, and so forth." (T4 18:12-16 [Havens].) At the meeting, Havens was told that Regionet did not want to sell the company or a controlling interest, and Havens responded that he was not interested in a minority share. (T4 18:17-20 [Havens].) At that point Havens said the Regionet people told him that they had "an option or a right of first refusal on . . . Cooper's B block AMTS stations and licenses." (T4 18:21-19:1 [Havens].) Then Havens laid out his plans and asked for the station details, and Regionet's representatives said that if Havens applied for licenses in areas where Regionet had unsuccessfully sought them and appealed, they might challenge him. (T4 19:1-9, 23:18-25 [Havens].)

Havens also discussed his plans with Cooper, who "didn't confirm or deny" if Regionet had an option or right of first refusal for Paging Systems' licenses. (T4 25:1-6 [Havens].)[19] Cooper also allegedly told Havens – who testified at trial that he wanted to avoid wasting time

---

[19] In a designated, but uncited, exchange found in Cooper's deposition transcript, Cooper states that there was no such option. (Cooper Dep. 184:25-185:18, 186:22-187:3.)

34

and expense preparing license applications if Cooper was going to object to them – that, with respect to interference issues, if he provided engineering "showing [he] was protecting some reasonable contour," Cooper may not object.  (T4 25:7-24 [Havens].)  After Havens prepared his applications, he called Cooper again to see if he would object.  Havens described the response as follows:

> So when I called him the second time, he told me that I don't want to agree with anything you're doing to apply for AMTS licenses because there is some big nationwide company coming to meet me and to meet Regionet to buy all of the A and B block licenses.  And if I were to agree that you can apply for any AMTS spectrum, then it could diminish the value of their deal.

(T4 25:25-26:6 [Havens].)

Havens's testimony, then, shows that he approached a company (Regionet), said he wanted to buy it or at least purchase a controlling interest in it, rejected the proposition of taking a minority interest, and informed its representatives that, equipped with an understanding of why that company failed to obtain certain licenses it applied for, he would be applying for licenses that would encircle their sites and he wanted information about their stations so his operations wouldn't interfere with its operations.  Havens provides no corroboration, whether documentary or testimonial, for the Regionet representatives' alleged statement that an option agreement existed, but even assuming the statement was made it is unexceptional conduct for the company to push back, and asserting that it had contingent interests in additional licenses credibly could have been a tactical effort to ward off a competitor.  Plaintiffs do not provide any reason to construe this alleged statement as more than unilateral puffery by Regionet, which, of course, is free to decide on its own with whom it will deal.  *See Monsanto*, 465 U.S. at 761.  Cooper's not "confirm[ing] or deny[ing]" the existence of an option agreement and statements about not

adversely affecting a purported deal by working with Havens do not tip the scales in favor of the agreement's supposed existence.

In sum, the early conversation between Daniel and Cooper does not amount to direct evidence of a market-allocation agreement between Regionet and Paging Systems and/or Touch Tel, and the alleged option agreement testified to by Havens does not render the conversation any less ambiguous.

### 2. *Continuation of the "Agreement"*

Regionet is not a defendant in this action. Plaintiffs' case against MCLM (as well as against the Mobex defendants), depends on the Daniel-inspired "agreement" migrating from Regionet to the company that purchased its AMTS licenses (Mobex Network Services) and then, after that, to the company that purchased the licenses from Mobex (MCLM). Plaintiffs contend that this continuum was effectuated through employees that moved, along with the licenses, from Regionet to Mobex Network Services to MCLM. (Cooper, at Touch Tel, held the same position throughout the relevant period.)

More particularly, plaintiffs contend that when Regionet sold its licenses to Mobex Network Services, Regionet's Daniel and vander Heyden also went to Mobex, where they had the opportunity to continue the conspiracy. (Pls.' FF ¶¶ 67-73; Pls.' CL ¶¶ 31-32.) Circumstantial proof, according to plaintiffs, is that Daniel and vander Heyden worked with Reardon, which gave them the opportunity to bring him, and through him Mobex and later MCLM, into the agreement. Beyond this proximity, plaintiffs point to meetings between Reardon and Cooper during which the agreement could be discussed. (Pls.' CL ¶ 32.) This is all speculative: aside from the absence of documents or testimony from any witness that the proximity and meetings yielded conversations about an agreement to work together to stifle

competition from others, it is not clear that Daniel ever worked at Mobex Network Services. Reardon testified that he did not [T7 10:9-10 [Reardon]], and plaintiffs' only evidence refuting this is a letter [D105] summarizing an FCC meeting in which Reardon stated that Daniel attended a meeting on behalf of Mobex Communications; the meeting, however, coincides with the time frame when Mobex was buying Regionet's assets, which is an equally plausible explanation for Daniel's presence. (*See* T7 10:11-22 [Reardon].)

Further, vander Heyden, an engineer, was hired by Mobex Network Services for the specific purpose of completing construction of stations within upcoming deadlines. (T7 12:2-21 [Reardon].)  Despite plaintiffs' characterization of him during trial as a "senior authority" at Mobex Network Services [T7 11:24-12:1] and their assertion that he and Reardon "worked closely together" [Pls.' FF ¶ 72], plaintiffs failed to show that vander Heyden had a say in managerial matters or that he had any meaningful opportunity to interact with Reardon. Reardon's testimony, instead, was that vander Heyden reported to the head of engineering while at Mobex Network Services, and that he left the company in approximately late 2001.  (T7 12:16-21 [Reardon].)  Even assuming that both Daniel and vander Heyden worked directly with Reardon, "[p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 894 (3d Cir. 1981).  Plaintiffs show only opportunity for, not the existence of an unlawful agreement, and so their claim that the Daniel-instigated "agreement" continued into the next generation of spectrum ownership is speculative.

As support that the agreement survived through the years so that ultimately it included MCLM, plaintiffs point to Reardon, who was hired by MCLM after the Mobex Network Services-MCLM transaction closed.  (Pls.' FF ¶¶ 68-69, 73.)  Reardon testified that he had little

communication with Cooper over the years, occasionally meeting him at trade shows [T8 15:14-22, 18:14-21].   Plaintiffs did not present evidence that these Reardon/Cooper meetings had anything to do with AMTS licenses, and, again, opportunity to conspire is an insufficient basis for inferring the existence of a conspiracy.  *Tose*, 648 F.2d at 894. Plaintiffs' theory gets some support through the meeting Reardon arranged between Cooper and Clarity Partners in 2005 in connection with Clarity's diligence efforts on the investment in Mobex Network Services it was considering.  (*See* Pls.' FF ¶ 73; T8 12:1-13:15 [Reardon].) But it is not clear that Reardon even attended that meeting, and in any event he provided the explanation that Clarity was interested in learning about the different technology Paging Systems deployed for its AMTS spectrum, which plaintiffs did not refute.  (T8 13:16-15:9 [Reardon].)   Critically, plaintiffs point to nothing supporting a conclusion that any meetings between Reardon or anyone else at Mobex or MCLM and Cooper had anything to do with AMTS licenses.

Further, the DePriests testified that they had no communication with Cooper or anyone else from Paging Systems or Touch Tel.  Sandra DePriest testified that she had no discussions or communications with anyone from Paging Systems or Touch Tel before or after the asset purchase agreement was signed, and that MCLM had no agreements of any kind with either company.  (T6 111:5-22 [S. DePriest]; *see also id.* 114:9-11 (stating that she "had not even heard of [Paging Systems] prior to this litigation").)   Donald DePriest concurred on all points.  (T6 119:5-9, 119:23-120:4 [D. DePriest].)   Likewise, Cooper testified that "we had de minimis relationships with MCLM. We had no business dealings with them.  We had met the people a few times." (Cooper Dep. 230:11-16.) Cooper further testified as follows:

Q    At any of these stations where PSI had no -- PSI and/or Touch Tel had no paying customers, was there colocation with Mobex or MCLM?
. . . .

38

A     I have very limited information on these people.  We say hello and that's
it.

(Cooper Dep. 294:9-15.)  This does not support a conclusion that an agreement of any

sort made its way to MCLM.

Plaintiffs have hinted at, though not developed, an argument that the alleged conspiracy

traveled to Mobex Network Services and MCLM as successors in interest to Regionet.  (*See, e.g.*,

Pls.' FF ¶¶ 13, 74; Pls.' CL ¶¶ 46-47; *see also* Pls.' Supp. FF/CL ¶ 19.)  The evidence, however,

indicates arms-length dealings.   (T7 26:2-28:7 [Reardon] (testifying about diligence in

conjunction with Watercom acquisition); T7 30:24-31:6, 31:21-34:24, 35:19-21, 37:13-18

[Reardon] (Regionet diligence); P104 (MCLM-Mobex asset purchase agreement).)   Moreover

the record shows random rather than planned events led to the emergence of MCLM as a

licensee:  MCLM was a fallback option for Mobex Network Services after the Clarity transaction

fell apart amid Havens's protests, and it was not the only prospective buyer of Mobex's licenses.

(T7 56:5-11, 87:1-3, 87:9-89:1 [Reardon].)  Reardon stepped into a managerial role only when

MCLM's original choice, Ron Fancher, became ill.  (T6 18:9-19:12 [S. DePriest].)  Further, the

transaction price must be viewed in the context of the testimony about changes in technology and

customer demand.  (*See, e.g.*, T7 60:23-61:3, 91:12-22 [Reardon].)

### 3.  *Other Circumstantial Evidence: Conscious Parallelism*

Plaintiffs also argue circumstantial evidence in the form of various "plus" factors proves

that an agreement in violation of § 1 was in place.   (Pls.' CL ¶¶ 14-15.)   Their position

approximates a conscious parallelism argument; that is, that the defendants' parallel conduct

permits an inference that they conspired with each other. (*See* Pls.' CL ¶¶ 14-21.)  *See also In re*

*Baby Food*, 166 F.3d at 121 (explaining conscious parallelism theory in price-fixing context).

Because "conduct as consistent with permissible competition as with illegal conspiracy does not,

standing alone, support an inference of antitrust conspiracy," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (citing *Monsanto*, 465 U.S. at 764), parallel conduct supports a finding of concerted action only when "'placed in a context that raises a suggestion of a preceding agreement." *Burtch*, 662 F.3d at 228 (quoting *Twombly*, 550 U.S. at 557). Proceeding on this theory requires plaintiffs not merely to show that the defendants' behavior was parallel, but also that they "were conscious of each other's conduct and that this awareness was an element in their decision-making processes," and that "certain 'plus' factors" accompanied the conduct. *Petruzzi's*, 998 F.2d at 1242-43. Qualifying "plus" factors include "actions contrary to the defendants' economic interests," "a motivation to enter into such an agreement," and "evidence implying a traditional conspiracy." *Id.* at 1242, 1244.

Plaintiffs' evidence of parallel conduct falls into several broad categories: defendants' failure or refusal to provide information about their operating parameters, or "contour" information [Pls.' FF ¶¶ 59, 148, 151]; defendants' non-construction and/or non-operation of licensed sites and stations [*id.* ¶¶ 60, 75, 78a,[20] 108-09, 111, 118, 124]; choices with respect to the auctions consistent with the alleged agreement to divide the blocks among themselves [*id.* ¶ 81]; and silence in the face of opportunities to potentially invalidate each other's licenses [*id.* ¶¶ 96, 97, 101, 132]. Plaintiffs also contend that Paging Systems, Mobex Network Services, and MCLM took other assorted actions not in their respective economic interests unless there was a conspiracy.

### a. <u>Operating Contours</u>

First, plaintiffs point to defendants' failure to provide information about their stations' operating parameters. (*See, e.g.*, Pls.' FF ¶¶ 59, 78, 148, 151.) They argue that an agreement

---

[20] Paragraph 78a indicates the second paragraph bearing number 78.

40

must have existed because the defendants all took the stance that plaintiffs first had to provide a detailed station construction proposal, even though it would be in their respective interests to cooperate with plaintiffs to avoid interference issues. (*Id.* ¶¶ 61, 149-52.) In making this argument, plaintiffs offer as factual support an extensive discussion, interpretation, and application of FCC regulations pertaining to non-interference between site-based and geographic licensees. (*See, e.g., id.* ¶¶ 53-61, 150; *see also* Pls.' Supp. FF/CL ¶¶ 47-54, 58.)

Even if the defendants, or any of them, failed to comply with these FCC regulations, this is only relevant to the extent it supports a finding of concerted action. As an initial matter, the evidence is equivocal on whether defendants took identical positions; *i.e.*, that the conduct was parallel. Havens testified that in a 2002 telephone conversation with Cooper about Havens's plans to apply for site-based licenses Cooper said he would consider providing contour information if Havens provided engineering showing that he was "protecting some reasonable contour." (T4 24:2-5, 25:1-16 [Havens].) However, Cooper testified that Paging Systems would only provide contour information if it was requested by the FCC. (Cooper Dep. 139:23-141:5, 142:1-15.) Reardon and Sandra DePriest, on the other hand, testified that they expected to be presented with proposed build-out information before disclosing to plaintiffs the information they sought. (T9 67:12-21, T7 198:1-199:14 [Reardon]; T6 92:10-23 [S. DePriest].) Further, there is no evidence that in declining, Paging Systems on the one hand, and Mobex and later MCLM on the other, were aware of each other's decision to withhold contour information, much less that such awareness factored into their own dealings with plaintiffs.

Further, plaintiffs have suggested that it would be in defendants' interests to avoid interference on their systems (if they were operating) by providing contour information and so their refusals signified an agreement *not to* provide it. (*See, e.g.*, Pls.' FF ¶¶ 61, 149.) But

41

plaintiffs ignore the reality – which Havens testified about – that the interests of site-based and

geographic licenses are not necessarily aligned in that the rights of each to operate are

circumscribed by the other's. Plaintiffs themselves point out this inherent conflict, noting that

the regulations aim to protect site-based licensees from interference from geographic licensees'

operations, and that the site-based licensee cannot expand its operations once the geographic

license is issued [Pls.' FF ¶¶ 53-54]. As such, it is not always in the site-based licensee's

economic interest to furnish information to its competitor. This is particularly so here, where

Havens admitted that his companies have not signed leases for purposes of constructing stations,

and that in spite of the number of licenses plaintiffs have obtained, all they have to show by way

of operations is "some antenna and some equipment" and "various plans." (T4 124:23-125:15,

98:17-18 [Havens].) In other words, plaintiffs have not shown that the defendants would have

had more than an academic interest in avoiding interference, which is the reason they would be

providing their contour information. At the same time, plaintiffs have not shown *their* interest in

defendants' contour information was related to anything other than serving their own future

business interests. Under the circumstances, then, the defendants were presented with a choice

between avoiding abstract conceptual interference, or providing potentially sensitive information

to its competitors – in MCLM's case, to competitors (the plaintiffs) that began suing MCLM

from its inception.[21] Plaintiffs' evidence does not tend to exclude the possibility that each

---

[21] Reardon described MCLM's dilemma thus:

> Q. And, Mr. Reardon, why would you not want to give plaintiffs the most
> accurate, detailed and thorough information concerning your site-based stations,
> in order to avoid the very interference that you said you don't want to have
> happen?

> A. Well, that is sort of asking a conclusion or asking for an opinion that I
> didn't express. As I have said earlier, quite to the contrary. If and when this
> extremely litigious person actually is going to build a site and comes with a--

defendant opted to risk the former – independently of decisions by the other defendants to do the same. Plaintiffs urge an inference that their evidence does not support. "[N]o conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons." *In re Baby Food*, 166 F.3d at 122.

### b. Plaintiffs' "Warehousing" Theory

Next, plaintiffs contend that evidence of conspiracy is found in the defendants' failure to construct and operate stations as FCC regulations require, false statements in renewing their licenses, and failure to retain documentation regarding station construction. (Pls.' FF ¶¶ 109, 111-16, 118, 127-28). They argue that this course of action demonstrates a conspiracy among them existed because vigorous competitors would have seized on each other's deficiencies as an opportunity to knock a counterpart out of the market. (Pls.' FF ¶ 103; Pls.' CL ¶ 23; T3 109:10-110:10, 111:14-20, 119:11-121:14 [Havens].) Plaintiffs posit the defendants had an understanding sealed by the threat of "mutually assured destruction": neither would report the

---

within 120 kilometers of an existing site and says, I would hope to be at this location with this type of equipment, how do we avoid interference? Then I have instructed our attorneys to very clearly make sure that we avoid the interference, because we are liable if one of our users gets interfered with.

But this is somebody again who is very litigious. And . . . we also need to make sure that information which could be used by quote unquote "bad guys" doesn't get out in the public domain.

So we're also a little sensitive about the fact that the users of the systems are utilities, railroads for public safety, pipelines, state troopers, security folks.

Q.     Why would you then not want to be absolutely sure that there was no interference with these very important public functions?

A.     Well we do want to make sure there's no interference. As Mr. Havens testified himself, sir, he's never built anything. He's not even come close.

(T9 87:18-89:1 [Reardon].)

43

other(s) to the FCC because that would prompt the targeted entity to retaliate against the reporting one. (*See, e.g.*, Pls.' CL ¶¶ 22, 39; Pls.' Supp. FF/CL ¶ 4.)

It is questionable whether and how much Paging Systems and Mobex Network Services (and later MCLM) knew about the construction and operational status of each other's stations. Plaintiffs' proofs are only the weak inference they draw that the defendants had to have known, because the information is publicly available [T3 111:21-112:1 [Havens]], and also because none of them would risk violating the FCC rules unless others too were violating them.[22] Further, plaintiffs suggest that Cooper "knew that Mobex/MCLM had a business model of not putting radios in and keeping them working but just investing in licenses with 'de minimis' customers." (Pls.' FF ¶ 109.) But this is twisting what Cooper said when he was questioned about whether Paging Systems and Touch Tel were "competitors" of Mobex or MCLM. (Cooper Dep. 225:22-226:17.)   He was drawing distinctions between the companies' business models and philosophies, not indicating knowledge about whether Mobex Network Services or MCLM were non-compliant.   Moreover, when he was asked directly whether Touch Tel ever found out that Mobex Network Services had not constructed stations as represented, Cooper replied that it hadn't.  (Cooper Dep. 230:8-231:1.)

The weakness of plaintiffs' position is compounded by the ambiguous nature of evidence they rely on as "plus" factors, which focuses on so-called parallel efforts by the defendants to

---

[22]   At pre-trial stages and at trial, plaintiffs also argued that co-location of stations by the defendants compels the conclusion that they must have known about each other's non-compliance.  Plaintiffs appear to have dropped that argument, as the only mention of it in their proposed findings of fact and conclusions of law is that MCLM's submissions "merely focus[ed] [on] co-location matters which are a tiny portion of the much larger whole." (Pls.' Supp. FF/CL ¶ 35.)  In any event, even if the Court assumes knowledge, as explained below plaintiffs' evidence is insufficient to prove that any non-reporting decision was more likely the product of a conspiracy than of an independent business decision.

"hide" their regulatory non-compliance. Plaintiffs characterize as suspicious certain notices regarding construction in advance of their respective construction deadlines that Paging Systems and Mobex Network Services independently submitted to the FCC, describing the text as "strangely worded." (Pls.' FF ¶ 108.) They claim that it "strains credibility" to think that the companies "independently hit upon the same strategy to fool the FCC into thinking the construction deadlines were met." (Pls.' FF ¶ 109; see also id. ¶ 124; and FF ¶ 111 (similar filing of "false" renewal applications).) This theory itself strains credibility because it invents a narrative about the individual defendants' ups and downs in the FCC without proof that there is a connection between and among them. Plaintiffs theorize there was "a strategy to fool the FCC." Plaintiffs then assume the FCC was fooled. And out of these theories and assumptions plaintiffs ask the Court to find concerted action. It is just as plausible that if each company had not met a construction or a coverage requirement, it would take steps to preserve the license in question regardless of what any other companies were doing.

The same applies to the 2004 pre-auction comments of Mobex and Paging System requesting to stay the auction and asserting that there is heavy incumbency to be considered by potential bidders. Such statements and efforts are attributable to business reasons having nothing to do with a conspiracy between them to hide non-compliance, including an interest in resisting newcomers. See Twombly, 550 U.S. at 566 (noting that "resisting competition is routine market conduct").

Plaintiffs' theory also assumes that, if the defendants were really competing with each other, they would have had the motive to knock each other out of the market by reporting each other to the FCC. Tolerating each other's participation in the market, plaintiffs theorize, shows that the defendants were engaged in a scheme to amass and control spectrum. But this ignores an

45

obvious alternative explanation: each defendant didn't necessarily want what the other one had. Companies do not expand indefinitely, *Twombly*, 550 U.S. at 569. And all plaintiffs have relied on are defendants' general statements about expanding and having a robust presence in the market. (Pls.' FF ¶ 132 (citing T3 115:1-117:22 [Havens]; P388; P389; P102).)

In fashioning their warehousing arguments, plaintiffs have discussed at length FCC regulations pertaining to construction, coverage, and operational requirements, and positions taken and arguments made by the defendants before the FCC. (*See, e.g.*, *id.* ¶¶ 22-31; Pls.' Supp. FF/CL ¶ 20.) Using this body of material plaintiffs argue that the defendants' licenses were actually invalid and that these licenses automatically terminated for failure to comply with the regulations. Plaintiffs then contend that the defendants' various "false" filings resulted in limiting plaintiffs' rights under their geographic licenses. (*See, e.g.*, Pls.' FF ¶¶ 60, 130.) Again, this is the plaintiffs' *narrative* arising out of their interpretation of FCC regulations, and their conclusion that the defendants were non-compliant and must be engaged in a conspiracy to keep plaintiffs out. This is hardly "evidence"; without offering any event or document or witness that would put legs under their "ipso facto" argument, plaintiffs are seeking to bundle up how the defendants are faring before the FCC into proof of a combination among them to fool the FCC (or the market place) into limiting their acquisition of spectrum.

### c. **Strategy In Auctions**

Plaintiffs contend that Paging Systems, Mobex Network Services, and MCLM approached bidding in the FCC geographic license auctions in a manner consistent with an agreement to divide the licenses between themselves. (Pls.' FF ¶¶ 52, 81; Pls.' Supp. FF/CL ¶¶ 6-13.) According to plaintiffs, entities interested in or preparing to bid in the auctions would incur no cost and no risk by indicating in pre-auction filings an intent to bid on *all* licenses

available. Therefore, they continue, indicating an intent to bid – or actually bidding – only on A-block licenses in Mobex's case and only on B-block licenses in Paging Systems' case reveals that these defendants were sticking to the original plan to divide the licenses. (*See, e.g.*, Pls.' FF ¶ 52; Pls.' Supp. FF/CL ¶¶ 7-11.)   Plaintiffs posit that "[t]here is no question that [Paging Systems] and Mobex/MCLM, had they been acting independently in pursuit of their own best economic interests, would have sought more spectrum and would have applied to bid much more aggressively." (Pls.' Supp. FF/CL ¶ 13.)

But this is pure speculation on plaintiffs' part.   Viewed in the context of Mobex's liquidity problems, which Havens himself acknowledged, its divestiture of nearly all of its affiliated companies, and the loss of Clarity as an investor, it is equally likely that Mobex's proposed bidding strategy (which never came to fruition, as it ultimately did not submit the deposit required for it to attain qualified bidder status) arose out of its own business reasons as that it reflects a conspiracy between Mobex and Paging Systems not to seek the other's licenses. *See In re Baby Food*, 166 F.3d at 127 ("The evidence reflects . . . strategic planning as to whether and when to pursue particular business opportunities. We are unwilling to question such business judgment."). Likewise, Cooper testified that "the only reason we [Paging Systems and Touch Tel] were interested in B block is 'cause we worked the B block.   We had no interest in the A block.   B block is what we were on, that's what we knew, and that's how our systems worked out there." (Cooper Dep. 198:14-19.)   It is unexceptional that Paging Systems would stick to B-block licenses when opportunities to obtain geographical licenses arose.

Second, and relatedly, plaintiffs point to actual bidding in the auctions as consistent with the purported market-allocation scheme, stating that "neither Defendant ever sought to bid for licenses in the same Block and region where the other Defendant owned site-based licenses."

(Pls.' FF ¶ 52; see also id. ¶ 81; Pls.' CL ¶ 23.)  Plaintiffs ignore that it makes sense from a business standpoint for site-based licensees to seek geographic licenses encompassing the regions in which the site-based licenses are located.  (See MCLM Supp. FF/CL ¶ 15.)  As MCLM explains, "purchasing the [g]eographic [l]icense blanketing MCLM's incumbent stations is good business sense from MCLM's perspective to prevent interference on its existing operating systems and expand coverage of those systems (not to mention avoiding conflicts before the FCC like those with Plaintiffs)."  (Id. (citing T6 22:2-9, 51:13-15 [S. DePriest]).)

Plaintiffs also contend that the defendants' decision not to bid more aggressively indicates that they were constrained by an agreement.  The theory goes that because spectrum is finite and valuable and the companies wanted to expand, it would only make sense for them to try to obtain more, and so, equipped with the knowledge that each other's site-based licenses would "revert automatically" to the geographic licensee in that area, they could be expected to bid for such licenses both to expand their respective footprints and to limit the others' expansion. (Pls.' Supp. FF/CL ¶ 13; Pls.' FF ¶ 84.)  But constraints on bidding outside of areas where the defendants already operated can be explained by the simple consideration of resources, something plaintiffs have not addressed.  There is unrefuted evidence in the record that Mobex had financial problems, and with no evidence beyond a purported general expansion interest on the part of Paging Systems and MCLM, the Court cannot conclude that it is more likely than not that they were constrained by anything other than their own respective business strategies.

In sum, the relative bidding postures of the defendants are as easily (or more) explained by business logic.  And again, this conduct is being offered as illustrating conduct consistent with a conversation decades before between two individuals, one of whom never participated in the bidding process.

### d. **Silence**

Plaintiffs' proof based on "silence" works this way. A defendant ("defendant A") would be expected to challenge the conduct of another defendant ("defendant B") if the companies were truly competing against each other. Plaintiffs conclude from defendant A's failure to mount such a challenge that the only explanation is a conspiracy between defendants A and B. In every instance, however, what is missing is evidence that defendant A *knew* about defendant B's conduct, or evidence tending to show that defendant A's decision was not the product of an independently-motivated decision made with its own interests in mind.

To understand the first of plaintiffs' arguments on why silence is evidence of conspiracy requires an appreciation of a concept called the *Second Thursday* doctrine. According to the parties, the doctrine permits the sale or transfer of licenses owned by licensees involved in a bankruptcy proceeding for the benefit of innocent creditors. (T6 76:5-11 [S. DePriest].) It is an exception to the general rule that licenses cannot be transferred when involved in a hearing regarding the licensee's character qualifications. (D.E. 274 [MCLM *Second Thursday* Trial Brief] at p.1; see also D.E. 275-1 [Pls.' *Second Thursday* Trial Brief] at p.2.) In its bankruptcy case, MCLM invoked the doctrine in proposing to transfer its AMTS licenses to another entity under its plan of reorganization. (*See* D.E. 274 at p.1; *see also* T7 133:19-23 [Reardon].) Plaintiffs suggest that MCLM had improper motives in using the *Second Thursday* mechanism, and that Paging Systems' silence in this is inexplicable unless it had an agreement with MCLM because Paging Systems "would benefit from invalidation of MCLM's licenses, making those regions available for acquisition by [Paging Systems] in future auctions, and both [Paging Systems] and Mobex/MCLM have long held themselves out as intending to expand and be the dominant players in AMTS." (Pls.' FF ¶ 132; *see also* Pls.' CL ¶ 30.) Plaintiffs have not

pointed to evidence indicating why Paging Systems would be aware that MCLM was pursuing this course.

Further, plaintiffs impute to Paging Systems a desire to expand based on unspecified comments and positions taken before the FCC [T3 115:1-116:1 [Havens]], and statements about incumbency it made in its pre-Auction 57 request to delay the beginning of that auction [P389]. (*See* Pls.' FF ¶ 132.) It is not clear from plaintiffs' cited evidence that Paging Systems had any interest in expanding into the specific areas where MCLM held licenses. Again plaintiffs jump from an abstract interest in seeing competitors exit from the market, something they impute to each of the defendants, to the conclusion that the failure to seize a potential opportunity to eliminate a competitor indicates an anti-competitive market. What plaintiffs have not done, however, is show why Paging Systems would be more likely to mount a challenge rather than to decide that the steps needed to make that challenge were not worth it. In short, plaintiffs have not provided information about events or offered documents or witness testimony that would tend to exclude the conclusion that Paging Systems was acting based on an independent, strategic business decisions. *See In re Baby Food*, 166 F.3d at 127 (declining to second-guess strategic judgments as to whether company would enter new markets and pursue opportunities).

Plaintiffs also contend that Reardon's employment as a director of Choctaw, the company that would acquire the licenses as a result of application of the *Second Thursday* doctrine, shows that a conspiracy exists, because the only reason Choctaw would have hired him despite the restrictions placed on use of the *Second Thursday* doctrine is his "knowledge and management of the conspiracy." (Pls.' FF ¶ 134; Pls.' CL ¶ 92.) But this ignores an obvious alternative explanation: Reardon's general institutional knowledge and knowledge of the field are beneficial to any holder of these ATMS licenses.

On another front, plaintiffs state that Paging Systems did not take issue with MCLM's use of a small business bidding credit in Auction 61, and has remained silent throughout the FCC proceedings against MCLM pursuant to the hearing designation order. (Pls.' FF ¶¶ 96-97, 101; Pls.' CL ¶ 26-29.)  This is deemed especially suspicious because using a bidding credit provides a significant advantage over other bidders, and because Paging Systems was already protesting Havens's companies' joint bidding at the auctions.  (Pls.' CL ¶¶ 26-27.)

But plaintiffs' argument again presumes that Paging Systems had a motive to seek MCLM's licenses. Simply because plaintiffs' own business plan requires having rights across the country does not mean that any of the defendants, including Paging Systems, has the same interest.  Once again, plaintiffs' argument about "silence" reveals their deeply held point of view that in the field of spectrum, vigorous competition is about eliminating competing businesses. This is plaintiffs' view, however, and again fails to account for the principle that "'[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.'"  *Twombly*, 550 U.S. at 569 (quoting Areeda & Hovenkamp ¶ 307d, at 155 (Supp. 2006)) (alteration in original).  Plaintiffs' reasoning that Paging Systems would be expected to challenge MCLM's conduct in using a bidding credit because it was challenging Havens's conduct in using a joint-bidding strategy also misses the mark. Cooper expressed a general awareness of MCLM's "problem with the FCC" as a result of the bidding credit, but did not express a grasp of the details [Cooper Dep. 336:13-24]; further, the hearing designation order laying out the details of the allegations against MCLM was issued in 2011 [*see* P357], while Paging Systems appeared to have challenged Havens's strategy at around the time of the auction some six years before.

e. **Otherwise Inexplicable Decisions**

Plaintiffs also present a host of decisions by the defendants that they characterize as conspiratorial because the actors in each scenario would not have made the choices they did if they were acting in a competitive market.

First, plaintiffs point to Paging Systems' request to set aside the results of Auction 57, in which Mobex Network Services did not participate, as evidence that Paging Systems and Mobex must have had an agreement; otherwise "it made no commercial sense" for Paging Systems to seek relief that would add another competitor to the auction, particularly since Paging Systems won the only license for which it bid.  (Pls.' CL ¶ 45; *see also id.* ¶ 25; Pls.' FF ¶¶ 85-95.)  While this argument has surface-level appeal, a different explanation emerges from the evidence.  In ruling on Paging Systems' request to set aside the results, the FCC also addressed its challenge to the participation of two Havens-controlled entities in the auction, a challenge Mobex Network Services had also made, unsuccessfully, before the auction.  (*See* P118 ¶¶ 1, 5, 7-14.)  Paging Systems suggested to the FCC that the participation of Havens's commonly controlled entities prompted Mobex not to participate in the auction.  (*See id.* ¶¶ 7, 10.)  As Havens's companies ultimately obtained eight of the ten licenses auctioned in Auction 57, while Paging Systems obtained only one, it is equally, if not more, plausible that Paging Systems invoked Mobex's non-participation as a device in aid of its attempts to oust the Havens companies for its own benefit.

Nor is it remarkable that Mobex Network Services and Paging Systems took similar positions on whether Havens's commonly-controlled entities should be permitted to participate in the auction – or, to that end, that Paging Systems challenged Havens's companies' participation while appearing to favor Mobex being given an opportunity to participate.  (*See*

Pls.' FF ¶¶ 77, 88; Pls.' CL ¶ 25.)  Plaintiffs themselves have repeatedly contended that it is natural competitive behavior to attempt to exclude one's competitor from the market.  Mobex and Paging Systems easily could have concluded, *independently of each other*, that resisting entry into the AMTS licensing market of Havens and his companies could be of benefit.  Although as explained above Paging Systems was less supporting Mobex than making an argument against Havens, Paging Systems also could have concluded (again, unilaterally) that its interests would be better served if the Havens companies stayed out of the market, regardless of what happened to Mobex.  The point was made by the Supreme Court in *Twombly*, where the plaintiffs claimed that incumbent telephone carriers ("ILECs") had conspired with each other to resist entry by new, or "competitive," carriers ("CLECs") (with whom the ILECs were required by law to share their infrastructure) by imposing unfavorable terms on the CLECs' use of the ILEC systems, and by agreeing not to compete in other ILECs' territories:

> The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege . . . there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

*Twombly*, 550 U.S. at 566.

Next, plaintiffs contend that the "low" price MCLM paid for Mobex Network Services' licenses indicates the existence of a conspiracy.  (Pls.' CL ¶ 46.)  According to them, "[t]here is no question that MCLM knew it was buying damaged goods" and "the only cogent explanation for anyone being willing to take these compromised licenses is the existence of a conspiracy that was communicated to those acting for MCLM to induce MCLM's purchase of those licenses. A deal like that could really serve to block others and could confer great economic gains on both

53

sides of the conspiracy if they could just hang on." (Pls.' CL ¶ 47.) Plaintiffs go on to argue that

"hanging on" required deceiving the FCC about construction and operation and "[n]either could

have risked playing that game alone and having the whistle blown to the FCC on the other."

(Pls.' CL ¶ 48.) Along with its twists and turns, plaintiffs' theory rests on extravagant claims

about motivation. As explained earlier, there was testimony about the significant changes in the

marketplace in the mid-2000s, when MCLM purchased the licenses, changes that readily explain

price fluctuations. (*See* T7 60:23-61:3, 91:12-22 [Reardon].)

### f.  Summary

Plaintiffs have relied on a mix of direct and circumstantial evidence in an effort to prove

their assertion that there *must* be a conspiracy afoot. It is at times unclear how their evidence is

intended to fit within the established framework for determining whether illegal concerted action

exists. Again and again, as shown in the foregoing discussion, plaintiffs pull out an event or a

legal position in the FCC and claim that it can "only be explained" by a conspiratorial motive or

a clever plan to exclude Havens and his companies from getting AMTS licenses. This fails

completely as proof by a preponderance, which is plaintiffs' burden before the Court.

Plaintiffs characterize, arrange, and interpret events surrounding the acquisition of AMTS

licenses by them and by the defendants to illustrate and perhaps justify that they have not been

able to move ahead with *their* vision for AMTS. But building that case does not prove a case of

a conspiracy to restrain trade, and accepting it risks squelching legitimate business conduct by

labeling it conspiratorial. *See Matsushita*, 475 U.S. at 593. A careful assessment of the

plaintiffs' evidence and legal arguments establishes that plaintiffs have a narrative in mind – a

lofty vision they have for AMTS spectrum is being foiled by players in the AMTS spectrum

market – and they have lined up various historical facts to support it. But the narrative is fatally

different from what a successful Section 1 claim is made of.  Indeed, the narrative strongly suggests that Havens's vision for spectrum requires that he and his companies must possess just about all of it for their vision to become reality, something that requires elimination of their competitors, and not the other way around.

Keeping the focus, then, on plaintiffs' burden to establish the elements of their claim and evaluating plaintiffs' evidence in its totality, *see Petruzzi's*, 998 F.2d at 1230 (evidence to be considered as a whole rather than "tightly compartmentalized"), the Court concludes that plaintiffs have not proven that it is more likely than not that there was concerted action within the meaning of § 1, and as such, have failed to support their Sherman Act claim against MCLM. Put another way, were the Court as factfinder presented with the first question in a typical verdict sheet given to the jury in a Sherman Act § 1 case,[23] "Have Plaintiffs proven by a preponderance of the evidence that the Defendant entered into contract(s), combination(s) or conspiracy(ies) with any separate entity or entities?" the Court would answer, easily, No.

And so because plaintiffs have not proven the existence of concerted action, the Court need not reach the second component of their § 1 claim: whether the conduct alleged imposed a restraint upon trade that was unreasonable.[24]  *See Burtch*, 662 F.3d at 230 (concluding that because plaintiff had not alleged evidence of an agreement, there was no need to consider whether other elements of a § 1 claim were satisfied); *Superior Offshore*, 490 F. App'x at 500 n.7 ("Because we hold that [plaintiff] did not present sufficient evidence of concerted action, we

---

[23] *See, e.g.*, *Deutscher Tennis Bund v. ATP Tour, Inc.*, D. Del. No. 07-178, D.E. 195 ("Verdict Sheet"), at p. 1.

[24] Juries do the same thing when they are told that if they answer "No" to the question about whether there has been proof by a preponderance of concerted action, they should proceed no further. *See* Verdict Sheet at p.1.

need not address whether the defendants' conduct 'imposed an unreasonable restraint on trade.'")

(citation omitted).

### C. The Mobex Defendants

At the beginning of trial, the Court denied plaintiffs' motion for default judgment against

Mobex Communications and Mobex Network Services without prejudice to renewal following

the resolution of the case against MCLM, which was litigating the case on the merits. (T1 5:19-

13:16.) As the Court recognized at that time, resolution of the case with respect to MCLM could

influence two factors the Court must consider in determining whether default judgment is

warranted: whether the defaulting defendants have a meritorious defense, and whether the

plaintiffs would be prejudiced in the absence of default judgment entering. (T1 12:2-7.) *See*

*Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008)

(Ackerman, J.) (reciting standard for default judgment). Granting default judgment against these

defendants would have also risked the possibility of inconsistent judgments should plaintiffs fail

to carry their burden to prove MCLM's liability [T1 12:7-10], a concern now relevant based on

the Court's conclusion that plaintiffs have failed to demonstrate that MCLM or either of the

Mobex defendants was a party to any concerted action within the meaning of 15 U.S.C. § 1.

Therefore, the Mobex defendants have a meritorious defense, and plaintiffs, having not proven

liability, would not suffer any prejudice as a consequence of default judgment being denied

against those defendants. Accordingly, plaintiffs' § 1 claim against Mobex Network Services

and Mobex Communications will be dismissed. *See Animal Sci. Prods., Inc. v. China Nat'l*

*Metals & Minerals Imp. & Exp. Corp.*, 596 F. Supp. 2d 842, 849 (D.N.J. 2008) (suggesting that

"if default is entered against some defendants in a multi-defendant case, the preferred practice is

for the court to withhold granting default judgment until the action is resolved on its merits

against non-defaulting defendants: if plaintiff loses on merits, the complaint should then be dismissed against both defaulting and non-defaulting defendants."); *see also Farzetta v. Turner & Newall, Ltd.*, 797 F.2d 151, 154 (3d Cir. 1986).

## VI.    CONCLUSION

At every step of the way, plaintiffs have built their case on evidence that is ambiguous or even contradicted.   They draw the inference of concerted conduct without showing how the evidence they offer in support tends to exclude the possibility that an inference of independent action can be drawn.   The law governing Sherman Act § 1 claims demands discernment and carefully drawing lines; as the Supreme Court has written, and countless opinions since have echoed, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," and mistaken inferences can "chill the very conduct the antitrust laws are designed to protect."   *Matsushita*, 475 U.S. at 588, 594.

When Sandra DePriest was questioned by plaintiffs' counsel about MCLM's failure to furnish plaintiffs operating contour information, this principle became clear:

> Q.    Do you understand that [Havens's] allegation is that the failure to give contour information really seriously cripples and blocks one who might wish to do work on AMTS providing AMTS service?
>
> A.    That's totally theoretical.
>
> Q.    You mean--
>
> A.    He has not one lease.   He has not one system.   So, you know, it's theoretical.
>
> Q.    Well, is it theoretical that failure to give the information means that he can't build the systems?
>
> . . . .
>
> A.    What system?

Q.     What systems have you built-out on your four geographic licenses for A spectrum?

A.     Well, what we have done is we have entered into site leases.  We have entered into contracts with companies to our very best.   But every single application that we have filed Mr. Havens has filed an objection.  And we have litigated it to the point where we no longer are able to litigate any more.

       If you want to talk about anti-competitive activity, the litigation aspects we have not been able to get our leases approved, our sites approved, our sales approved.  We don't actually have the leases approved, but the sales closed because of the litigation.

Q.     Do you see any connection between MCLM's failure to give the contour information and that litigation?

A.     No.

Q.     None at all?

A.     No, not in those instances. No.

Q.     Well --

A.     The Southern California, the train system, to be able to enter in to a positive train control.  Lives are at stake.

Q.     They sure are.  That's absolutely right.

A.     And that doesn't have anything to do with Mr. Havens.

Q.     And you would not give any contour information to Mr. Havens, isn't that correct?

. . . .

Q.     Even though lives are [at] stake, you would not give contour information, isn't that correct to Mr. Havens, Mrs. DePriest?

. . . .

A. I don't know of any situation that Mr. Havens has presented that has posed a
   risk in relation to that except to hinder the development of the Southern
   California railroad system.

Q.     In what respect did he hinder the development of the Southern California railroad system?

A.     By opposing it.

(T6 88:23-90:23 [S. DePriest].)

Sandra DePriest, and Reardon as well, had facts to back up these statements.   The testimony of both witnesses on the impact on MCLM of Havens's companies' repeated litigation efforts rang true in the courtroom.   When Sandra DePriest stated, "If you want to talk about anti-competitive activity," her outburst serves as an instructive counterpart to the plaintiffs' collection of ambiguous evidence from which they draw damning conclusions that, once examined, ring hollow.

For the foregoing reasons, plaintiffs not carried their burden to prove that MCLM or the Mobex defendants violated § 1 of the Sherman Act.   Accordingly, final judgment will be granted in MCLM's favor and against plaintiffs on plaintiffs' § 1 claim in Count 3 of the second amended complaint, and this claim will be dismissed as against Mobex Network Services and Mobex Communications.

An appropriate order will issue.


Date:   September 2, 2014                    /s/ Katharine S. Hayden
                                            Katharine S. Hayden, U.S.D.J.