# UNITED STATES COURT OF APPEALS

*for the*

# THIRD CIRCUIT

---

Case No. : 14-4043

---

SKYBRIDGE SPECTRUM FOUNDATION, WARREN C. HAVENS, TELESAURUS VPC, LLC, AMTS CONSORTIUM, LLC, INTELLIGENT TRANSPORTATION & MONITORING WIRELESS, LLC and TELESAURUS HOLDINGS GB, LLC

*Appellants,*

- v. -

MOBEX NETWORK SERVICES, LLC, MARITIME COMMUNICATIONS/LAND MOBILE, LLC, PAGE SYSTEMS, INC. and TOUCH TEL CORPORATION

*Respondents.*

---

ON APPEAL FROM AN ORDER AND FINAL JUDGEMENT ENTERED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, NEWARK AT 2:11-CV-00993 (KSH-CLW)

## BRIEF ON BEHALF OF PLAINTIFFS/APPELLANTS

Sean R. Kelly (skelly@saiber.com)
Michael J. Grohs (mgrohs@saiber.com)
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
(973) 622-3333

STEPHEN HUDSPETH, ESQ.
6 Glen Hill Road
Wilton, Connecticut 06897
(203) 762-2846
*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, plaintiffs-appellants Skybridge Spectrum Foundation, Telesaurus VPC, LLC (now known as Verde Systems, LLC), AMTS Consortium, LLC (now known as Environmentel, LLC), Intelligent Transportation & Monitoring, LLC and Telesaurus GB, LLC, each discloses that: (1) it has no parent corporation; (2) no publicly held company holds 10% or more of its stock; and (3) no publicly held corporation has a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...........................2

STATEMENT OF THE CASE.................................................................4

    A.    Background and Procedural History .....................................................4

    B.    Statement of Facts .................................................................6

        1.    Overview of AMTS Spectrum ...................................................6

        2.    AMTS Spectrum Applications and Related Product and Geographic Markets ............................................................6

        3.    AMTS Spectrum Licensing, Including A and B Blocks ..........10

        4.    The Defendants' Conspiracy to Preclude or Hinder Competitors................................................................18

        5.    Injury to Plaintiffs .................................................................31

SUMMARY OF ARGUMENT ...............................................................33

ARGUMENT .................................................................................37

POINT I.......................................................................................37

    PLAINTIFFS' CLAIMS OF CONSPIRACY IN VIOLATION OF SHERMAN ACT § 1 SHOULD NOT HAVE BEEN DISMISSED ............37

    A.    Standard for Review.................................................................37

B.      Elements of §1 of the Sherman Act ....................................................37

C.      Argument on these Claims ................................................................38

        1.      Relevant Market....................................................................38

        2.      Evidence of Unlawful Horizontal Concerted Action................40

POINT II ........................................................................................................54

        MCLM VIOLATED THE FCA, AND PLAINTIFFS' CLAIMS
        ALLEGING VIOLATION SHOULD NOT HAVE BEEN
        DISMISSED. ........................................................................................54

A.      Standard of Review .........................................................................54

B.      Argument on these Claims ................................................................54

CONCLUSION ...............................................................................................63

CERTIFICATION OF BAR MEMBERSHIP...........................................64

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................65

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alltel Tennessee, Inc. v. Tennessee Public Service Commission*,
913 F.2d 305 (6th Cir. 1990) ...............................................................60

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)....................................................................41, 42

*In re Baby Food Antitrust Litigation*,
166 F.3d 112 (3d Cir. 1999) ...............................................................44

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..............................................................................38

*Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*,
748 F.2d 879 (4th Cir. 1984) ...............................................................61

*Columbia Broadcasting System, Inc. v. United States*,
316 U.S. 407 (1942).............................................................................59

*In re Cont'l Airlines*,
91 F.3d 553 (3d Cir. 1996) ...................................................................37

*Contemporary Media Inc. v. FCC*,
214 F.3d 187 (D.C. Cir. 2000).............................................................52

*In re Flat Glass Antitrust Litigation*,
385 F.3d 350 (3d Cir. 2004) ...........................................................44, 45

*Global Crossing Telecommunications, Inc. v. Metrophones
Telecommunications, Inc.*,
550 U.S. 45 (2007).........................................................................55, 56

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005) .................................................................37

*Hawaiian Telephone Co. v. Public Utilities Commission of the State of Washington*,
827 F.2d 1264 (9th Cir. 1987) ...........................................................61

*Howard Hess Dental Laboratories, Inc. v. Dentsply Intern., Inc.*,
602 F.3d 237 (3d Cir. 2010) .............................................................37

*In re Hydrogen Peroxide Antitrust Litigation*,
552 F.3d 305 (3d Cir. 2008) .............................................................53

*Illinois Bell Co. v. Illinois Commerce Commission*,
740 F.2d 566 (7th Cir. 1984) ............................................................61

*Lansdowne on the Potomac Homeowners Ass'n., Inc. v. OpenBand at Lansdowne, LLC*,
713 F.3d 187 (4th Cir. 2013) .......................................................58, 60

*Mallenbaum v. Adelphia Commc'ns. Corp.*,
74 F.3d 465 (3d Cir. 1996) .........................................................59, 61

*Master Call Communication, Inc. v. World-Link Solutions, Inc.*,
2009 WL 936887 (D.N.J. April 6, 2009)..............................................55

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................42, 44

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978).....................................................................51

*New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine*,
742 F.2d 1 (1st Cir. 1984)...............................................................60

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ............................................................53

*Palmer v. BRG of Georgia, Inc.*,
498 U.S. 46 (1990).................................................................42, 43

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
998 F.2d 1223 (3d Cir. 1993) ..........................................................44

*Smithkline Beecham Corp. v. Eastern Applicators, Inc.*,
   2002 WL 1197763 (E.D.Pa. May 24, 2002).......................................................46

*South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n.*,
   744 F.2d 1107 (5th Cir. 1984) .......................................................................61

*Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n.*,
   738 F.2d 901 (8th Cir. 1984) .........................................................................61

*U.S. v. Fischbach & Moore, Inc.*,
   750 F.2d 1183 (3d Cir. 1984) .......................................................................46

*U.S. v. General Motors Corp.*,
   384 U.S. 127 (1966)......................................................................................42

*U.S. v. Radio Corp. of America*,
   358 U.S. 334 (1959)......................................................................................53

*United States v. Container Corp. of America*,
   393 U.S. 333 (1969)......................................................................................46

*United States v. Foley*,
   598 F.2d 1323 (4th Cir. 1979), *cert. denied*, 444 U.S. 1043 (1980) ..................42

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967)................................................................................41, 42

*United States v. Topco Associates*,
   405 U.S. 596 (1972)..........................................................................41, 42, 43

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978)......................................................................................46

*In re Wellbutrin XL Antitrust Litig.*,
   No. 08-2431, 2011 WL 3563385 (E.D. Pa. 2011)............................................53

*Wiest v. Lynch*,
   710 F.3d 121 (3d Cir. 2013) .........................................................................54

**Administrative Decisions**

*Amendment of the Commission's Rules Concerning Maritime
    Communications*,
    17 F.C.C.R. 6685 (2002) .................................................................. 10

*In re Amendment of Commission's Rules*,
    15 FCC Rcd. 22585 ......................................................................... 47

*In the Matter of Intermart Broadcasting Twin Falls, Inc.*,
    23 F.C.C.R. 8822 (2008) .................................................................. 52

*In the Matter of Maritime Communications/Land Mobile, LLC*,
    2014 WL 5088184 (F.C.C. Oct. 9, 2014) .................................... 30, 32

*Maritime Communications/Land Mobile, LLC*,
    25 F.C.C.R. at 3807 ......................................................................... 15

*In the Matter of Maritime Communications/Land Mobile, LLC,
    Debtor-in-Possession Application to Assign Licenses to Choctaw
    Holdings, LLC*,
    29 F.C.C.R. 10871 (2014) .................................................................. 3

*Northeast Utils. Serv. Co.*,
    24 F.C.C.R. 3310 (2009), *aff'd. sub nom. Maritime
    Communications/Land Mobile, LLC*, 25 F.C.C.R. 3805 (2010) ............... 14, 15

*Second Thursday Corp.*,
    22 F.C.C.2d 515 (1970), *reconsideration granted in part*, 25
    F.C.C.2d 112 (1970) .......................................................................... 3

*Warren C. Havens*,
    28 F.C.C.R. 8456 (2013) ................................................................... 15

**United States Code**

15 U.S.C. §15 ........................................................................................ 1

18 U.S.C. §1001 .................................................................................. 57

28 U.S.C. §1291 .................................................................................... 1

28 U.S.C. §1331 .................................................................................... 1

28 U.S.C. §1337 ................................................................................1

47 U.S.C. §201 ...........................................................................*passim*

47 U.S.C. §206 ...........................................................................*passim*

47 U.S.C. §207 ...........................................................................*passim*

47 U.S.C. §313 ........................................................................53, 63

47 U.S.C. §401(b) ........................................................36, 54, 59, 60

49 U.S.C. §20157(a)(1)-(2) ................................................................7

**Code of Federal Regulations**

47 C.F.R. §1.946(c) ................................................................12, 13

47 C.F.R. §1.955(a) ................................................................12, 31

47 C.F.R. §2.106 ................................................................................6

47 C.F.R. §30.385 ................................................................................6

47 C.F.R. §80.49 ............................................................................46

47 C.F.R. §80.49(a)(3) ......................................................10, 11, 12

47 C.F.R. §80.70(a) ......................................................................51

47 C.F.R. §80.385 ..........................................................................60

47 C.F.R. §80.385(a)(3) ..................................................................62

47 C.F.R. §80.385(b) ................................................................*passim*

47 C.F.R §80.385(b)(1) ............................................................11, 62

47 C.F.R. §80.385(c) ......................................................12, 25, 26

47 C.F.R. §80.409 ..........................................................................29

47 CFR §80.331(d) ........................................................................60

17 F.C.C.R. at 6704 ................................................................*passim*

**Other Authorities**

I.R.C. §501(c)(3) ............................................................................................4, 32, 33

FCC Rule §1.17...............................................................................................58

Fed.R.App.P. 4(a)(1)(A) ...................................................................................1

**JURISDICTIONAL STATEMENT**

The District Court had subject matter jurisdiction under 15 U.S.C. §15 and 28 U.S.C. §§1331 and 1337 because this action involves claims under the Federal Communications Act of 1934 (the "FCA") and the Sherman Act.  [A30].

This Court has jurisdiction pursuant to 28 U.S.C. §1291 because this appeal is from final decisions rendered by the United States District Court for the District of New Jersey, including (1) the pre-trial dismissal of plaintiffs' FCA claims in its Order [A63] and Opinion [A64] entered on December 22, 2011 (the "2011 Order"); and (2) the dismissal of the plaintiffs' Sherman Act §1 claims in its Opinion [A4], Order and Final Judgment [A3] entered on September 2, 2014, following trial (the "2014 Judgment").

This appeal is timely under of the Federal Rule of Appellate Procedure 4(a)(1)(A) because the 2014 Judgment disposing plaintiffs' claims was entered on September 2, 2014.  [A3].  A Notice of Appeal was filed on September 26, 2014. [A1].

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

Did the District Court err by:

1.    Dismissing plaintiffs' Sherman Act §1 claim in the 2014 Judgment by (i) failing to give weight to evidence of unlawful concerted activity among horizontal competitors; (ii) accepting at face value denials of such concerted action

1

from witnesses whose credibility was severely compromised, and (iii) disregarding evidence of numerous "plus factors" constituting evidence of antitrust conspiracy.

This issue first appears in the 2014 Judgment [A3] and the District Court's supporting opinion [A4].

2.      Dismissing plaintiffs' FCA injunctive and damages claims in the 2011 Order on the theory that there was no binding order or determination of the Federal Communications Commission ("FCC").  [A77-A79].  The District Court also erred in concluding that plaintiffs did not state a claim that that the alleged challenged practices were unreasonable and unlawful under FCA §201(b) and sufficient to support a private right of action under FCA §§206-207.

The issue of dismissal of plaintiffs' FCA claims was raised by defendants by motion to dismiss [A92(D.E. 9)], was contested [A93(D.E.12)], and was ruled upon [A63, A64 and A94(D.E. 30-31)].

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court.  Currently, plaintiffs and defendant Maritime Communications/Land Mobile LLC ("MCLM") are parties to actions pending in two other forums:  (1) administrative proceedings before the FCC (the "FCC Proceedings"); and (2) MCLM's bankruptcy before the United States Bankruptcy Court in Mississippi (the "Bankruptcy").

The three proceedings are factually interrelated.  The FCC Proceedings, including those designated by Order FCC 11-64 to proceed before an Administrative Law Judge [A480], are aimed principally at the revocation and termination of MCLM's claimed AMTS Spectrum licenses (explained below), both site-based and geographic, and disqualification and fines.  MCLM's core objective in the Bankruptcy is to be conditionally "cleansed" of its prior wrongful acts which would otherwise result in the loss of its licenses under Order FCC 11-64 through attempting to obtain extraordinary discretionary FCC relief under the "Second Thursday Doctrine" (arising in *Second Thursday Corp.*, 22 F.C.C.2d 515 (1970), *reconsideration granted in part*, 25 F.C.C.2d 112 (1970)).[1]  Many of these and related wrongful acts, also identified in FCC Orders, are relied upon by plaintiffs in this action as evidence of MCLM's violation of both the antitrust laws and the FCA, and in challenging the validity of MCLM's licenses and its license qualifications in the FCC Proceedings and the Bankruptcy.

---

[1] The FCC recently addressed the application of this doctrine to MCLM and held that MCLM does not qualify for such treatment for multiple reasons.  *See In the Matter of Maritime Communications/Land Mobile, LLC, Debtor-in-Possession Application to Assign Licenses to Choctaw Holdings, LLC*, 29 F.C.C.R. 10871, at ¶¶20-24 (2014). That FCC Opinion and Order was issued on September 11, 2014 - - less than 10 days after the 2014 Judgment was entered by the District Court.

3

## STATEMENT OF THE CASE

**A.**    **Background and Procedural History**

Plaintiffs-Appellants ("Plaintiffs") consist of Warren Havens, an individual, four LLCs of which Havens is president and principal owner, and an I.R.C. §501(c)(3) nonprofit (Skybridge Spectrum Foundation), of which he is president. (T2 6:10-12, 14:5-8, 25:9-22 **[Havens]**).

In 2008, Plaintiffs sued MCLM, MCLM's predecessors in license-asset ownership Mobex Network Services, LLC and Mobex Communications, Inc. (collectively "Mobex"), and Paging Systems, Inc. and its affiliate Touch Tel Corp. (collectively "PSI").    [A127, A91].    MCLM, Mobex, and PSI are collectively referenced as the "Defendants."    The Defendants were horizontal competitors of the Plaintiffs and had acquired site-based and geographic FCC licenses for the Automated Maritime Telecommunication System ("AMTS") portion of the radio spectrum (the "AMTS Spectrum") across the country.    [A10-A11].    (In some situations in which practices continue from one set of Defendants to the next on the Mobex and MCLM side of the conspiracy, they are referenced herein as "Mobex/MCLM".)

Plaintiffs' Second Amended Complaint (the "Complaint") [A91(D.E. 1)] asserted that Defendants, acting in concert and in violation of the FCA and the Sherman Act, engaged in a nationwide scheme to acquire and illicitly "warehouse"

4

sham AMTS Spectrum licenses and used them to preclude or severely restrain Plaintiffs' competition, including Plaintiffs' lawful use of their valid geographic licenses in the AMTS Spectrum market. *See* [A138, A153-A158 (Complaint, ¶¶1, 32-45)]. In December 2011, the District Court dismissed Plaintiffs' FCA claims in its 2011 Order [A64] and, in August 2012, denied Plaintiffs' motion for reconsideration [A101(D.E. 98, 99)].

A nine day bench trial was held on Plaintiffs' Sherman Act § 1 claim. [A119-A121(D.E. 266-270, 272-273, 276-279)]. Only Plaintiffs and MCLM appeared at the trial. [*Id.*]. Although the Mobex defendants had pre-trial defaults entered against them [A107(D.E. 152)], at the beginning of trial the District Court denied Plaintiffs' motion for default judgment against Mobex [A119(D.E. 265)]. PSI settled with Plaintiffs, surrendering most of their site-based licenses, and did not appear at the trial. [A114(D.E. 203-3)].

Following trial and post-trial submissions (*see* [A116-A121(D.E.233-D.E.289]), the District Court entered the 2014 Judgment against Plaintiffs and in favor of MCLM [A3] on the issue of proof of conspiracy without reaching the other elements for a violation of Sherman Act §1 [A58-A59]. The District Court also dismissed the Complaint against Mobex, finding that the outcome for Mobex rose or fell on the outcome for MCLM. [A59-A60].

In this appeal, Plaintiffs seek review of the District Court's 2011 Order dismissing the claims under the FCA [A63] and 2014 Judgment dismissing the Sherman Act §1 claims against MCLM and Mobex [A3].

**B.    Statement of Facts**

    **1.    Overview of AMTS Spectrum**

It is undisputed that Plaintiffs and Defendants owned licenses in the AMTS Spectrum.  [A10-A14].  It is also undisputed that the AMTS Spectrum is 217 to 218 MHz and 219 to 220 MHz.  *See* 47 C.F.R. §§2.106, 30.385.    The AMTS Spectrum is not broken up by other, non-AMTS, licenses and uses.[2]  The AMTS Spectrum creates the product market within which Plaintiffs' antitrust claims are evaluated.

    **2.    AMTS Spectrum Applications and Related Product and Geographic Markets**

Advances in wireless technology since the 1980s have made possible new critical-system uses for which the AMTS Spectrum is particularly well-suited,

---

[2] AMTS Spectrum is the "sweet spot" in the radio spectrum for transportation accident avoidance systems and other critical systems.  Other potentially suitable spectrum bands are too encumbered and unavailable because they are already substantially used: below 216 MHz (principally used for television broadcasting, and industrial and public agency shared uses, and also difficult to control below 100 MHz); 216-217 MHz (short range transmissions for auditorium amplification, garage-door openers, hearing aids, etc.); 218-219 MHz (low power and height); 220-222 MHz (broken up into very small band-width uses and geographic areas); 222-225 MHz (amateur "ham" radio); 225-400 MHz (exclusively military); above 400 MHz (unavailable and lacking range for accident-avoidance use). (T1 119:17-122:15 **[Lindsey]**; T3 9:20-10:23; 14:23-19:4; 19:15-22:10 **[Havens]**).

including for public transportation safety. (T2 23:17-25:8, 115:4-13 **[Havens]**).

Plaintiffs' presented the testimony at trial of two experts, Ron Lindsey (T1 98:25-99:1, 99:23-100:1) and Professor Raja Sengupta (T1 56:11-14, 57:8-10) to give examples of these uses for railway safety and roadway accident avoidance respectively: "Positive Train Control" (PTC) and "Cooperative High Accuracy Location" ("HALO"). MCLM offered no expert testimony. [A9].

### (a)    Expert Lindsey's Testimony regarding PTC

PTC systems can reduce or eliminate railroad accidents caused by human error as described by Ron Lindsey, former chief communications engineer for a Class I railroad and railway engineering expert who helped develop PTC. (T1 98:22-99:2, 117:20-118:23 **[Lindsey];** T2 114:2-115:13 **[Havens]**).

These technological advances have been recognized as offering great benefits to the public and the economy. For example, in the *Rail Safety Improvement Act of 2008* (codified at 49 U.S.C. §20157), Congress mandated that all freight and commuter railroads deploy PTC by the end of 2015. (T1 123:21-124:5, 126:7-14 **[Lindsey]**). Railroads need access to suitable licensed spectrum for long transportation corridors in which their radio systems can operate uninterrupted within a single radio band. They also need nationwide "interoperability" of equipment. *See* 49 U.S.C. §20157(a)(1)-(2); (T1 117:23-125:5; 126:17-132:1 [**Lindsey**]; T2 112:7-21 [**Havens**]).

7

The AMTS Spectrum offers advantages in rail accident avoidance using systems employing PTC that cannot be duplicated in other portions of the radio spectrum given availability of bandwidth and feasibility of radio transmission over long distances, and given limitations of other portions of the spectrum.  (T1 118:24-127:21 [**Lindsey**]).

### (b)    Expert Sengupta's Testimony regarding HALO

AMTS Spectrum also provides the "sweet spot" for "intelligent traffic" applications using HALO to reduce roadway accidents significantly.  (T1 67:5-68:19; 79:7-80:17 [**Sengupta**]; T2 139:23-141:22 [**Havens**]).

 Raja Sengupta, Professor in the Department of Civil and Environmental Engineering, Systems and Transport Programs, of the University of California at Berkeley (T1 56:11-14 [**Sengupta**]), confirmed that roadway accident avoidance systems using HALO could potentially avoid 76% of vehicular roadway accidents nationwide (T1 67:5-20 [**Sengupta**]), but require 100% nationwide coverage to do so (T1 86:4-17 [**Sengupta**]).  Professor Sengupta testified that such systems are best implemented using the AMTS Spectrum, which he agreed was a "sweet spot" (T1 92:7-13 [**Sengupta**]) given its great suitability in available bandwidth and tower requirements, among other engineering specifics (T1 85:6-86:2 [**Sengupta**]).

Such an accident-avoidance system takes a standard GPS signal that is accurate to around 3 meters -- good for locating a street address but not for

8

avoiding an accident -- and refines it to an accuracy of around 10 centimeters. (T1 79:7-80:5 **[Sengupta]**). It does so using a system that requires only off-the-shelf hardware installed on each vehicle and thus is something that could be offered ubiquitously by OEMs on all new cars and as a simple retrofit to existing vehicles. (T1 88:20-89:5 **[Sengupta]**). Without 100% nationwide HALO coverage, however, automobile manufacturers cannot risk including such systems in vehicles for liability reasons. (T1 79:7-80:17 **[Sengupta]**). For highway accident avoidance, the market for AMTS Spectrum application is thus nationwide. (T1 67:21-68:19, 79:7-80:17, 86:13-17, 94:13-23 **[Sengupta]**).

The only present partial alternative to such a HALO-based accident avoidance system is radar-based systems unique to particular vehicles, not on every vehicle and thus not part of a nationwide accident-avoidance system. (T1 67:21-68:19, 94:13-23 **[Sengupta]**).

### (c)    Examples of Other AMTS Spectrum Uses

Because of the long-range radio propagation in the AMTS Spectrum and the way the FCC has divided up other radio frequency ranges in the electromagnetic spectrum, the AMTS Spectrum is ideally suited for other new uses such as: "smart grid" energy systems, "green" oil and gas exploration applications, reduction of traffic congestion, and walking navigation systems for the blind, among other

measures.  (T2 23:17-25:8; 124:23-129:7; T3 9:15-22:12 **[Havens]**).  MCLM's own written materials confirm the accuracy of the foregoing. *See, e.g.*, [A255].

AMTS Spectrum usage and advantages apply regionally (*e.g.*, PTC (T1 120:1-121:2 **[Lindsey]**)) as well as nationally (*e.g.*, HALO (T1 86:4-17 **[Sengupta]**)).  Consequently, blockage or substantial restraint of AMTS Spectrum usage can disrupt the AMTS Spectrum market both regionally and nationally.  (T5 78:1-79:11 **[Havens]**); *see* [A364 (NJ Transit) and A381 (MTA)].

### 3.    <u>AMTS Spectrum Licensing, Including A and B Blocks</u>

Before 2000, the FCC issued AMTS Spectrum licenses without charge on a so-called "site-based" basis in most major markets and transport corridors.  (T2 71:10-25 **[Havens]**).  Following a several year freeze, the FCC then issued only so-called "geographic" AMTS Spectrum licenses for ten large regions encompassing the whole nation.  *See Amendment of the Commission's Rules Concerning Maritime Communications*, 17 F.C.C.R. 6685, 6686, 6690, 6699-6700 (2002) ("*The Fifth Report and Order*"); 47 C.F.R. §80.49(a)(3); T3 54:8-21 **[Havens]**). Under both of these licensing regimes, the total AMTS Spectrum is divided into two "Blocks" -- "A" and "B," 1 MHz each -- with two equal parts of each Block. (T2 34:24-25, 38:4-19 **[Havens]**).

The FCC auctioned the geographic licenses, granting them to the high bidders (after bid payments).  (T2 32:1-3, 71:10-15 **[Havens]**).   However, it

"grandfathered" the existing and operating site-based licenses contained within the larger geographic license areas, by obligating the geographic licensees to protect a defined radio signal level contour ("Service Contour") of the pre-existing site-based licenses under 47 C.F.R §80.385(b)(1), which is also referred to as the "Protection Rule." *See The Fifth Report and Order*, 17 F.C.C.R. at 6699-6700.

Protection under this Protection Rule required that certain technical parameters of stations (which are license-authorized radio transmitter antenna sites) actually being operated by a site-based licensee be provided by the site-based licensee to the geographic licensee (the "Contour Information"). *Id*. at 6704. Such individual Contour Information of each site-based licensee is not found in FCC records or otherwise available. It can only come from the site-based licensee itself. *See, e.g.*, [A171 (FCC Order DA 09-793), A176 (FCC Order DA 09-643) and A184 (FCC Order DA 10-664), which are Exhibits 1, 2 and 3 to the Complaint and collectively referred to herein as the "Cooperation Orders"].

### (a)    Site-Based Licenses and Their Automatic Termination

In return for the original free license grants to the site-based licensees, each was required to represent to the FCC that it would construct and commence providing radio communication service from a valid station at the licensed location within two years of the grant dates. *See* 47 C.F.R. §80.49(a)(3); (T3 54:8-21 [**Havens**]). Such actual construction and operation was, and is, a requirement for

11

keeping the site-based licenses in effect. *Id*.; *see, e.g.*, [A520 and A527 (FCC audit letters to Mobex and PSI, citing 47 C.F.R. §80.49)]. Site-based AMTS Spectrum licenses (and their component stations) terminate *automatically*, without specific FCC action, for failure to satisfy these requirements. *See* 47 C.F.R. §§1.946(c), 1.955(a) and 80.49(a)(3) ("Authorizations automatically terminate…without specific Commission action, if the licensee fails to meet applicable construction or coverage requirements…[or] if service is permanently discontinued." §1.955(a)(2)-(3)).

When the FCC adopted the geographic licensing system, it provided that the "frequency blocks" in all site-based licenses "recovered" by the FCC, upon any invalidation or termination, would "revert automatically" to the holder of the geographic license that covers the same block and encompasses the areas of the site-based licenses, recognizing that public policy favors consolidation of spectrum in the larger geographic licenses. 47 C.F.R. §80.385(c); *The Fifth Report and Order*, 17 F.C.C.R. at 6704(¶40). Such permanent site-based license discontinuance triggers immediate, automatic termination of that license. *See* 47 C.F.R. §§1.946(c), 1.955(a) and 80.49(a)(3).

After the trial had concluded, MCLM admitted in the FCC Proceedings that it had permanently discontinued more than 4/5ths of its site-based stations it had claimed to be valid before the District Court (and the FCC and Bankruptcy Court)

12

up to twenty-seven months before. [A208(D.E. 287)].  As discussed below, this damning post-trial admission is completely and fundamentally inconsistent with key trial testimony of MCLM's executives on which the District Court relied and on which its decision was based.  As a result, the District Court was badly misled.

### (b)    The FCC Auctions for Geographic Licenses

The first AMTS geographic license auction, known as Auction 57, was held on September 15, 2004 [A441], and the second, Auction 61, was completed on August 17, 2005 [A388].   (T2 27:2-14 **[Havens]**).  PSI obtained a B Block geographic license in Auction 57 [A447], and PSI and MCLM obtained additional geographic licenses in Auction 61 (four A Block licenses for MCLM and an additional B Block license for PSI) [A396].  By close coordination between themselves, neither Mobex/MCLM nor PSI ever sought to bid for licenses in the same Block and region in which the other held a pre-existing site-based license. [*Id.*].

In sum, both the Block A and Block B AMTS for all 10 geographic license regions in the U.S., were licensed to the highest bidders -- 19 of the 20 total geographic licenses went to Plaintiffs and Defendants.  [A447, A396 and A673]. Plaintiffs succeeded in obtaining a number of geographic licenses overlaying most of the Defendants' pre-existing site-based licenses (which Defendants falsely claimed were still valid).  [*Id.*]; (T3 6:15-9:2 **[Havens]**).

13

### (c)    Non-interference Rights of Site-Based Licenses and the FCC Cooperation Orders

As noted above, with the issuance of the geographic licenses covering large areas, the FCC promulgated orders to protect incumbent AMTS site-based licensees' pre-existing Service Contours from radio-transmission interference by the geographic licensee holding the same spectrum Block in the same region. *See, e.g., The Fifth Report and Order*, 17 F.C.C.R. at 6702-6703(¶37); 47 C.F.R. §80.385(b).    The FCC also protected the larger geographic licensees from the surrounded incumbent site-based licensed stations by strictly confining those site-based licensee's scope of operation to their existing Service Contours at the time the geographic license for their area issued.  *See Northeast Utils. Serv. Co.*, 24 F.C.C.R. 3310, 3311 n.12 (2009) (holding that "a site-based AMTS incumbent may not relocate its service beyond its existing contour" or undertake "any [other] modifications that impair the rights of the geographic licensee" (at 3314 n.42)), *aff'd. sub nom. Maritime Communications/Land Mobile, LLC*, 25 F.C.C.R. 3805 (2010).

As a result of these FCC orders, a valid site-based licensee could lawfully operate valid pre-existing stations -- *up to the limits of those Service Contours* -- in areas within geographic licenses of the same AMTS Spectrum Block, resulting in "holes" in the geographic licensee's radio-service coverage area where the

geographic licensee could not transmit.   47 C.F.R. §80.385(b); (T2 41:7-42:2 **[Havens]**; T6 101:17-22 [**S. DePriest**]).

The Protection Rule, cited in the Complaint as the "Contour Protection Rule" [A148 (Complaint, ¶21)], is the primary basis for the Cooperation Orders, which explain and implement its purpose.  *See, e.g.*, [A171, A176 and A184 (Complaint, Ex. 1, 2 and 3)].  As the Cooperation Orders instruct, the incumbent site-based licensee shall provide the Contour Information of its valid stations to the geographic licensee upon request so that those site-based stations' Service Contours can be calculated and enable the surrounding geographic licensee to make its protection calculation under the Protection Rule.  [*Id*.].

For example, as stated by the FCC to MCLM in FCC Order DA 09-793 [A173 n.9]:

> This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour. This is necessary because a station's predicted 38 dBu signal contour is a function of its ERP [Effective Radiated Power] . . . but the power limit for site-based AMTS stations in the rules and on their licenses is based on transmitter output power rather than ERP . . . and determining a station's ERP requires additional information, such as antenna gain and line loss.

*See also Northeast Utils. Ser. Co.,* 24 F.C.C.R. at 3311 n.12; *Maritime Communications/Land Mobile, LLC*, 25 F.C.C.R. at 3807; *Warren C. Havens*, 28 F.C.C.R. 8456, 8456-57 (2013); and *The Fifth Report & Order*, 17 F.C.C.R. at 6704.

Without the Contour Information, the geographic licensees cannot plan and operate stations and service closer than 120 km (stated in the Protection Rule) of incumbent stations. *See* 47 C.F.R. §80.385(b). This geographical safety zone would block out most of the nations' critical major markets and transportation corridors -- *if* those site-based license stations had been actually constructed in a timely fashion and had thereafter been kept in operation. *See The Fifth Report & Order*, 17 F.C.C.R. at 6704; (T2 41:4-42:2 **[Havens]**).

### (d)    Defendants' Coordinated Withholding of Necessary Contour Information

In flagrant and long-continuing violation of the FCC's Cooperation Orders and the underlying Protection Rule, PSI and Mobex/MCLM, acting in concert, blocked Plaintiffs' entrance and expansion into the ATMS Spectrum market by consistently refusing to provide their essential Contour Information even though -- if they had had valid stations -- it would have been easy to provide such information. (T2 94:7-20, 95:14-96:17; T5 78:1-25, 79:1-11 **[Havens]**). Providing Contour Information would also have advanced the site-based licensee's own interests by protecting its existing Service Contour. *See The Fifth Report & Order*, 17 F.C.C.R. at 6704.

PSI's Robert Cooper (identified below) testified that he knew the Contour Information would be helpful and could easily be provided but PSI refused to do so. [A780-A783, A901, A905, A910-A913]. MCLM did likewise. (T6 91:6-

94:24 **[S. DePriest]**; T7 198:1-199:14 **[Reardon]**).    The Cooperation Orders specifically tell MCLM the type of information it must provide.    [A173 n.9, A187(¶6)].    Yet, MCLM refused to furnish its Contour Information in response to Plaintiffs' requests unless Plaintiffs first provided MCLM with an engineered construction proposal for their planned geographic-license stations.    (T9 67:12-21 **[Reardon]**).

Then MCLM together with PSI improperly asserted that they would only tell Plaintiffs whether Plaintiffs' engineering proposal would interfere with their Service Contours, not what their Service Contours actually were.    (T4 77:9-25, 79:1-16 **[Havens]**; T9 66:2-67:21, 69:6-71:10 **[Reardon]**) [A780-782].    PSI and Mobex/MCLM made such assertions knowing that without their Contour Information, Plaintiffs could not make an appropriate engineering proposal at all because Plaintiffs could not determine without Defendants' Contour Information where to place their geographic license stations.    (Geographic licenses authorize stations to be placed *anywhere* within the geographic licensee's licensed area (the main value of these licenses) as long as the Protection Rule is satisfied.    *Id.*; (T6 91:6-94:24 **[S. DePriest]**; [A171-178]; and 47 C.F.R. §80.385(b).

In the absence of a conspiracy, Defendants' concerted conduct was contrary to each Defendant's individual self-interest because self-interest would be *advanced* by furnishing their own Contour Information in order to secure radio-

interference protection (without which any real operations on their part would be futile). *Id.* The Defendants' concerted conduct was also contrary to the public interest under FCC and Congressional policy for effective and efficient use of scarce spectrum resources that FCC licensees effectively hold in a public trust. *See The Fifth Report & Order*, 17 F.C.C.R. at 6704. That conduct constitutes FCC-prohibited spectrum-warehousing. *See* (T6 91:20-94:4, 95:23-98:7 [**S. DePriest**]; T9 67:12-21, 69:6-71:10 [**Reardon**]); and [A171-A175].

### 4. The Defendants' Conspiracy to Preclude or Hinder Competitors

#### (a) The Cooper and Daniel Discussion

The birth of the conspiracy occurred in the early days of AMTS Spectrum licensing. Fred Daniel (founder of Regionet, a business that was subsequently acquired by Mobex) met with his friends Robert and Susan Cooper. [A184(Cooper)]. Susan Cooper was the alleged sole owner of PSI and her husband, Robert Cooper, was the owner of Touch Tel, which managed the operations authorized under PSI's AMTS Spectrum licenses. [A743-A744, A752(Cooper)]. Robert Cooper testified that he, Susan and Daniel discussed the potential value of AMTS Spectrum. [A835-A837, A870]. They further discussed how Daniel would apply for the A Block licenses and the Coopers could apply for the B Block licenses, and by doing so in a coordinated fashion, they could jointly control much of the AMTS Spectrum between themselves. [*Id.*].

18

Cooper testified to the specific terms of this clearly anticompetitive horizontal understanding in an unequivocal manner. [*Id*.]. Indeed, Cooper was quite explicit about the terms of their plan to divide the AMTS Spectrum between the two competitors, with one owning A Block licenses and the other owning B Block licenses. Cooper stated:

> We did not know about AMTS until a conversation with Fred [Daniel] where he said 'I am going to apply for part 80 AMTS licenses similar to what they have in the central part of the United States out there. There's another block out there' -- and only Fred can say this the way I'm going to say this -- 'And you can do that if you want, you can apply for the other one because I'm not going to.' And that's the conversation we had. But it wasn't – that was it.

[A835].[3]

Cooper described very clearly an exchange of highly sensitive competitive information between two direct competitors, laying the foundation for the understanding by which each would take action to divide the AMTS Spectrum by block between them. [A835-A836]. That is, of course, exactly how events unfolded after the discussion. Daniel and Regionet applied for A Block AMTS

---

[3] The reference to "what they have" is to the third big player in AMTS, Waterway Communications, Inc. (Watercom), which had AMTS Spectrum licenses along the Mississippi navigable waterways, including Mississippi tributaries and the Gulf coast). Mobex acquired Watercom (with all of its B Block as well as A Block site-based licenses) and those former Watercom licenses became part of the AMTS Spectrum licenses conveyed by Mobex to MCLM in 2005. (T7 8:17-20, 17:20-18:19 **[Reardon]**)

licenses; PSI applied for B Block licenses. [A835-A837, A870]. The result was that, along both East and West coasts and the Great Lakes region, PSI proceeded to obtain the B Block licenses, while Daniel's company acquired the A Block licenses. [*Id*.].

Then they each falsely and repeatedly represented to the FCC (and to would-be competitors) that each had satisfied FCC requirements for construction, coverage, and service-operation at their respective locations in order to retain their site-based licenses deceitfully. *See* [A520-A549 (FCC audit letters and responses)]. Acting together, they hid the evidence of those failures and fraudulent statements, and even falsely undertook to renew licenses that each knew had expired by operation of law. (T4 5:15-8:13 **[Havens]**); [A525, A540-A541].

### (b)    Mobex and then MCLM Replace Daniel/Regionet in the Conspiracy

By 2001, Mobex acquired the above-noted AMTS A Block site-based licenses of Regionet (the company that Daniel and Paul vander Heyden owned) and the A and B Block licenses in Mississippi River basin/Gulf Coast licenses of Watercom. (T7 7:19-9:4, T8 62:7-19 **[Reardon]**). By then, PSI owned virtually all the rest of the B Block site-based licenses in the country. (*Id*.).

The Coopers' role with PSI continued throughout all periods relevant to this litigation. The knowledge on the other side of the conspiracy passed from Regionet to Mobex (which acquired Regionet) (T7 10:1-10 **[Reardon]**)), and then

20

to MCLM which agreed to purchase Mobex's AMTS licenses on May 20, 2005 [A267].  Throughout this period, the Regionet/Mobex/MCLM camp relied heavily on the actions and knowledge of the very same executives.  For example, Daniel's senior colleague at Regionet was Paul vander Heyden.  [T7 11:18-23, T8 19:4-5 **[Reardon]**).  Daniel and vander Heyden functioned on behalf of Mobex even after Mobex's acquisition of Regionet.  *See, e.g.*, [A710].  Vander Heyden continued in active employment with Mobex for a period of years after Mobex acquired Regionet.  (T7 10:1-22; **[Reardon]**).  Mobex's CEO was Reardon (T6 14:2-15:14 **[S. DePriest]**).  Reardon's involvement became a constant at Mobex and then MCLM.  Indeed, Reardon's career as a senior executive (having started as a telecommunications lawyer) spanned both Mobex and MCLM throughout their respective periods of ownership of the AMTS Spectrum licenses.  (T7 6:6-23, 6:24-7:18, 15:10-21 **[Reardon]**).

Thus, under Reardon's guidance, the Mobex/MCLM side of the equation remained fully informed about -- and an active and willing participant in -- the plan to exclude by deterring competitors from AMTS Spectrum licensing and from competing in the AMTS Spectrum market.  It is, for example, undisputed that after Mobex's license acquisition (from May of 2001 onward) Reardon met at least once or twice a year with the Coopers (T8 18:14-21 **[Reardon]**).  It is acknowledged that "business subjects" were discussed between these two horizontal competitors.

(T8 11:9-13:15 **[Reardon]**).    Reardon's involvement continued after MCLM's
2005 acquisition of the Mobex site-based licenses through his key role as manager
and executive officer of MCLM.    (T6 14:2-15:14, 16:23-17:10, 19:7-12 **[S.
DePriest]**).

After their initial discussion about dividing the A Block and B Block
licenses between them, both sides of the conspiracy proceeded just as they had
discussed and agreed.    [A835-A837, A870].    Each sought and obtained their
allocated share of the A Block and the B Block site-based licenses in most major
markets and transport corridors nationwide,[4] including eventually those in the
Great Lakes geographic region.    [A396 and A447].    The conspiracy continued into
the geographic license system.    Not once did these two major competitors apply to
bid or actually bid against each other. [*Id*.].    Beyond that, and despite being direct
competitors, PSI and Mobex/MCLM each supported the other in ways that only
made sense economically if they were acting in concert for their collective
economic gain.    Examples include cooperating with each other to (i) conceal the
fact that their own (and each other's) site-based licenses had automatically
terminated through failure to construct and provide service operations, and (ii)
scare off competitors from bidding on surrounding geographic licenses by falsely

---

[4] *See* footnote 3 for the only exception:  Mobex's acquisition of Watercom with its
existing system of A and B Block stations already in place.

asserting that the geographic licenses were heavily encumbered by Defendants' fraudulently continued site-based licenses. (T3 78:22-79:3 [**Havens**]).  Each party knew full well about the construction and operational failures that rendered the other's licenses invalid, yet each protected the other through silence.  (T2 53:12-55:6; T3 38:3-39:22 **[Havens]**; [A520 and A527 (FCC audit letters)].

### (c)    PSI Requests the FCC to Invalidate the Auction 57 Results

That PSI and Mobex/MCLM agreed to help one another for their mutual advantage was plain and obvious.  For example, PSI urged that Auction 57 for geographic licenses be redone in order to allow Mobex (its competitor) to participate -- a startling incident of coordinated action -- even though Mobex had been earlier disqualified from this auction for failure to submit a required upfront payment.    [A424, A550 and A556].    (T2 67:7-15; T4 28:10-29:5 **[Havens]**). Auction 57 proceeded without Mobex, and in it, PSI acquired the Block B geographic license for the Great Lakes region at the minimum bid. [A447-A448]. Nevertheless, PSI petitioned the FCC to *invalidate* the results of the auction (with its results quite favorable to PSI) and *redo* the entire auction.  (T2 44:3-45:21; T2 46:18-47:8; T4 95:7-96:8; T5 64:17-65:17 **[Havens]**); [A302].  If the auction were redone,  PSI would have had its highly favorable first-time result canceled and would face the uncertainty of outcome of a redone auction, including potentially not getting the license it had won or having to bid more to get it.   Absent

conspiracy, this conduct by PSI was completely against its own economic interests.[5]

The Defendants' individual bids for their own geographic licenses were closely coordinated between them as well.  Mobex and PSI each applied in Auction 57 only for the geographic licenses that did not contain any site-based licensed stations of the other.  For example, Mobex applied for geographic licenses having the A Block in all of the nation and the B Block (with the A Block) in the "Mississippi River" license area, and PSI applied for the geographic licenses having the B Block in all of the nation except for that Mississippi River area. [A__, A__ and A__]; (T4 28:10-29:17; T2 53:4-56:20 [**Havens**]).[6]  There was no financial or other charge by the FCC and no risk to Mobex or PSI to have applied for all licenses or to have submitted to the FCC the qualifying "upfront payments" for all licenses (or any quantity of licenses) so as to bid against each other.  Instead, the bidding was carefully choreographed.  [A339-A440].

Of course, given the knowledge that each competitor had about the other's failure to meet construction, coverage and service requirements, PSI knew that if it bought the geographic licenses that encompassed Mobex site-based stations, the AMTS Spectrum of those site-based stations would (at no additional cost) revert

---

[5] The FCC denied PSI's Petition.  [A308]; (T4 32:24-33:19, 34:19-36:2 **[Havens]**)
[6] AMTS-Spectrum geographic licenses by area are shown on an FCC-issued map.  [A674].  Each area has an A Block and a B Block license. (T2 12:13-23 [**Havens**]).

automatically to PSI under 47 C.F.R §80.385(c). Likewise, under that same Protection Rule, Mobex knew that if it bought the geographic licenses that encompassed PSI site-based stations, the AMTS Spectrum in those stations would at no additional cost revert automatically to Mobex. Yet, in accordance with their conspiratorial plan, neither bid on geographic licenses in the other's territory even though each knew of the other's vulnerability.

### (d)    PSI Raised No Concerns about MCLM's Conduct in Auction 61

In Auction 61, MCLM applied for and was granted a "very small business" 35% bidding discount based upon false certifications that its and any affiliates' gross revenues were zero. [A483, A485 and A499]. After the auction, MCLM admitted to spousal affiliate revenues, resulting in the FCC reducing MCLM's discount to 25%. However, that too was fraudulently incomplete since in later FCC investigations, MCLM and its owners (the DePriests) reluctantly admitted to more affiliates and revenues. [A499]. Yet throughout this fraud, PSI remained stunningly silent even though Cooper was aware of what had been going on. [A965]. Thus, PSI avoided any criticism of MCLM while at the same time both PSI and MCLM continued to cooperate in vigorously litigating against Plaintiffs' joint bidding (held to be entirely lawful by the FCC) in both AMTS Spectrum auctions. *See, e.g.*, [A317].

25

When Sandra DePriest -- who was trained as a telecommunications lawyer (handling among other things FCC license applications) as well as a general business lawyer, first with a law firm and then for her husband's company (T6 5:19-6:5, 23:22-25:9 **[S. DePriest]**) -- was asked on cross-examination to explain such deceitful conduct, her response, incredibly, was to hide behind the attorney-client privilege. (T6 52:12-59 **[S. DePriest]**).   With a bidding credit of 35% or even of 25%, a bidder has an enormous advantage in the bidding process, because that bidder needs to pay that much less if it is a successful bidder.  (T3 90:23-93:8 **[Havens]**).  The bidder enjoying the credit can therefore afford to go significantly higher in the bidding process than it could absent the credit, and, as a result, win licenses which it could not otherwise afford.  (*Id.*).

As the FCC stated,

> It took more than a year – and only after WTB [the Wireless Telecommunications Bureau] determined that [MCLM] had run afoul of the 'bright-line' spousal attribution provision in section 1.2110 – for MCLM to amend its application, at staff direction….  Several weeks later – and only in response to ongoing administrative litigation – MCLM belatedly acknowledged that Donald DePriest actually controlled three more entities….  Some three years later – and only in response to a written request for information from WTB – MCLM divulged more than two dozen additional affiliates of Donald DePriest.  Several months thereafter – and only in response to an Enforcement Bureau letter of inquiry – MCLM disclosed information about Donald DePriest's involvement in MCT Corp.

[A965(citations omitted)].

26

(e)    **Defendants' Collusive Misrepresentations to the FCC**

The FCC requires site-based AMTS Spectrum licensees to notify the FCC when their stations have met the construction and coverage requirements and commenced service to subscribers within the two-year construction period. (T2 88:19-118:15 **[Havens]**). Instead of doing so, however, PSI and Mobex each submitted similar speciously-worded notices announcing that they would "commence testing to commence service" before the looming deadlines. (T3 85:16-86:15 [**Havens**]; T9 67:12-21 **[Reardon]**); [A534 and A539, in which the FCC years later stated to both PSI and Mobex, "we find that you provided estimated future dates for activation and/or to begin initial tests to commence service, rather than notification that construction had been completed by a certain date."].

That both PSI and Mobex used the same strategy and the same sort of specious notices to trick the FCC that construction deadlines were met, when they were not, strongly suggests coordinated and concerted conduct. As noted above, Cooper even admitted during his deposition that PSI <u>never</u> had any service to subscribers for its AMTS Spectrum stations asserted as constructed notwithstanding that service is the purpose and requirement of license

construction.[7]  PSI's AMTS engineer, David Kling, confirmed the lack of stations providing service to customers during his deposition.  *See, e.g.,* [A1149-A1150, A1153-A1154].

Not only did PSI and Mobex/MCLM use exactly the same ploy to deceive the FCC, each knew the wrongdoing of the other and helped conceal that wrongdoing rather than report it to the FCC.  Their concerted conduct amounted to a joint misrepresentation to the market.   The FCC maintains a "Universal Licensing System," or "ULS", which is its official license database and application system[8] that allows online access to FCC licenses and applications processed by the Commission and is widely relied upon in the telecommunications industry. Both PSI and Mobex/MCLM filed renewal applications on ULS for licenses that were invalid.   By doing so, they both effectively misrepresented to the marketplace, through the ULS, that they had licensed stations with valid Service Contours ("non-interference" rights) that did not actually exist.  (T2 129:8-130:17 **[Havens]**).

Mobex's conduct is reflected by a chart that it prepared in or around 2004. [A1097].  As explained by Mobex's senior officer David Predmore during his deposition, a "Y" or "N" indicated whether various stations were "revenue

---

[7] *See* Cooper Deposition testimony at: [A795-A799, A809-A814, A818, A820, A886, A910-A914, A920-A921, A926-A927, A930-A931 and A950-A951].

[8] *See* http://wireless.fcc.gov/uls/index.htm?job=home

generating". [A1075-A1080]. After first claiming that not "revenue generating" meant not "profitable", Predmore admitted that a non-revenue notation really meant those site-based stations were not serving any customers. [A1077-A1078]. Mobex's complete lack of paying subscribers was confirmed in an August 2006 letter from Reardon to the Universal Service Administrative Company seeking ULS fee refunds and stating that by 2004-2005 Mobex's customers were not interconnected (as required of AMTS licensees under FCC rules) and revenues were "de minimus". [A518].

Significantly, when Mobex acquired Regionet's licenses, and when MCLM acquired Mobex's licenses, neither buyer retained the documentation purportedly evidencing the construction, including the dates thereof, and continuous operation of the stations [A1005-A1010], even though that documentation was a required by the FCC for AMTS stations in operation. *See* 47 C.F.R. §80.409.

### (f)    PSI's Similar Silence over MCLM's Invocation of the Second Thursday Doctrine

Defendants' concerted plan to allocate the market among themselves continued to MCLM's recent attempt to use the FCC's *Second Thursday Doctrine* (*see* note 1, *supra*) to escape the consequences of its wrongdoing described in FCC Order 11-64 [A480] through the Bankruptcy filing -- an event MCLM's Reardon characterized as "good news" to interested parties. (T7 182:18-184:4 **[Reardon]**).

29

MCLM attempted to use this doctrine in order to salvage its unlawfully obtained and maintained licenses; without the application of the doctrine, all of MCLM's licenses are subject to revocation in the FCC Proceedings.  Although it was a direct competitor of MCLM that would benefit from the loss of MCLM's license rights, PSI offered no protest over MCLM's attempted invocation of this extraordinary FCC relief.  A vigorous competitor would almost certainly have protested, as Plaintiffs did.  Once again, MCLM and PSI acted to help and protect each other to enhance their collective market power.

### (g)    Post-Trial MCLM Filings in the FCC Proceedings

On August 4, 2014, MCLM filed in the FCC Proceedings on Issue G Responses to the FCC's Enforcement Bureau Interrogatories ("Response"). [A233].  The interrogatories are dated July 21, 2014 and were propounded pursuant to FCC Order.  [A214].  By letter dated August 22, 2014, Plaintiffs provided the District Court with the Interrogatories and Response.  [A208(D.E. 287)].  In the Response, MCLM admits, as noted above, that it *permanently abandoned* the vast majority of the site-based licenses and component stations at issue well before trial.  [A235-A242].  The Response was verified under oath by Sandra DePriest as President of MCLM wherein she states she relied on "operation of the incumbent stations" information from Reardon and Robert Smith.  [A244]. *See also*, *In the Matter of Maritime Communications/Land Mobile, LLC*, 2014 WL

5088184, at *3 (F.C.C. Oct. 9, 2014) ("*FCC Order 14M-31*"), in which the Administrative Law Judge agrees with the determination that MCLM's "operations have permanently discontinued and that the authorizations have automatically terminated per Section 1.955(a)."

At trial, Reardon testified about MCLM's stations' Contour Information multiple times -- including under Court questioning (*see, e.g.*, T9 66:2-67:21, 69:6-71:10) -- not mentioning their permanent discontinuance but asserting the contrary (*see, e.g.*, (T7 101:4-6)).  MCLM's CEO Sandra DePriest did likewise.  (T6 88:23-90:23 **[S. DePriest]**).   In response to Plaintiffs' repeated requests for Contour Information both before and during the trial of this action, the only truthful response by MCLM as to this vast majority of site-based licenses and stations would have been that they had been permanently discontinued and terminated, thus, no Contour Information could or need be furnished.   However, this was decidedly not the response given by MCLM.  *See, e.g.*, Reardon (T7 143:7-13, 157:13-159:9, 167:1-169:10; T9 66:2-67:21, 69:6-71:10) and Sandra DePriest (T6 92:24-93:16, 97:24-98:7, 105:19-106:18).

## 5.    Injury to Plaintiffs

Plaintiffs offered ample evidence of business lost to them as a result of MCLM's unlawful conduct.   Losses have included impeding the ability of Plaintiffs to offer PTC to NJ Transit, Amtrak (until after the PSI settlement), and

MTA, among other potential users, and the income to Plaintiffs that would have resulted therefrom. *See, e.g.*, (T2 88:3-25, 89:1-23, 90:1-25, 91:7-24 **[Havens])**; as to NJ Transit *see, e.g.*, [A363]; (T2 100:2-25; 101:1-25, 102:1-8, 103:10-25, 104:1-23 **[Havens]**); as to Amtrak *see, e.g.*, [A466]; (T2 92:9-19, 93:16-25, 94:1-25, 95:1-13, 99:3-12 **[Havens]**); as to the MTA *see, e.g.*, [A368 and A666]; (T2 108:15-25, 109:1-5, 15-25, 110:1-25, T5 50:5-7, 53:1-4, 13-25, 53:1-25 **[Havens]**).

The evidence adduced, including as to NJ Transit as an example, shows that blocking occurred. [A363]; (T2 100:2-25; 101:1-25, 102:1-8, 103:10-25, 104:1-23 **[Havens]**). The fact of the need for these PTC systems was documented by NJ Transit (*see id.*), and Amtrak [A466] (*see* T2 92:9-19, 93:16-25, 94:1-25, 95:1-13, 99:3-12 **[Havens]**), and the MTA (*see* [A368 and A666]; (T2 108:15-25, 109:1-5, 15-25, 110:1-25, T5 50:5-7, 53:1-4, 13-25, 53:1-25 **[Havens]**), and others (*see, e.g.*, T2 89:1-17 **[Havens]**). Plaintiffs offered ample other evidence of business lost to them as a result of this conspiracy and that those losses were the proximate result of the conspiracy. (T2 88:3-25, 89:1-23, 90:1-25, 91:7-24 **[Havens]**).

Losses have also encompassed the lost revenues from Plaintiffs' inability to build out the systems due to blocking by Defendants' invalid stations that would likely have already resulted in the creation of a roadway accident-avoidance system nationwide. (*Id.*). While the AMTS HALO core of the nationwide system will be implemented by Plaintiff Skybridge (a §501(c)(3) nonprofit) at no public

charge; the Plaintiff LLCs will also participate, offering ancillary AMTS-based services for charge.  (*Id*.).

## SUMMARY OF ARGUMENT

For more than a decade, Mobex, followed by its successor, MCLM, acted in concert with PSI to divide and unlawfully warehouse substantially all of the AMTS Spectrum (Blocks A and B) in site-based licenses nationwide between themselves. Acting in concert, each severely discouraged new entrants from bidding for geographic licenses under the new geographic licensing regime by false public claims before the FCC and the market, including false and coordinated representations in the FCC 2004 Audit, that all of their site-based licenses' stations were validly constructed and in operation when they were not.  Indeed, soon after trial MCLM admitted to the FCC that a large percentage of their stations had long ago been permanently abandoned and automatically terminated.  This concerted deception led any prospective new-entrant bidders to believe that if they competed for geographic licenses at auction, Defendants had the AMTS Spectrum all locked up in the major markets and transport corridors, blocking new entrants in these critical areas and undermining business viability.  When Plaintiffs *did* act to win geographic licenses nonetheless, Defendants, again concertedly, blocked Plaintiffs from actually commencing operations and deriving meaningful economic return by refusing Contour Information repeatedly demanded by Plaintiffs.

33

Thus, in violation of §1 of the Sherman Act, Defendants engaged in a horizontal conspiracy to allocate licenses and to prevent Plaintiffs (who are their direct competitors) from gaining and/or increasing market share in the AMTS Spectrum, a well-defined market both in product and geographic terms and a sweet spot in radio spectrum for transportation accident-avoidance systems, among other important applications. Acting together, the Defendants claimed to have valid site-based licenses when, as to at least the vast majority of them, they did not. Again acting together, they refused to provide essential Contour Information to Plaintiffs with respect to their allegedly valid AMTS Spectrum stations as required by FCC rules and orders. Defendants' conspiratorial scheme was successful: it severely blocked, restrained, and delayed Plaintiffs' efforts to compete.

MCLM was shockingly dishonest before the District Court about its longstanding permanent discontinuance, and therefore automatic termination, of the vast majority of its licenses and stations thereunder. This dishonesty severely contaminated the District Court's decision on the issue of proof of conspiracy since the District Judge relied on the truthfulness of MCLM witnesses. [A62].

The District Court also applied an improper standard for proof of conspiracy. By relying on the word of MCLM's principals rather than on the factual record that pointed plainly toward conspiracy, the District Court used an improperly stringent and misdirected standard that would compel the dismissal of

virtually all antitrust conspiracy cases except those relatively few that follow a successful government criminal prosecution in which the prosecutors have the ability, through threats of individual criminal prosecution and grants of use immunity, to get individual conspirators to testify against each other.  While a private plaintiff lacks the clout of a criminal prosecutor, the law seeks to encourage injured parties to assist in the enforcement of the antitrust laws by functioning as "private attorneys general."  Where, as here, (a) MCLM's and PSI's principals have acknowledged the foundational elements of a conspiracy; and (b) there is clear evidence of a horizontal market allocation scheme; and (c) numerous "plus factors" are present showing conduct that is inconsistent with the individual economic interests of each co-conspirator, there is substantial and compelling evidence of a horizontal conspiracy which cannot be disregarded or dismissed out of hand.

MCLM's frauds, obfuscations, and disclosure misrepresentations also violate FCA sections and related FCC rules and are actionable by injured private parties in a federal suit for injunctive and damages relief, all as pled in Counts I and II of the Complaint (dismissed before trial).  The FCC directives and actions at issue here, including but not limited to the Protection Rule, the Cooperation Orders, and FCC audits, are in fact legally binding such that a federal court may award relief for their violation.  They are definite and specific in their requirements

and results, and injunctive enforcement and damages remedies clearly may be sought and granted.  On top of flagrant violations of the Cooperation Orders and the Protection Rule, MCLM has also repeatedly engaged in lies and obfuscation directed at the FCC as the FCC found in Order 11-64 [A480], causing grave damage to Plaintiffs.   MCLM's continuing fraud corrupts the core of the telecommunications regulatory system and is the strongest evidence of unjust and unreasonable conduct by a common carrier FCC licensee in violation of §201(b) -- giving rise to damage actions under §§206-207 and injunctive enforcement under §401(b).  These unreasonable acts have caused injury to Plaintiffs by everything from over a decade (to date) of blocking them with invalid and fraudulent site-based licenses as to which Contour Information was denied (and fraudulently maintaining there was Contour Information to provide when MCLM's licenses were, in fact, defunct), to cheating in auctions thereby corrupting the FCC's geographic licensing system, causing Plaintiffs to lose lawful high bids and otherwise-resulting license grants.

**ARGUMENT**

**POINT I**

**PLAINTIFFS' CLAIMS OF CONSPIRACY IN VIOLATION
OF SHERMAN ACT § 1 SHOULD NOT HAVE BEEN DISMISSED**

**A.    Standard for Review**

Since this appeal is from the 2014 Judgment -- a final order and judgment after trial -- this Court's review is plenary.  The standard for review of the tried §1 Sherman Act claim is one of abuse of discretion as to factual determinations and simple error in application of law as to legal conclusions.  *See In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996).

**B.    Elements of §1 of the Sherman Act**

Four elements must be established to prove a violation of Section 1 of the Sherman Act (15 U.S.C. §1): "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action [was] illegal; and (4)…[plaintiff] was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005), quoted with approval in *Howard Hess Dental Laboratories, Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237 (3d Cir. 2010).

C.     **Argument on these Claims**

1.     **Relevant Market**

The evidence adduced at trial on relevant product and geographic markets confirms that the AMTS Spectrum constitutes the relevant product market given its unique sweet spot for multiple important uses, both nationally and regionally, and the absence of available substitutes for that spectrum in those uses.  Those uses include ones fundamental to roadway and railway accident avoidance.  There can be no dispute that, absent a valid FCC-issued license, one cannot lawfully provide radio services.

While the oft-cited *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), is a merger case decided under §7 of the Clayton Act, 15 U.S.C. §18, not §1 of the Sherman Act (*id*. at 296), the decision contains a careful description of how relevant product and geographic markets or submarkets (as large as "the entire Nation" and "as small as a single metropolitan area") are defined within which the Defendants' anticompetitive conduct is to be evaluated.  *Id*. at 324-26, 336-37. The Court evinced a desire, reflecting Congressional intent, to keep the process of market definition flexible and very much oriented towards the particular circumstances of the specific setting, guided by the facts of the individual industry in establishing appropriate market boundaries.

Here the characteristics and availability of the radio spectrum itself (as explained at trial by expert and fact witnesses and through exhibits) and the FCC's licensing process easily define the relevant product market as the AMTS Spectrum. Other ranges of the radio spectrum are either entirely unsuitable or are restricted for other uses.

The relevant geographic markets are also easily defined on the facts of this case. The uses to which the AMTS Spectrum are put automatically define the geographic market within which the litigants compete. The geographic market for HALO applications is necessarily nationwide, whereas the geographic submarket for PTC and "smart-grid" applications is regional. The parties herein simultaneously compete in both this national market and these regional submarkets. The anti-competitive impact of the Defendants' wrongful conduct is equally injurious to Plaintiffs in both.

A broader market impact beyond Plaintiffs' lost business alone, as described in detail in the Facts section *supra,* takes multiple different forms:

a.) Defendants' joint false assertions of valid stations under site-based licenses severely skewed both auctions of AMTS Spectrum geographic licenses.

b.) Prospective, post-auction sub-licensees, such as railroads like Amtrak and NJ Transit seeking geographic AMTS Spectrum to deploy PTC under Congressional mandate were blocked for critical years because of Defendants'

assertion as valid of invalid stations under site-based licenses, thus creating large but false Service Contour holes in Plaintiffs' geographic licenses making them non-viable for PTC where service must encompass large areas of a railroad's operations. The result has been lengthy delay in implementation of PTC accident-avoidance systems. The same has been true nationwide for HALO.

Both together give rise to a broad-based injury to the market itself resulting from the corruption by Defendants of the licensing and use of AMTS Spectrum, a public resource for highly important societal purposes. Defendants' conspiratorial schemes have hindered the implementation, regional and nationwide, of both of new technology (*e.g.*, HALO) and of existing technology (*e.g.*, PTC) where, through both, injuries and deaths can be avoided, and as to PTC, fulfillment of a major Congressional mandate on rail safety with a deadline at year-end has been frustrated, especially in the Northeast Corridor.

### 2.    Evidence of Unlawful Horizontal Concerted Action

In this case the evidence of concerted action between two horizontal competitors -- Mobex/MCLM and PSI -- was amply supplied by admissions evidencing direct discussions to allocate the AMTS Spectrum and by continuing concerted action by both sides over the years to achieve this unlawful goal.

Yet the District Court found that there was insufficient evidence of conspiracy. In so finding, the District Court relied on the credibility of MCLM's

witnesses who, even as they testified, knew that key portions of what they were saying were false. In fact, within six weeks after the trial ended and only days after the post-trial briefing was concluded, the magnitude of their false testimony was revealed in FCC filings that MCLM itself made and that were verified by these very witnesses.

The District Court did not dispute that "The defendants have not provided Havens and/or plaintiffs with operating contours or parameters for their stations…." [A18]. And, on the matter of conspiratorial agreement to allocate the AMTS market between Mobex/MCLM and PSI, while the District Court concluded that Cooper's testimony "fail[ed] to establish that Cooper *agreed* to proceed as Daniel proposed", it added "…Daniel's statements, as relayed by Cooper, illustrate a course of action that Daniel and his company intended to take, which arguably warned Cooper off of pursuing the same course. But the contents of the statement fail to reflect a unity of purpose or meeting of the minds to undertake an unlawful arrangement." [A34 (emphasis in original)]. This sort of superficial analysis disregards the reality of conspiratorial conduct. Such competitors ordinarily do not share their confidential business plans with each other unless their purpose is to achieve concerted action among them for their collective benefit. Rarely do co-conspirators sign agreements or even exchange words of express agreement. Only through the information exchanged (on, in the

41

District Court's own words, "a course of action" [A34, A36, A46]), followed by each co-conspirator's reliance on the information given by the other (as evidenced by their subsequent actions), does a conspiracy become apparent.

Precedent in the Supreme Court and this Circuit clearly confirms what constitutes concerted action. The application of that precedent to a finding of conspiracy on these facts is supported by United States Supreme Court decisions such as *American Tobacco, Topco*, and *Sealy*, *infra*, all of which involve *per se* violations of the Sherman Act. *American Tobacco Co. v. United States*, 328 U.S. 781 (1946) (20-year conspiracy [at 804] with "no written or express agreement" but "a clear course of dealing" [at 800]); *United States v. Topco Associates*, 405 U.S. 596 (1972) (a conspiracy of over 20 years with horizontal market division, found *per se* illegal, even though unaccompanied by price-fixing or other restraints); *United States v. Sealy, Inc.*, 388 U.S. 350, 354-55 (1967) (same for over 35 years). *See also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990); *U.S. v. General Motors Corp.*, 384 U.S. 127, 142-143 (1966) ("it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy").

*American Tobacco* involved a criminal prosecution in which no agreement (written or express) was found to exist, only a course of dealing, yet proof of that course of dealing was found sufficient even to sustain a criminal conviction. 328

U.S. 809-810.  *See, also*, *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979), *cert. denied*, 444 U.S. 1043 (1980) (though assent by co-conspirators was not clear at the time of formation of the antitrust conspiracy, subsequent conduct in furtherance of the conspiracy supported even a criminal conviction).  While the Supreme Court found the allegation of a lengthy conspiracy to be implausible in *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574 (1986), it did so in the context of a predatory pricing case in which the Court found that the likelihood of competitors agreeing to sustain the losses required by long-term predatory pricing was remote.

This case, by contrast, is one involving territorial allocation.  The *per se* condemnation of the horizontal division of markets on a territorial basis applies broadly, as shown by *Topco, Sealy and Palmer, supra*, each of which is a horizontal-division-of-markets case involving a conspiracy of long duration.

> Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other. *Palmer, supra,* at 49-50.

By contrast, the standard of proof of an illegal conspiracy that the District Court set here creates much too high a bar.  In a horizontal territory-allocation agreement such as pled here, even had there not been an explicit discussion (as there was here), this Court's treatment of "plus factors" makes it clear there would have been sufficient evidence of a conspiracy in violation of §1 of the Sherman

Act.  The plus factors include: (a) evidence that Defendants had a motive to enter into a conspiracy; (b) evidence that Defendants repeatedly acted against their legitimate individual economic self-interest to assist the other; (c) evidence that Defendants were aware of each other's actions; and (d) evidence that Defendants acted in lockstep fashion.  The District Court did not dispute the basic facts as Plaintiffs laid them out as to the similarities of position taken before the FCC from at least 2004 onward by Mobex/MCLM on the one hand and PSI on the other.  *See, e.g.*, [A24-28].  However, the District Court failed to weigh the extent to which the positions taken were wholly inconsistent with the Defendants' economic interests if engaged in unilaterally, but entirely consistent with their combined interests if they were acting in concert.

In *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1223 (3d Cir. 1993), the conspiracy was alleged to include, among other things, an agreement to refrain from soliciting each other's accounts.  This Circuit found that more liberal inferences from circumstantial evidence can be made where the concerns of implausibility expressed in *Matsushita* with respect to an alleged predatory pricing conspiracy are not found.  This Circuit's development of this approach continued with *In re Baby Food Antitrust Litigation*, 166 F.3d 112 (3d Cir. 1999) where the Court stated, "[t]he acceptable inferences which we can draw from circumstantial evidence vary with the plausibility of the plaintiff's theory and

44

the dangers associated with such inferences." *Id*. at 124. This approach continued further with *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004), where the evidence showed simply three closely timed and nearly identical increases in the list price for flat glass by the five companies found to be co-conspirators. The plus factors were identified as "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy'" *Id*. at 360 (citations omitted). The Court found that the price increases were contrary to each defendant's self-interest absent conspiracy. A key piece of evidence in *Flat Glass* was the exchange of pricing information among these competitors, even though the mere exchange itself was not, in and of itself, unlawful. *Id*., at 368-69. Yet, taken with other evidence, this otherwise lawful exchange was found to be probative of a Sherman Act, §1 violation. This Court has also rejected the notion that each piece of evidence has to stand on its own; rather, it has concluded that the totality of the evidence can be considered together by the trier of fact in deciding whether the "plus factors" are present. *Id*.

As noted above, there are numerous cases in which sharing of confidential competitive information between horizontal competitors is an important indication of an intent to engage in concerted action. Here, the conversation between Daniel and Cooper about which block of licenses Daniel intended to apply for and which

block he expected Cooper to apply for without interference from Daniel was an exchange of highly confidential information between competitors. The sharing of such information coupled with each party's reliance upon the information from the other so as to divide the available market between them is evidence of a *per se* §1 violation. *See*, *e.g*., *Petroleum Prods. Antitrust Litig*., 906 F.2d 432, 445-50 (9th Cir. 1990), *cert. denied*, 500 U.S. 959 (1991) (exchanges of price information treated as a plus factor from which a jury could infer conspiracy among rivals to fix prices); *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978); *United States v. Container Corp. of America*, 393 U.S. 333, 337-38 (1969) (exchange of price information even without an agreement to adhere to prices is still unlawful in a highly concentrated industry). The discussion here was akin to competitors who competitively bid on the same construction projects and divide up the market by agreeing who will be the lowest successful bidder on project A and who will be the lowest successful bidder on project B. *See U.S. v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1188 (3d Cir. 1984); *Smithkline Beecham Corp. v. Eastern Applicators, Inc.*, 2002 WL 1197763, at *3-4 (E.D.Pa. May 24, 2002).

In violation of the FCC's Protection Rule and Cooperation Orders, PSI and Mobex/MCLM, acting in concert, blocked Plaintiffs' entrance and expansion into ATMS Spectrum geographic markets across the country and in key transportation corridors (through use of geographic licenses Plaintiffs had bid on, won and paid

for) by failing to provide essential Contour Information for Defendants' allegedly validly constructed and operating site-based stations -- that in fact were neither validly constructed nor operating.

All of the Defendants' site-based station licenses were issued before November 16, 2000; so, the stations' two-year construction deadlines (under 47 C.F.R. §80.49) had long since passed by the time of the first geographic license auction (in 2004), and no new site-based licenses, or expansions of Service Contours of timely and lawfully constructed stations, were permitted thereafter under FCC orders.  S*ee In re Amendment of Commission's Rules*, 15 FCC Rcd. 22585, 22621-22(¶¶76-77) (2000).  The whole truth, as disclosed in MCLM's post-trial admissions to the FCC, is that as to at least 4/5ths of their claimed site-based licenses, MCLM and its predecessors had never built out or operated them and/or had permanently discontinued them long before trial ("shortly before" May 12, 2012 and December 2, 2013, as asserted in MCLM's post-trial admissions to the FCC).  Therefore, those licenses not only were automatically terminated by FCC rule but had no Contour Information since there were no operating stations.  So, the simple answer as to why MCLM refused to comply with the Protection Rule and Cooperation Orders was finally revealed in MCLM's post-trial admissions to the FCC, that at least 4/5ths of its site-based licenses stations had permanently discontinued and automatically terminated (*i.e.*, "died") *long before* the trial.

There can be no Contour Information for permanently discontinued, or "dead", stations.

For years MCLM and PSI jointly stonewalled and fraudulently claimed their remaining stations were all in operation and valid. Each party knew the other was falsely reporting operation as to all stations and construction as to many stations, yet each remained silent. They did so in concert to protect their anticompetitive conspiracy with an unlawful goal to collectively warehouse invalid spectrum licenses. Silence by both was part of the deal because whistleblowing disclosure of the lies by either against the other would have been the death knell for both. As to MCLM, all of this fraud continued right through the trial.

The collective misrepresentations about the validity of their site-based licenses, both at trial and before, and their collective efforts to conceal the permanent discontinuance of such licenses was highly misleading and perfectly consistent with MCLM's and PSI's objective of severely blocking and restraining competitors in this market, including Plaintiffs. This very conscious and deliberate omission of the truth until all trial submissions were complete quite clearly eviscerates the credibility of the trial testimony of MCLM's key witnesses. The District Court believed the testimony of MCLM's CEO Sandra DePriest and its former senior executive John Reardon as is evidenced by the weight given to their testimony at the conclusion of its 2014 Judgment [A60-A62]. Yet MCLM's post-

trial FCC filings and stipulations confirm that DePriest and Reardon both lied when they testified at trial that the reason for refusing to give their Contour Information to Plaintiffs was because Plaintiffs failed to provide their geographic license build-out plans to MCLM. *See FCC Order 14M-31*, 2014 WL 5088184, at *3. The truth was quite the opposite: there was no Contour Information to give because the vast majority of MCLM's site-based stations had long since terminated. [A235-A242]. These witnesses concealed this critical information from the Court just as they had from the FCC and Plaintiffs.

The District Court clearly relied on MCLM's misrepresentations at trial since it characterizes the notion of MCLM's lost licenses due to automatic termination as simply "plaintiffs' *narrative*" [A49 (emphasis in original)], a characterization the District Court would likely not have made if MCLM's witnesses had told the truth about MCLM's licenses, including when they were permanently discontinued and hence, by their own admission, automatically terminated. The District Court even gave credence to Reardon's suggestion at trial that MCLM failed to give Contour Information to Plaintiffs because, according to Reardon, Plaintiff Havens "is very litigious" [A45-A46, n.21] and not because there was no information for MCLM to give for non-existent stations. The District Court further failed to give proper consideration to the evidence of the FCC 2004 construction audit of Defendants' stations which demonstrated a minor portion of

the unlawful warehousing (including fraudulent renewals) that Defendants engaged in in wide areas of the nation.  [A520, A534, A527 and A543].

In short, the District Court simply disregarded a mountain of damning evidence.  Defendants' concerted actions were carefully and consciously directed by both camps: neither side bid on geographic licenses in the other's territory even though each knew of the other's vulnerability.  Each steadfastly adhered to the division of the market previously discussed between them, and each joined their combined attempt at economic exclusion of all others, including Plaintiffs.  Each side acted in concert to assist the other and not blow the whistle.  Thus, while a non-conspiring competitor would have strenuously objected to such things as the other's fraud and unlawful warehousing shown in the 2004 audit, MCLM's misconduct in Auction 61, and maintaining invalid licenses (just as PSI vigorously attacked Plaintiffs' geographic-license bids in multiple FCC filings and subsequent federal appeals which it lost), PSI was silent.  PSI's inaction in the face of MCLM's misconduct, and vice versa, is inconsistent with its economic self-interest if acting alone but speaks volumes about the level of concerted conduct between PSI and MCLM.  Because Mobex/MCLM and PSI between them controlled virtually all of the site-based licenses nationwide, their concerted refusals to comply with the Protection Rule and the Cooperation Orders and to follow FCC regulations had but one purpose and effect: to attempt to scare the Plaintiffs and

other would-be competitors out of the market, and to retain full control of the AMTS Spectrum market by making Plaintiffs' geographic licenses impossible to use. Defendants' unlawful warehousing of AMTS Spectrum is contrary to core Congressional and FCC policy for regulation of our nation's scarce broadcast-spectrum resources. For the geographic and site-based licensing systems to function together, nothing can be more important than compliance with FCC orders as to how the parties must cooperate in order to avoid interference.[9] A licensee with what is actually an invalid site-based license who compounds that fraud by failing to provide Contour Information corrupts the operation of the geographic license system by preventing its build-out and operation. Such wrongful conduct also corrupts the auction process by giving prospective bidders a false impression that the license on which they are bidding will be subject to greater encumbrance -- that is, more or larger "holes" in the geographic license territory -- than is actually the case. *See* (T2 53:15-56:1 **[Havens]**).

There are few antitrust conspiracies that have offered this combination of an explicit, express discussion of a plan to allocate the market with numerous plus factors that demonstrate conduct contrary to the best economic interests of the co-conspirators acting independently of their conspiracy.

---

[9] For AMTS, this is further shown by 47 C.F.R. §80.70(a).

Thus, Defendants' conduct was unlawful *per se* under Sherman Act §1, as noted above, as a horizontal territorial allocation among competitors. But even an agreement that does not rise to the standard of being a *per se* violation can nonetheless be violative of §1 under a Rule-of-Reason analysis if, on balance, the practice is one that "suppresses competition" rather than "promotes competition." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691 (1978). To defeat liability under this standard, defendants must show sufficient pro-competitive justifications from their conduct, such as lowering production costs or increasing interbrand competition, to outweigh the competitive harm. Justifications unrelated to competition are irrelevant. Here MCLM is unable to show any pro-competitive justification for its conduct. On the contrary, its conduct suppressed competition both in the auctions for geographic licenses and, thereafter, in thwarting the development of the AMTS Spectrum for valuable applications for the public good.

Conspiring to block others in the scarce national resource of the radio spectrum (and denying our nation the opportunity for advanced transportation safety systems in the process) is unlawful conduct of the highest order. As the FCC itself has noted, "both the potential for deception and the failure to submit material information can undermine the Commission's essential licensing functions." *In the Matter of Intermart Broadcasting Twin Falls, Inc.*, 23 F.C.C.R.

8822, 8827 (2008).  The FCC has also said, "When auction applicants undermine our disclosure rules, such actions threaten the very foundation upon which we conduct our auctions."  [A500(¶49) to which can be added: "The FCC relies heavily on the honesty and probity of its licensees in a regulatory system that is largely self-policing."  *Contemporary Media Inc. v. FCC*, 214 F.3d 187, 193 (D.C. Cir. 2000) (citation omitted)].  *See Policy Regarding Character Qualifications in Broadcast Licensing, Report, Order and Policy Statement*, 102 F.C.C.2d 1179 (1985).  Licensee integrity is a must for the system to work given the large number of licensees.

Plaintiffs acted honestly and played by the rules in a pro-competitive way; MCLM acted unlawfully and anti-competitively to thwart and block Plaintiffs from succeeding in doing so.  The conspiracy here might very well have succeeded long-term in the way Defendants had planned if Plaintiffs had not steadfastly refused to give up despite the daunting obstacles Defendants placed in their path. That Plaintiffs have suffered injury as a result of the Defendants' conduct cannot be seriously denied.[10]

---

[10] As to the fact-of-injury element, the evidence is strong (*supra*, at pp. 31-32) and this is not a heavy burden to meet in any event.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001); *accord In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 311 (3d Cir. 2008); *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385 at *14 (E.D. Pa. 2011).

53

In light of its egregious anti-competitive conduct, MCLM is properly subject to license cancellations to restore what MCLM, acting in concert with PSI, has blocked and impeded for years.  This Court is empowered to order such license cancellations under 47 U.S.C. §313 upon a finding of an antitrust law violation by an FCC licensee.  *See U.S. v. Radio Corp. of America,* 358 U.S. 334, 340-46 (1959).

## POINT II

### MCLM VIOLATED THE FCA, AND PLAINTIFFS' CLAIMS ALLEGING VIOLATION SHOULD NOT HAVE BEEN DISMISSED.

#### A.    Standard of Review

Appeal as to the 2011 Order is from a dismissal of claims on a motion to dismiss; thus, the Court's review is plenary.  The review on appeal for these claims is whether the District Court erred in its findings of law based on the facts as pled.  *See Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013).

#### B.    Argument on these Claims

Count I states a cognizable claim for injunctive relief for violation of 47 U.S.C. §401(b).  That section explicitly authorizes, upon the failure or neglect of a person "to obey any order of the Commission other than for the payment of money," application to the appropriate district court not just by the Commission but also by "any party injured thereby" for "the enforcement of such order".

As set forth in Count II [A161], 47 U.S.C. §§206-207 authorizes an action such as Plaintiffs' under §206 for injury caused for acts, or failures to act, that are required of a common carrier "for the full amount of their damages…together with a reasonable counsel or attorney's fee, to be fixed by the court…", and §207 allows the injured party either to "make complaint to the Commission" *or* to "bring suit for the recovery of damages…in any district court of the United States of competent jurisdiction."

As the District Court agreed [A78], the definitive authority on the scope of §§206-207 claims is the U.S. Supreme Court's decision in *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007), in which the Supreme Court stated that the §207 language "makes clear that the lawsuit is proper *if* the FCC <u>could</u> properly hold that [the challenged practice] is an 'unreasonable practice' deemed unlawful under §201(b)." *Id.* at 52-53 (underlined emphasis added).[11]   The Supreme Court's intentional use of the

_____

[11] In so holding, the Supreme Court added that it had reached this conclusion because:

> the immediately preceding section, §206, says that a common carrier is '*liable*' for '*damages* sustained in consequence of' the carrier's doing '*any act, matter, or thing in this chapter* prohibited or *declared to be unlawful.*'   And §201(b) declares '*unlawful*' any common-carrier 'charge, *practice*, classification, or regulation *that is unjust or unreasonable.*'

*Id.* at 53.

phrase "*could* properly hold" instead of "*did* properly hold" is telling, recognizing, *inter alia*, that a prior FCC holding is not required for court enforcement and that "to violate a regulation that lawfully implements §201(b)'s requirements *is* to violate the statute." *Id.* at 54 (emphasis in original). *See also, Master Call Communication, Inc. v. World-Link Solutions, Inc.*, 2009 WL 936887, at * 9 (D.N.J. April 6, 2009) ("…plaintiff's right to sue under the Act originates from Sections 206 and 207, which make parties who violate the Act liable to parties they injure through such violations…. Plaintiff need only allege that it has suffered an injury as a result of the defendant's violation of the Act." (Citation omitted)).

Here, Plaintiffs extensively and properly pled [A147-A152 (Complaint, ¶¶20-30)] claims under FCA §§201, 206 and 207 resulting from the acts and practices of MCLM that were prohibited by regulations and orders which the FCC "could properly hold" to be "unjust or unreasonable" and, thus, "unlawful" under §201(b) which provides that all carriers' practices "shall be just and reasonable." *Id.* [A163 (Complaint, ¶58)]. Moreover, the order deemed sufficient for FCA §201 purposes in *Global Crossing* was an FCC "Compensation Order" that allowed the parties to try to cooperate, but ultimately imposed requirements if there was no cooperation.

Congress very intentionally mandated that the FCA would be enforceable, in substantial part, through private actions in district courts by providing very broadly

in §206 that if a carrier[12] "shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful", it "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence…."

MCLM's conduct violates, among other provisions of the FCA, §201(b). MCLM has not only violated rules, orders and regulations of the FCC but also has repeatedly engaged in inherently unreasonable acts like lying and obfuscation directed at the FCC, including in (a) bidding on geographic licenses under falsely obtained discounts clearly inapplicable to it as the FCC has found [A480 (FCC Order 11-64)], or (b) statements (later admitted to be false) asserting station construction and operation of terminated stations, and (c) false license renewals knowing the stations were dead. *See* [A520-A554 re 2004 FCC audit]; *FCC Order 14M-31*, 2014 WL 5088184, at *3. FCC license applications require certifications invoking 18 U.S.C. §1001 for criminal defrauding of the government if violated. Thus, MCLM's frauds in their filings of false applications, bids, and renewals were criminal violations that go to the very foundation of the FCC's regulatory system; they provide the strongest possible evidence of unjust and unreasonable conduct in violation of §201(b), giving rise to damages under §§206-207 for Plaintiffs' injuries arising from everything from blocking with false site-based licenses and

---

[12] MCLM is an FCC-regulated CMRS common carrier. [A143-A144 (Complaint, ¶¶12 and 16)].

with Contour Information denied, to corrupting the bid process in auctions in which Plaintiffs competed.

These MCLM violations and the foundational nature of the law violated was explained by the full Commission in FCC Order 11-64:

> The integrity of our auctions program is of paramount importance, and we take allegations and evidence of auction misconduct very seriously. The Commission relied to its detriment on Maritime's [MCLM's] initial and purportedly "corrective" filings -- including in its dismissal of a petition to deny. As the Commission has stated, "[we rely] heavily on the truthfulness and accuracy of the information provided to us. If information submitted to us is incorrect, we cannot properly carry out our statutory responsibilities." [A482(¶7)(citing *In the Matter of Amendment of Section 1.17 of the Commission's Rules Concerning Truthful Statements to the Commission, Notice of Proposed Rulemaking,* 17 FCC Rcd 3296, 3297 P 3 (2002)].

MCLM's violations encompass not only false statements to win and keep auctioned geographic licenses, but also untruthfulness in getting and keeping its site-based licensing, all as pled in the Complaint.[13]  [A147-A152 (Complaint, ¶¶ 20-30)].   Violation of these foundational requirements for licensee conduct

---

[13] FCC Rule §1.17 states that violation of it is itself unreasonable:  "(a) .... no person ... shall....provide material factual information that is incorrect or omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading *without a reasonable basis* for believing that any such material factual statement is correct and not misleading."  (Emphasis added).  Moreover, it is axiomatic that untruthfulness is unjust and unreasonable, especially in the context of FCC licensing applications and statements thereunder.

impedes the FCC's ability to carry out its statutory responsibilities and is patently unjust and unreasonable under §201.

A court-enforceable FCC order can take a variety of forms, including a rulemaking or a non-rulemaking order.  *See Lansdowne on the Potomac Homeowners Ass'n., Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013) (involving an FCC Exclusivity Order concerning cable providers).  Even an FCC rule itself is a court-enforceable order provided it requires or prohibits an action.  *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416-25 (1942); *Mallenbaum v. Adelphia Commc'ns. Corp*., 74 F.3d 465, 468 (3d Cir. 1996).

Here, MCLM violated the Protection Rule, the Cooperation Orders, and other FCC rules and regulations as specifically alleged by Plaintiffs [A147-A152 (Complaint, ¶¶ 20-30)] when it failed to provide Contour Information to Plaintiffs. The Cooperation Orders were not rulemaking orders merely offering interpretive guidance, as the District Court erroneously found. [A77].  Rather, they were FCC orders issued under the pre-existing Protection Rule and other FCC rules and regulations that set forth definite and clearly enunciated requirements for Defendants to follow in providing Contour Information.

Although the Complaint alleges multiple violations, any one violation by MCLM of any of these orders, rules and regulations permits Plaintiffs to proceed

in court against it.  As one example of such MCLM-violated orders, the Complaint details Plaintiffs' numerous attempts to get Contour Information and the resulting injury to Plaintiffs.  [A147-A152 (Complaint, ¶¶20-30)].

The Fourth Circuit has recently affirmed that rulemaking orders as well as non-rulemaking orders are enforceable by private right of action under §401(b).  *Lansdowne, supra,* 713 F.3d at 199-201.  The test is simply whether the FCC order in question sets forth "specific rights and obligations of the [ ] litigants," as the Cooperation Orders here clearly do.  *Id*. at 201 (internal quotation omitted).  Ironically, the language of the Fourth Circuit concerning the practices in that case has equal applicability here: "...OpenBand has engaged in what amounts to an elaborate game of regulatory subterfuge...."  *Id*., at 207.

In fact, the Cooperation Orders call for certain very specific conduct and are thus not rulemaking even within the meaning of *New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine*, 742 F.2d 1 (1st Cir. 1984) on which the District Court so heavily relied.  [A74-A75].  Here, first iteration of the Cooperation Orders was issued by the Wireless Telecommunications Bureau of the Commission which has no rulemaking authority as a matter of law.  *See* 47 CFR §80.331(d).  Also, the directives set forth in the Cooperation Orders specifically applied an *existing* FCC rule, 47 C.F.R. §80.385, and conclude with ordering clauses ("Accordingly, IT IS ORDERED…").  *See, e.g.,* [A174].

60

Moreover, *New England Telephone & Telegraph*'s very narrow interpretation of available court enforcement under §401(b) has never been accepted by this Circuit and has been rejected by the six Circuits (the Fourth, Fifth, Sixth, Seventh, Eighth and Ninth) that have had occasion to address the issue. *See Lansdowne*, *supra* ; *Alltel Tennessee, Inc. v. Tennessee Public Service Commission*, 913 F.2d 305, 308 (6th Cir. 1990); *Hawaiian Telephone Co. v. Public Utilities Commission of the State of Washington*, 827 F.2d 1264, 1271 n.19, 71-72 (9th Cir. 1987) ("[T]he Fourth, Fifth, and Eighth Circuits, as well as the federal court for the District of Washington, have expressly or implicitly rejected the analysis of *New England Telephone & Telegraph Co*…."); *Illinois Bell Co. v. Illinois Commerce Commission*, 740 F.2d 566, 570 (7th Cir. 1984); *Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 748 F.2d 879, 880-81 (4th Cir. 1984) (vacated and remanded on other grounds); *South Central Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n*., 744 F.2d 1107, 1115 (5th Cir. 1984) (vacated and remanded on other grounds); *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*., 738 F.2d 901, 907-08 (8th Cir. 1984) (vacated and remanded on other grounds).

Trying (unsuccessfully) to reconcile this Circuit's decision in *Mallenbaum* with its decision here, the District Court focused on the "expected to cooperate" language of the Cooperation Order as offering interpretive guidance as opposed to directive. [A77]. However, as the Complaint makes clear, the Cooperation Orders

61

were specifically directed to Defendants, including MCLM, as "site-based" (or "incumbent") licensees and unambiguously directed how cooperation must be achieved through providing very specifically defined Contour Information. [A149-A150 (Complaint, ¶23 quoting and citing the Cooperation Orders)]. Moreover, all relevant Cooperation Order terms (including "geographic licensee," "site-based station," and "protected contour") are defined in FCC rules (and are otherwise well-known in the wireless industry). *See, e.g.,* 47 C.F.R. §80.385(a)(3) (defining geographic license areas). Further, 47 C.F.R. §80.385(b)(1) describes in detail the required method by which the Contour Information for the protected Service Contour is to be calculated using the "actual operating parameters" of the site-based licensee station. Thus, the Cooperation Orders are more than sufficiently specific to constitute enforceable orders, as Plaintiffs alleged. [A148(Complaint, ¶22)]; *see also* [A178 n.12 and A187 (¶6)("… this *obligation* requires, at a minimum, that the site-based licensee 'provid[e] upon request sufficient information to enable the geographic licensees to calculated the site-based station's protected contour.'" (Emphasis added)].

Yet, MCLM stonewalled right through the trial, lying to cover up its necessary lack of Contour Information for its vast array of non-existent stations under its site-based licenses. MCLM's stark and longstanding failure in

truthfulness about, and provision of, Contour Information is but one among multiple FCC order violations pled, all of which caused Plaintiffs injury.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court, on the FCA claims, vacate the 2011 Order and, on the Sherman Act §1 claim, reverse the 2014 Judgment ordering that final judgment be entered on the record below as to liability in favor of Plaintiffs and against Defendants MCLM and Mobex and remanding for proceedings to revoke MCLM's licenses under 47 U.S.C. §313 and to determine treble damages, counsel fees and costs.

Dated: February 23, 2015

   s/ Sean R. Kelly            
Sean R. Kelly (NJ Bar No. 019201979)
Michael J. Grohs (NJ Bar No. 018542004)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932
(973) 622-3333

**STEPHEN HUDSPETH, ESQ.**
6 Glen Hill Road
Wilton, Connecticut 06897
(203) 762-2846

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATION OF BAR MEMBERSHIP**

I hereby certify pursuant to Third Circuit Local Appellate Rule 46.1 that I am admitted to the Bar of the United States Court of Appeals for the Third Circuit and am in good standing.

Dated:  February 23, 2015

s/ Sean R. Kelly           
Sean R. Kelly

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This calculation sum was provided by the Microsoft Word processing system word count function.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Mircosoft Word 2013 in Times New Roman (a proportionally-spaced typeface), 14-point size.

3.     I further certify that the electronic copy of this brief filed with the Court is identical in all respects, and that a virus check was performed on the electronic version using the Webroot SecureAnywhere, version 8.0.7.28, software program.

Dated:  February 23, 2015


s/ Sean R. Kelly
Sean R. Kelly