UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-4043

---

SKYBRIDGE SPECTRUM FOUNDATION, a Delaware Nonprofit Corporation;
WARREN C. HAVENS, an individual; TELESAURUS VPC, LLC, a Delaware
Limited Liability Company; AMTS CONSORTIUM, LLC, a Delaware Limited
Liability Company; INTELLIGENT TRANSPORTATION & MONITORING,
LLC, a Delaware Limited Liability Company; and TELESAURUS HOLDINGS
GB, LLC, a Delaware Limited Liability Company,

Appellants/Appellants,

v.

MOBEX NETWORK SERVICES, LLC, a Delaware Limited Liability Company;
MARITIME COMMUNICATIONS/LAND MOBILE, LLC, a Delaware Limited
Liability Company, PAGING SYSTEMS, INC., a California Corporation; TOUCH
TEL CORPORATION, a California Corporation, and DOES 1-100,

Respondents/Appellees.

---

On Appeal from an Order and Final Judgment entered on September 2, 2014,
and an Order on a Motion to Dismiss entered on December 22, 2011,
in the United States District Court for the District of New Jersey,
Civil Action No. 2:11-cv-00993 (KSH) (CLW)

---

BRIEF OF DEFENDANT/RESPONDENT
MARITIME COMMUNICATIONS/LAND MOBILE, LLC

---

Robert W. Mauriello, Jr., Esq.
GRAHAM CURTIN, P.A.
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey  07962-1991
(973)-292-1700
rmauriello@grahamcurtin.com
Attorneys for Defendant/Respondent
Maritime Communications/Land Mobile, LLC

2244943.2

TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF AUTHORITIES ................................................................................ iii

SUMMARY OF ARGUMENT ............................................................................. 1

COUNTERSTATEMENT OF FACTS ................................................................. 7

PROCEDURAL HISTORY ................................................................................ 30

STANDARD OF REVIEW AND ARGUMENT ............................................... 31

I.    THE JUDGMENT ENTERED IN FAVOR OF MCLM
      FOLLOWING A BENCH TRIAL MUST BE AFFIRMED
      BECAUSE APPELLANTS DID NOT ESTABLISH ANY OF
      THE REQUISITE ELEMENTS UNDER SECTION ONE OF
      THE SHERMAN ANTITRUST ACT ........................................... 31

      A.    MCLM Has Not Engaged In Concerted Action ................... 35

      B.    MCLM Has Always Competed Fairly And There Is No
            Evidence Of Anti-Competitive Effects Within The
            Relevant Product And Geographic Markets ........................ 40

            1.  Product Market ................................................................. 42

            2.  Geographic Market ........................................................... 46

      C.    Since There Is No Evidence Of Concerted Or Illegal
            Action, Appellants Are Unable To Prove Injury As A
            Result Of That Action ........................................................ 47

# TABLE OF CONTENTS
(continued)

II.   APPELLANTS' REMAINING CAUSES OF ACTION WERE
      PROPERLY DISMISSED FOLLOWING A MOTION TO
      DISMISS ........................................................................................ 49

      A.    The Trial Court Correctly Found That Under Any
            Circuit's Standard, Appellants' So-Called "Cooperation
            Orders" Are Not Orders Subject to Enforcement ................. 49

      B.    As Determined By The Trial Court, Appellants Have No
            Private Right of Action Under Sections 206 and 207 of
            the Communications Act ...................................................... 54

      C.    The Trial Court Correctly Found That Appellants Cannot
            Invoke Section 201 of the Communications Act Because
            The FCC Has Not Determined that Defendants Have
            Engaged in Any Unjust or Unreasonable Practices .............. 57

CONCLUSION .................................................................................... 60

2244943.2

CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant/Respondent Maritime Communications/Land Mobile LLC discloses that it: (1) has no parent corporation; (2) no publicly held company holds 10% or more of its stock; and (3) no publicly held corporation has a financial interest in the outcome of this proceeding.

2244943.2

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                          <u>Page</u>

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946) ................................................................................ 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................ 36

*Brown Shoe Co., Inc. v. U.S.*,
370 U.S. 294 (1962) ........................................................................... 41, 42

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ................................................................................ 41

*Carter v. Hewitt*,
617 F.2d 961 (3d Cir. 1980) ................................................................... 32

*Cannon v. Cherry Hill Toyota, Inc.*,
190 F.R.D. 147, 161-62 (D.N.J. 1999) ................................................. 33

*Coalition to Save Our Children v. Board of Educ.*,
90 F.3d 752 (3d Cir. 1996) ..................................................................... 32

*Conboy v. AT&T Corp.*,
241 F.3d 242 (2d Cir. 2001) ............................................................. 54, 55

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ................................................................................ 36

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
610 F.3d 820 (3d Cir.), *cert. denied*, 131 S. Ct. 658 (2010) ................ 42

*DiFederico v. Rolm Co.*,
201 F.3d 200 (3d Cir. 2000) ................................................................... 32

*Fellner v. Tri-Union Seafoods, LLC*,
539 F. 3d 237 (3d Cir. 2008), *cert. denied*, 566 U.S. 1182 (2009) ...... 49

# TABLE OF AUTHORITIES
(continued)

Cases                                                                    Page

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005),
*cert. denied, motion granted by*, 547 U.S. 1092 (2006) .................... 31, 32, 34, 36

*Greene v. Sprint Communications Company*,
340 F.3d 1047 (9th Cir. 2004) ....................................................... 55, 56

*In re: Baby Food*,
166 F.3d 112 (3d Cir. 1999) ......................................................... 34, 36

*Lansdowne on the Potomac Homeowners Ass'n., Inc. v.*
*OpenBand at Lansdowne, LLC*,
713 F.3d 187 (4th Cir. 2013) ............................................................. 50

*Mallenbaum v. Adelphia Communications Corp.*,
74 F.3d 465 (3d Cir. 1996) ............................................................... 50

*MCI Telecommunications Corp. v. Teleconcepts, Inc.*,
71 F.3d 1086 (3d Cir. 1995) ............................................................. 59

*Mellon Bank, N.A. v. Metro Communications, Inc.*,
945 F.2d 635 (3d Cir. 1991) ............................................................. 32

*Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.)*,
385 F.3d 350 (3d Cir. 2004) ............................................................. 35

*New England Tel. & Tel. Co. v. Public Utilities Commission of Maine.*,
742 F.2d 1 (1st Cir. 1984)................................................... 49, 52, 53

*North County Communications Corp. v. California Catalog & Tech.*,
594 F.3d 1149 (9th Cir. 2010) ...................................................... 56, 58

*Pastore v. Bell Tel. Co. of PA*,
24 F.3d 508 (3d Cir. 1994) ............................................................... 43

iv

# TABLE OF AUTHORITIES
(continued)

Cases                                                                                    Page

*Queen City Pizza v. Domino's Pizza*,
124 F.3d 430 (3d Cir. 1997) ........................................................................ 42, 43

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)........................................................................................ 41

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
 959 F.2d 468 (3d Cir. 1992) ........................................................................ 48

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
 952 F.2d 715 (3d Cir. 1991) ................................................................ 42, 43, 46

*U.S. v. Cargo Service Stations, Inc.*,
657 F.2d 676 (5th Cir. 1981) ........................................................................ 34

*U.S. v. Igbonwa*,
120 F.3d 437 (3d Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998) ...................... 31

*U.S. v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)........................................................................................ 34

*U.S. v. Topco Assoc.*,
405 U.S. 596 (1972)................................................................................. 34, 35

*U.S. v. Sealy, Inc.*,
388 U.S. 350 (1967)........................................................................................ 34

*Memorandum Opinion and Order* (FCC 14M-18),
EB Docket No 11-71 (released June 17, 2014) ................................................. 15

## TABLE OF AUTHORITIES
(continued)

Statutes, Rules and Other Authorities                                      Page

47 U.S.C. §401 ........................................................................... 6, 49-53

47 U.S.C. § 309 ............................................................................... 57

47 U.S.C. § 312 ............................................................................... 57

47 C.F.R. §80.385 ..................................................................... 23, 49, 51

Fed. R. Civ. P. 60(b)(3) ................................................................... 33

*Fifth Report,* 17 FCC Rcd 6685 .......................................................... 53

*Amendment of Parts 1, 22, 24, 27, 74, 80, 90, 95, and 101 To*
*Establish Uniform License Renewal, Discontinuance of Operation, and*
*Geographic Partitioning and Spectrum Disaggregation Rules and*
*Policies for Certain Wireless Radio Services*, WT Docket No. 10-112,
*Notice of Proposed Rulemaking and Order*, 25 FCC Rcd 6996 (2010).............. 33

2244943.2

SUMMARY OF ARGUMENT

Defendant/Respondent Maritime Communications/Land Mobile, LLC ("MCLM") (collectively, with all defendants "Defendants") respectfully submits this brief in opposition to the appeal filed by Appellants Warren C. Havens ("Havens") and his commonly controlled entities Skybridge Spectrum Foundation, Telesaurus VPC, LLC, AMTS Consortium LLC, Intelligent Transportation & Monitoring Wireless LLC and Telesaurus Holdings GB, LLC (collectively, "Appellants"), following a judgment dismissing the Second Amended Complaint as the combined result of a motion to dismiss (which dismissed all but one count) and a nine-day bench trial dismissing the single, Section 1, Sherman Act claim that withstood the motion to dismiss (the "Section 1 Claim").

As the trial court correctly determined in its 59-page trial decision, Appellants did not meet their burden of proof at trial that MCLM violated the Sherman Antitrust Act in concert with PSI-TT (as defined herein).  As an initial matter, there is simply no evidence that MCLM conspired with PSI-TT in any way – it is undisputed there is no written agreement or other document evidencing any alleged concerted action between MCLM and PSI-TT.  In fact, and as confirmed by all of the MCLM and PSI-TT witnesses, there have been scant few conversations ever between them – and absolutely no conversations, let alone

alleged oral or written agreements, regarding alleged conspiratorial actions
between MCLM and PSI-TT.

To the contrary, the Appellants spent virtually the entire trial (and
now their appellate papers) myopically focusing upon supposed unilateral actions
taken by MCLM that remain pending before either the FCC or the bankruptcy
court;[1] importantly for purposes of this action, Appellants presented no evidence
that PSI-TT was in any way involved (whether as a party or otherwise) in either the
proceedings before the FCC or in MCLM's bankruptcy action.  In lieu of
demonstrating any concerted action between MCLM and PSI-TT, Appellants have
unabashedly waged a bicoastal litigation campaign against MCLM (while at the
same time failing to enter into site leases and/or build out any of Appellants' own
FCC licenses) designed to deplete MCLM's resources and to interfere with
MCLM's operations, undermine MCLM's resolution of the FCC proceedings and
disrupt MCLM's reorganization under the bankruptcy plan confirmed by the
United States Bankruptcy Court for the Northern District of Mississippi in January

---

[1] Contrary to Appellants' statement in their Statement of Related Cases and
Proceedings, MCLM was not using the bankruptcy proceeding "to be conditionally
'cleansed' of its [alleged] prior wrongful acts" and, not surprisingly, the
Bankruptcy Court made no such finding of prior wrongful acts in its Order
Confirming Chapter 11 Plan of Reorganization over Appellants' numerous
objections in that action.  (A611).  And, the FCC proceedings remain pending and
no final determination in any respect has been made in those proceedings.
Notwithstanding Appellants' mischaracterizations of the proceedings, MCLM
confirms that there are related FCC proceedings and a bankruptcy action.

2013.  In short, Appellants utterly failed to prove any concerted action between MCLM and PSI-TT, let alone any concerted action that was illegal or supports in any way Appellants' Section 1 Claim.

Likewise, and as demonstrated below (even though the trial court correctly found that it did not have to address the other elements of the Section 1 Claim), Appellants failed to meet their burden of proof on the remaining elements of their Section 1 Claim.  Appellants presented no evidence (whether through the trial exhibits admitted into evidence, expert witness testimony or fact witness testimony) that could lead this Court to find by a preponderance of the evidence that alleged concerted action between MCLM and PSI-TT produced any anti-competitive effects upon either a relevant geographic or product market.  To the contrary, Mr. Havens' own sworn trial testimony was that he has not entered into any site leases for any of his AMTS licenses.  Moreover, while Appellants' expert witnesses identified potential beneficial uses of the AMTS licenses, neither defined a relevant geographic market (at best suggesting a potential nationwide market) or product market for AMTS licenses and both experts explicitly recognized that other spectrum (and not just AMTS licenses) could be used for the purposes that they identified.  Indeed, both of Appellants' experts testified at trial that they had performed no market analyses.  The undisputed testimony of MCLM's witnesses and the documents in evidence amply demonstrate that MCLM (and not

Appellants) has had numerous transactions with regional railroads, energy

companies and other entities seeking to put MCLM's AMTS licenses to beneficial

uses that remain blocked by Appellants' spurious litigation campaign, including

this Section 1 Claim.  There is simply nothing in the record that demonstrates any

alleged concerted action between MCLM and PSI-TT had any anti-competitive

effect on any product market in any geographic region.

   In essence, the evidence at trial proved that Mr. Havens is a serial

litigator who abuses the legal process (both in administrative actions and in court,

and now before the Third Circuit) to force his competitors, or virtually any person

or entity that crosses his path (including his own partners and lawyers), to spend

money on lawyers in order to divert their resources from their actual business.  Mr.

Havens' transparent "business" strategy (if it can even be called that) is to force his

adversaries, such as MCLM, into submission so that he has no competition for

purposes of selling Appellants' AMTS licenses.  The marketplace has suffered no

injury as a result of any alleged, but unproven, illegal concerted action between

PSI-TT and MCLM and neither have Appellants.  Appellants presented no

evidence of site leases for their AMTS licenses, or building costs or other expenses

to actually operate their licenses; in stark contrast, MCLM not only had to carry its

site leases and operating costs (because it actually operated) but it had to endure

competition from cellular and satellite companies – and had to defend itself against

Mr. Havens' national litigation campaign in the state of California, before the FCC, in the Bankruptcy Action, before the trial court and, now, before this Court in this baseless appeal.  In this appeal, and notwithstanding the trial court's decisions, Appellants continue to try to pave the way for their nationwide domination of the AMTS spectrum and market.  In furtherance of that goal, Appellants seek to have this Court not only undermine the trial court's credibility determinations made at trial, in addition to its factual findings based on a robust record, but seek to have this Court substitute its judgment for matters that are within the purview of the FCC and the bankruptcy courts.   While MCLM has been forced into bankruptcy in part by Appellants' nefarious conduct, the evidence at trial demonstrated that there was no concerted, illegal conduct by PSI-TT and MCLM that proximately caused either the undefined product and geographic markets, or even Appellants, any damages.  Accordingly, for the reasons set forth below and as was found following a nine-day bench trial, MCLM respectfully submits that Appellants' appeal as to its Section 1 Claim against MCLM be denied and that the trial court's dismissal with prejudice be affirmed.

Likewise, the trial court's dismissal of Appellants' remaining claims (which did not withstand a motion to dismiss) must be affirmed.  The claims in the Second Amended Complaint suffer from numerous legal deficiencies that warranted dismissal.  Appellants' first claim in the Second Amended Complaint is

for injunctive relief under Section 401(b) of the Communications Act (Count I), asking this Court to enforce putative FCC "orders."  But those alleged "orders" are not the type of orders that Congress intended to be judicially enforced; they do not provide any specific directives to the Defendants (and Appellant have not complied with the "order" in question either.  Count II seeking damages under Sections 206 and 207 of the Communications Act was also properly dismissed because Plaintiffs did not have any private right of action to pursue that claim in federal court.  But, even if Plaintiffs had a private right of action to sue, those claims were time-barred under the applicable statute of limitations set forth in the Communications Act.

For each of these reasons, and as set forth below, the trial court's dismissal of Appellants' Second Amended Complaint must be affirmed.

2244943.2

<u>COUNTERSTATEMENT OF FACTS</u>

MCLM relies upon the findings of fact determined by the trial court in its 59-page decision, which were amply supported by the trial evidence. However, and although this Court need not go beyond the facts found by the trial court, because Appellants' Statement of Facts goes far beyond and mischaracterizes the "facts" purportedly shown at trial, MCLM has included the following Counterstatement of Facts.

**<u>Appellants</u>**

As demonstrated at trial, the entity Appellants are a series of convoluted companies (including one supposed nonprofit company that shares partitioned and disaggregated Automated Maritime Telecommunications Service ("AMTS") licenses with the for-profit Appellants) controlled by Appellant Mr. Havens and are in the business of obtaining and transferring AMTS licenses issued by the Federal Communications Commission ("FCC"). Neither Mr. Havens nor Telesaurus Holdings, GB, LLC hold any AMTS licenses (A673; T4, 81:3-82:5, 106:12-107:18; Trial Opinion ("Tr. Op.") at 1, 7-8).[2] Appellants' Geographic AMTS licenses cover parts, but not all, of the country (though Appellants

---

[2] The trial transcripts are referenced as follows:
"T1" is day one of the trial, May 20, 2014; "T2" is day two, May 21, 2014; "T3" is day three, May 22, 2014; "T4" is day four, May 27, 2014; "T5" is day five, May 28, 2014; "T6" is day six, May 29, 2014; "T7" is day seven, June 2, 2014; "T8" is day eight, June 9, 2014; "T9" is day nine, June 10, 2014.

repeatedly assert they need all the licenses (Appellate Brief ("Ap. Br.") at 8-9) and

Appellants together have more licenses (both in geographic coverage and in

number) than MCLM and Paging Systems, Inc. (hereinafter referred to with Touch

Tel Corporation as "PSI-TT") combined.  (A673; A674).  No Appellant has

nationwide Geographic AMTS license coverage and Appellants combined do not

have nationwide Geographic AMTS license coverage.  (A673; A674).

**Defendants and Their Unrelated Businesses**

The trial court made a number of findings of fact regarding the

formation of the various Defendants and that their resulting businesses are

unrelated.  (Tr. Op. at 8-11, 39 ("arms-length dealings"); A572; A573; T8, 14:7-10,

66:12-67:12; R. Cooper 190:12-21).[3]  In making its findings, the trial court

observed that MCLM was formed by Sandra DePriest in 2005 in Delaware (Tr. Op.

at 8-9; A572; T6, 7:12-14); Mobex Communications, Inc. ("Mobex Comm.") was

formed in 1995 in Delaware (and dissolved in 2006), was owned by over 100

shareholders (none of them the DePriests or Coopers) and had a national presence

in several industries, with 13 subsidiaries or affiliates (Tr. Op. at 9-10; A574; T7,

24:1-15, 38:6-8, 40:7-13, 77:4-13; T8, 69:11-70:12); Mobex Network Services,

LLC ("Mobex Network"), was formed in 1998 in Delaware (and dissolved in

---

[3] The deposition testimony of Robert Cooper, owner of Defendant TT, was
admitted in lieu of live trial testimony over the objection of MCLM and references
to the deposition transcript (A737) are to "R. Cooper" followed by page and line.

2006) and was one of many Mobex Comm. subsidiaries or affiliates (Tr. Op. at 10;

A573; T7, 24:1-15, 38:6-8, 40:7-13); PSI is owned 100 percent by Susan Cooper

(Tr. Op. at 11; R. Cooper 14:8-13) and TT is owned 100 percent by Robert Cooper

(Tr. Op. at 11; R. Cooper 14:9).  MCLM and PSI-TT have different businesses,

with incompatible equipment and hold different AMTS licenses.  (Tr. Op. at 21;

T8, 14:7-10, 66:21-67:12; R. Cooper 317:24-318:2; A673, A674).  At trial,

Appellants did not present evidence or testimony that controverted the trial court's

findings that MCLM, Mobex Comm., Mobex Network and PSI-TT were formed at

different times and by different individuals.  (Tr. Op. at 8-11; A572; A573; T6,

8:15-22, 110:20-25; T9, 4:6-11).

 As further found by the trial court in support of its determination that

there was no conspiracy, MCLM and PSI-TT rarely communicated with each other,

if ever.  (Tr. Op. 38-39; T7, 86:3-12; T8, 18:15-19:23; R. Cooper 230:11-16,

294:14-15; T6, 111:5-22, 114:9-11; T6, 119:5-7).  Sandra DePriest, the owner of

MCLM, and her husband Don DePriest have not spoken to the Coopers, owners of

PSI-TT, since MCLM's formation in February 2005.  (Tr. Op. 38-39; T6, 111:5-22,

114:9-11; T6, 119:5-7).  Mr. Cooper testified that PSI-TT and MCLM "had no

business dealings" but he and his wife may have, at most, "met the people

[DePriests] a few times," though it is not clear in what timeframe, and the

DePriests have no recollection of ever speaking with the Coopers.  (Tr. Op. 38; R.

- 9 -

Cooper 230:11-16, 294:14-15; T6, 111:5-22, 114:9-11; T6, 119:5-7).  The trial

court determined this testimony was credible and Appellants did not present any

evidence to the contrary.  (Tr. Op. at 38-39).

## MCLM's Purchase of Mobex Network's Assets

Mobex Network obtained its AMTS site-based licenses from its

parent company Mobex Comm. after Mobex Comm. purchased the licenses from

two sources: Waterway Communication Systems and the Regionet companies

(Regionet Wireless License, LLC and Regionet Wireless Operations, LLC), which

three entities were not Defendants in this action, and each of these transactions

were completed after due diligence was performed.  (Tr. Op. at 17-19; T7, 7:19-9:4,

26:2-29:8, 30:24-36:7, 37:13-40:19).  Mobex Network was owned by Mobex

Comm. and Nextel Data Company (Tr. Op. 10; T7, 63:15-18; T8, 63:2-3, 63:21-

25).  Prior to MCLM's purchase of Mobex Network's assets in 2005, Mobex

Network entered into a transaction with Clarity General Partners ("Clarity"), which

transaction included the same AMTS site-based licenses and received FCC

approval but was never consummated because, as the trial court correctly

recognized, Appellants protested the transaction until Clarity declined to proceed

with the deal.  (Tr. Op. at 21-22; T7, 55:23-56:25, 87:1-4; T8, 70:15-71:21).  At

trial, Mr. Reardon analogized Appellants' (Mr. Havens') protests, as follows:

> when somebody is standing on the sidewalk screaming
> you have no right to own the house, while you're trying

> to hold an Open House, and bringing in people who
> might be interested in buying the house, it becomes a
> distraction out there [picketing] everyday like Mr.
> Havens does.

(T7, 56:21-25).

After the Clarity transaction fell apart because of Appellants' protests,

Mobex Network began marketing its assets and had several interested parties,

though only the MCLM purchase was reduced to writing.  (Tr. Op. at 22; T7, 87:1-

89-1).  In 2005, MCLM was formed and purchased the AMTS site-based licenses

held by Mobex Network for several million dollars in an arm's-length transaction,

which asset purchase agreement closed in December 2005 (the "MCLM-Mobex

Asset Purchase").  (Tr. Op. at 8, 22, 39; A682; T6, 7:12-14, 13:12-14:1, 17:15-17,

84:13-84:20; T5, 97:6-20, 102:20-22).  Importantly, and as found by the trial court,

MCLM had completely distinct ownership from both Mobex Comm. and Mobex

Network – there were no owners of either Mobex that owned any interest in

MCLM.  (Tr. Op. at 8-10; A572; A573; T6, 8:15-22, 110:20-25; T8, 59:24-60:25;

T9, 4:6-11).  Appellants did not offer any evidence that Mobex Network's

marketing and consummation of a transaction with MCLM differed from these

well-supported facts found by the trial court.  The MCLM-Mobex Asset Purchase

required and received FCC approval over Appellants' unsuccessful objections and

motion for reconsideration to the FCC.  (Tr. Op. at 22; A575).

- 11 -

As part of Appellants' unsuccessful objections at the FCC (including the motion for reconsideration), they raised the identical claims they raised at trial here – all of which were denied by the FCC in 2007 and the trial court in 2014.  In 2007, the FCC issued an Order, stating that Appellants alleged that "[Mobex] engaged in a conspiracy with MC/LM to violate Federal anti-trust laws. . . . The Division concluded that Havens' arguments in these respects did not raise even a *prima facie* case for denying MC/LM's Auction No. 61 long-form application." (A575, January 22, 2007 Order, ¶14 (emphasis added)).  And, in finding that Appellants failed to prove a conspiracy at trial, the trial court here stated that "a different explanation emerges from the evidence" and that Appellants' claim "fails completely."  (Tr. Op. at 52, 54).

The trial court found and the trial evidence demonstrates that, after the MCLM-Mobex Asset Purchase closed, Mobex Network ceased doing business, underwent a brief winding-up period and was "cancelled" on December 22, 2006. (Tr. Op. at 9-10; A573; T7, 76:7-8).  As part of the MCLM-Mobex Asset purchase, MCLM performed due diligence through Ron Fancher, who was intended to be MCLM's manager but became ill and was replaced by John Reardon in January 2006.  (Tr. Op. at 22; T7, 72:3-73:12; T6, 18:9-19:12, 27:13-15, 44:6-11).

**The AMTS System and Licenses Issued to the Parties**

AMTS, ranging from 217-218 MHz and 219-220 MHz, was established to provide ship-to-shore communications for maritime vessels.  (Tr. Op. at 11; A575, January 22, 2007 Order, ¶2; T7, 16:9-17:7).  Originally, the FCC issued site-based licenses, authorizing the operations within a contour area around a specific location ("stations").  (Tr. Op. at 12; A575, January 22, 2007 Order, ¶2 n.12)).  Appellants correctly assert that Defendants obtained a number of these site-based licenses but fail to mention that Appellants also applied for site-based licenses, which applications were long ago denied (and the denials are not part of this appeal), and then Appellants were sanctioned by the FCC for frivolously and repeatedly appealing the FCC's denial decision.  (A599).

In 2002, the FCC announced that it would stop issuing site-based licenses and begin auctioning Geographic AMTS licenses, authorizing the geographic licensees to construct and operate stations anywhere within a large defined geographic area rather than only at specified sites.  (Tr. Op. at 12; A575, January 22, 2007 Order, ¶3).  As the FCC was transitioning to geographic license procedures, it issued a moratorium on the issuance of site-based licenses.  (T2, 71:16-18).  Two auctions were held for the Geographic AMTS licenses: Auction 57, in September 2004, and Auction 61, in August 2005.  (Tr. Op. at 12).  Auction 57 took place before MCLM was formed and neither Mobex entity bid in Auction

2244943.2

57.  (Tr. Op. at 13; A388; A414; A441).  Although Appellants had the opportunity

to bid on A-Block AMTS geographic licenses during Auction 57, without either

Mobex entity participating in that auction (and before MCLM was even formed),

Appellants did not do so.  (Tr. Op. at 12-13; A441; T4, 94:18-23).  Appellants did

bid on the B-Block licenses in Auction 57 and managed to obtain <u>eight of the nine</u>

B-Block licenses that were awarded.  (Tr. Op. at 12).

Geographic licensees took the Geographic AMTS licenses subject to

the pre-existing site-based licensed stations within their areas; new facilities

operated by the geographic licensee could not interfere with the site-based

operations.  (Tr. Op. at 14; A575, January 22, 2007 Order, ¶3).  Prior to MCLM's

acquisition of Mobex Network's AMTS site-based licenses, the sites had been

constructed or cancelled.  (A575, January 22, 2007 Order, ¶10; T7, 12:7-15, 14:2-8,

16:9-17, 17:20-18:3, 22:10-16, 27:20-28:7, 28:21-29:8).  The FCC found that each

of the prior owners of MCLM's site-based AMTS licenses constructed or

maintained the locations within the licenses.  (A575, January 22, 2007 Order, ¶6

(stations "were in fact timely constructed"); A575, January 22, 2007 Order, ¶10

(FCC found "vast majority of the facilities at issue were timely constructed, and

deleted the unconstructed facilities"); A675, ¶10 (holding "we are not persuaded

that the petitions to deny filed by Havens demonstrate that the licenses for the

stations at issue should be deemed to have canceled automatically for failure to

meet construction/coverage requirements")).[4]  Appellants (which have relentlessly and continuously to this day litigated this matter before the FCC) did not present any evidence at trial that refuted these years'-old FCC holdings – in fact, the trial court described Appellants' theory as merely a "narrative" that was "hardly 'evidence.'"  (Tr. Op. at 46).

At Auction 61, held in 2005, MCLM acquired certain Geographic AMTS licenses, which made its overlapping site-based licenses redundant in many areas of the nation.  (Tr. Op. at 25; A388, Attachment A; T6, 65:20-21; T7, 127:20-128:5, 128:21-129:1; T9, 47:12-15).  In an effort to streamline FCC proceedings, MCLM entered into stipulations with the FCC's Enforcement Bureau, to resolve which site-based AMTS licenses were redundant and, therefore, no longer needed by MCLM.  (Tr. Op. at 25; A349; A558; A566; T7, 127:20-128:5, 128:21-129:1; T9, 47:12-15; T6, 65:20-21).  As to Appellants' Geographic AMTS licenses, Mr. Havens candidly admitted under oath that neither he nor his companies have ever entered into site leases and therefore could not possibly have constructed the licenses that they currently hold (and have owned for over a decade) and have never provided their proposed contour information to MCLM (or

---

[4] These conclusions were later confirmed by the FCC's Chief Administrative Law Judge who issued a summary decision holding that MCLM's site-based licenses were timely constructed, based in large part on the above-reference Commission rulings and the failure of Havens to provide any evidence to the contrary. *Memorandum Opinion and Order* (FCC 14M-18) in EB Docket No 11-71 (released June 17, 2014).

- 15 -

the other Defendants).  (Tr. Op. at 15, 42; T4, 97:14-98:7, 100:19-22, 124:23-125:15).

In accordance with Appellants' nonconstruction practices, during the pendency of this lawsuit the FCC has cancelled 455 of Appellants' licenses in the adjacent 220-222 MHz band due to Appellants' failure to construct anything after years of ownership.  (A625, n.2; A625, ¶¶35, 36; A1206, ¶22).  The testimony of Appellants' expert Mr. Lindsey confirmed that the 220-222 MHz band (where MCLM is not a license holder) is not only well suited for certain of Appellants' intended uses, but is actually being used for Positive Train Control ("PTC") in many areas of the United States.  (T1, 140:8-10).  The four class-1 railroads have even formed PTC-220, LLC, which is a joint venture aimed at developing PTC using the 220 MHz band.  (A466, n.6).  Appellants' exhibits further demonstrate that PTC can be implemented in the 220-222 MHz band.  (A364 (in 2012, New Jersey Transit sought "Procurement of 220MHz Radio-Frequency Spectrum for Positive Train Control"); A368 (in 2011, "the MTA Railroads jointly issued an RFP seeking 500 kHz of spectrum in the interoperable 217-222 MHz range"); A466 (in 2011, Amtrak stated in comment to the FCC that "[s]pectrum in the range of 217-222 MHz has emerged as the *de facto* home of PTC")).  Yet, Appellants chose not to construct their licenses in the 220-222 MHz band for PTC use (or

other uses that they now seek to implement in the AMTS band) and instead allowed those nationwide licenses to be cancelled by the FCC.  (A1206).

**<u>Appellants' Allegations Remain Unsubstantiated, as Found by the Trial Court</u>**

In their pleadings, Appellants suggested but could not prove at trial that Defendants have conspired in violation of the Sherman Antitrust Act in three ways, by: (1) coordinating the purchase of the A- and B-Block licenses and then co-locating stations (the supposed "Cooper-Daniel Agreement"); (2) agreeing to "warehouse" licenses by failing to construct and then failing to disclose to the FCC the alleged nonconstruction, including not reporting each other for nonconstruction at co-located sites; and (3) jointly withholding contour information for the incumbent licenses from Appellants.  (Tr. Op. at 30, 40; A135, ¶¶21-27, 32, 36, 39, 43, 44).

Facts Relevant to Alleged
<u>A- and B-Block Splitting/Co-location</u>

Appellants allegations regarding undated, undocumented and unsubstantiated discussions of block-splitting (supposedly between the owner of TT and Fred Daniels, the original owner of the site-based licenses before MCLM and before either Mobex entity) pre-date the formation of MCLM in 2005 and, if those hearsay discussions even occurred, they would be outside the four-year statute of limitations for the Section 1 Claim.  The only information presented at trial during the years of discovery in this action regarding the purchase of A- and

- 17 -

B-Block site-based licenses made clear that over 25 years ago PSI-TT and Fred

Daniel (the original owner of the MCLM site-based licenses but not a defendant in

this litigation) – *refused* to split A- and B-Block purchases and, instead, bid against

each other on both blocks (even involving their respective lawyers in protest).  (Tr.

Op. at 31-32; R. Cooper 198:6-200:3). In fact, the testimony and the trial court's

findings could not have been clearer that there was no conspiracy, even 25 years

ago:

> Q.  Did you have an agreement or did Touch Tel or PSI
> have an agreement with Fred Daniel or Paul
> Vanderheyden or Regionet or Mobex or MCLM whereby
> you and your interest on the one hand would only bid on
> B block licenses and the others would only bid on A
> block licenses?
>
> . . . .
>
> THE WITNESS: No such -- no such agreement at all.
> And the only reason -- the only reason we were interested
> in B block is 'cause we worked the B block.

(Tr. Op. at 16-17).  Mr. Cooper continued, explaining that PSI-TT, on the one hand,

and Fred Daniel, on the other hand applied for both blocks and, after protests were

filed, Mr. Daniel was awarded the A-Block and PSI-TT was awarded the B-Block:

> And so in order to have -- to get the B block -- okay,
> [Daniel's] applied for both of them. And this is still a
> competitive time frame where anybody can throw their
> hat in. So our engineers on behalf of PSI filed for both A
> and B blocks. Okay? The lawyers beat each other up a
> whole bunch out there. Protests were probably filed, and

> we ended up getting the B block, and Fred got the A
> block.

(Tr. Op. at 16-17, 31-32).  Other than Mr. Cooper's sworn testimony (which the

trial court found credible) regarding <u>the absence</u> of any conspiracy between

himself and the original owner (Fred Daniel) of the eventual MCLM site-based

licenses, there is no other reference to this supposed "conspiracy" – either in the

sworn testimony or in the volumes of documents introduced into evidence (of the

original 6,000-plus trial exhibits proposed by Appellants).  To the contrary, the

testimony uniformly established that the supposed coconspirators did not

communicate with each other regarding AMTS and certainly did not communicate

about the supposed conspiracy.  (Tr. Op. at 33; T6, 43:17-44:2, 111:5-22, 114:9-

11; T6, 119:5-120:7; R. Cooper 317:14-318:2).  Moreover, a significant number of

MCLM's acquired site-based licenses were from Waterway Communication

Systems, an entity which had no affiliation with Regionet or Fred Daniel.  (Tr. Op.

at 20; T7, 8:15-17).  Putting aside that the trial court found there was no evidence

of an initial agreement to conspire between persons not associated with MCLM,

Appellants also failed to demonstrate that the alleged conspiracy was somehow

transferred to MCLM – in fact, the trial court described Appellants' theory as

"speculative" and specifically recognized that that there was an "absence of

documents or testimony" in this regard.  (Tr. Op. at 36).

2244943.2

As to co-location, it is encouraged by the FCC to limit the number of unsightly towers erected to provide coverage, thereby encouraging licensees to operate from as few sites as possible.  (*See, e.g.,*A675, ¶9 (granting application to co-locate stations); R. Cooper 279:1-12 (many tenants co-located at single location), 301:6-9 (wireless companies "clustered on top of the mountain")).  Appellants well know that co-location is permissible and previously argued before the FCC that MCLM's site-based licenses (when they were Mobex Network's licenses) should have terminated <u>for failure to co-locate</u>.  (A675 ("Havens argues that because the stations were not co-located, the construction extension should be rescinded, and the licenses should be deemed to have canceled automatically for failure to construct.")).  Appellants did not present any evidence at trial regarding the supposed illegality of co-location, appearing to have abandoned this theory, and Appellants do not address their co-location theory on this appeal notwithstanding their pleadings.  (Tr. Op. at 44 n.22).

Facts Relevant to Alleged<br><u>Warehousing/Nonconstruction/Failure To Report Codefendants</u>

The trial court found Appellants' arguments regarding warehousing to be "weak" and unsupported by, at most, "ambiguous" evidence.  (Tr. Op. at 44).  The AMTS site-based licenses MCLM purchased from Mobex Network in 2005 had been constructed or had been returned to the FCC either (1) prior to MCLM's purchase of the licenses (as found repeatedly by the FCC) or (2) by stipulation due

- 20 -

to MCLM's acquisition of the overlapping, redundant Geographic AMTS licenses. (A575, January 22, 2007 Order, ¶6 (stations "were in fact timely constructed"); A575, January 22, 2007 Order, ¶10 (FCC found "vast majority of the facilities at issue were timely constructed, and deleted the unconstructed facilities"); A675, ¶10 (holding "we are not persuaded that the petitions to deny filed by Havens demonstrate that the licenses for the stations at issue should be deemed to have canceled automatically for failure to meet construction/coverage requirements")). By way of background, as to the site-based licenses, each license (or call sign) could have within it any number of locations (that could be designated and moved by the licensee, *i.e.*, license KAE889 had at least 49 sites), including more than one within the same city, such as in Portland, Oregon, where there were at least two locations in the years prior to MCLM's ownership.  (A520; A534; A539, KAE889, Locations 13 and 18; A675, ¶8; T8, 73:11-75:16).  Redundant locations often resulted when a license holder would test multiple locations within an area and determine which was optimal – completing construction and leaving the redundant sites dormant.  (T8, 73:11-75:16; A539, *e.g.*, Call Sign KAE889, Locations 13 and 18).  It is clear that MCLM's sites were timely constructed, not just because the FCC repeatedly found so, but because all of the construction records (dating back decades) regarding MCLM's sites were produced to Appellants.  (T7, 82:6-9). Appellants did not introduce any evidence or testimony at trial that refuted that

MCLM's sites were timely constructed – in fact, Plaintiff Havens admitted that he has never attempted to visit any MCLM site to assess construction status. (T5, 13:21-15:10). Because the licenses were already constructed, there was nothing for PSI-TT to report regarding the construction of MCLM's site-based licenses.

Even if MCLM's site-based licenses had not been timely constructed (which MCLM vigorously denies and contrary to the FCC's repeated findings), there was still no evidence of concerted action in that regard. The evidence at trial clearly demonstrated that PSI-TT would not have been aware of the construction status of other licensees' sites. PSI-TT would not have had the opportunity to view other licensees' equipment (or lack of equipment) because most sites within a site-based license are owned by independent third parties that construct towers and lease space on each tower to any number of tenants (both within and without the AMTS spectrum). (T7, 20:6-7, 34:3-7, 81:24-82:4; R. Cooper 230:14-16, 280:10-16). It is not unusual that employees of a licensee, such as MCLM, would never set foot on a site because licensees affix their equipment (through subcontractors) to a designated location (height and direction) on the tower and rely on property management companies to oversee the installation and maintenance work. (T7, 34:3-7; R. Cooper 179:17-22, 230:14-16). Because of the nature of sites (*i.e.*, dozens of tenants with unlabeled equipment) and the relationship tenants have with their sites (*i.e.*, no personal visits, third parties used for

construction/maintenance/management), it would be unlikely that MCLM or PSI-TT would have even known if the other had equipment installed at a site (or were even co-located there).  (T7, 34:3-7; R. Cooper 180:8-10, 181:22-182:3, 230:14-16, 294:9-21, 295:8-14, 300:17-302:11, 303:12-304:13, 315:24-316:16, 338:3-9).

Facts Relevant to Alleged
Withholding Of Contour Information

As found by the trial court, there is no evidence of any agreement, written or verbal, between PSI-TT and MCLM to withhold any information from Appellants.  (Tr. Op. at 42-43; T6, 43:17-44:2, 111:5-22, 114:9-11, 119:5-120:7; T8, 18:15-19:23; R. Cooper 317:6-318:2).  In testimony, both MCLM's witnesses and PSI-TT's witnesses made abundantly clear that they have never spoken about AMTS licenses, let alone to "conspire" to withhold information from Appellants.  (Tr. Op. at 41; T6, 43:17-44:2, 111:5-22, 114:9-11; T6, 119:5-120:7; T8, 18:15-19:23; R. Cooper 230:11-16, 294:14-15).  Perhaps most importantly, as both the FCC and the trial court concluded, MCLM is not obligated to provide its contour information in the first instance but, instead, is only required to "cooperate with geographic licensees" (1) where MCLM has site-based licenses, (2) where geographic licensees build a station within 120 km of MCLM's station and (3) where those geographic licensees construct stations and share their information so that MCLM and the geographic licensee can work together to refine contour and interference issues.  (A173, n.9; 47 C.F.R. §80.385(b); Motion to Dismiss Opinion

- 23 -

("MTD Op.") (A64) at 14 (the so-called Cooperation Orders "never required

Defendants engage in any particular disclosure"); T7, 198:1-20, 200:17-201:7).

Regardless, Appellants have had MCLM's contour information since

at least 2001 when Mobex Network (the prior owner of the MCLM licenses),

provided its contour information in a public *ex parte* filing to the FCC, which

Appellants clearly had in their possession because Appellants produced that *ex*

*parte* filing in discovery in this action (it bears Appellants' production number).

(A710, Exhibits IA-C, II, IIIF; T7, 57:17-24, 197:4-198:1).  As Plaintiff Havens

admitted, in 2010 (four years before trial), Appellants surreptitiously received

access to MCLM's private website which contained additional contour information

both in MCLM's confidential Amtrak proposal and in connection with a transaction

with Southern California Regional Rail.  (T7, 190:15-19, 192:12-18; T5, 28:7-

32:12).  Appellants were able to obtain access to this confidential information

through Steven Calabrese (a disgruntled, former MCLM employee) to whom Mr.

Havens candidly admitted he paid $5,000 or $6,000 despite having no business

affiliation with Mr. Calabrese.  (T5, 28:7-32:12).

In addition to much of MCLM's contour information being public,

MCLM has repeatedly stated to Appellants that it will cooperate in providing more

detailed and confidential contour information to Appellants when, and if,

Appellants become prepared to construct stations – which construction Appellants

have never begun in the decade Appellants have held their licenses – because

preventing interference through contour sharing is a collaborative process.  (Tr. Op.

at 42-43; T7, 198:1-20; T4, 97:14-98:7, 100:19-22, 124:23-125:15; T6, 91:20-

92:23).  Appellants have never identified to MCLM (or even at trial) any proposed

sites either within or even outside of 120 km of MCLM's sites that Appellants seek

to test for interference issues (because Appellants have not entered into site leases

to build anything); rather, Appellants repeatedly demanded that MCLM provide, at

MCLM's significant own cost and to its most lethal competitor, its nationwide

operating information (some, highly sensitive) including transmitter output,

antenna gain and line loss, when at the same time, Appellants provided none of

their own prospective information to MCLM.  (Tr. Op. at 13, 42; T7, 198:10-20;

T4, 97:14-98:7, 100:19-22, 124:23-125:15).

　　　　As amply demonstrated at trial, if Appellants actually intended to

construct sites, Appellants had the 17 dBu and 38 dBu contour information (and

have had it since 2001) and could adequately locate noninterfering sites, which

would be further refined through the use of a drive test (which tests Appellants

would need to complete even if Appellants had all of the confidential information

that they purportedly sought regarding MCLM's contours).  (A710, Exhibits IA-C,

II, IIIF; T7, 199:21-200:13, 203:5-12).  The drive test Appellants would need to do

(but have never done) would simply require a magnet-mounted spectrum analyzer

2244943.2

on a vehicle that drives the borders of the above-mentioned contours to detect where each signal actually lands; this drive test is usually done by third-party contractors.  (T5, 13:21-15:10T7, 199:21-200:13, 203:5-12).  In short, Appellants have all the information they need to protect MCLM's site-based stations' contours if Appellants wanted to build within 120 km of an MCLM site but Appellants continue raise the issue to unnecessarily create controversy (including three requests – each denied – to the FCC to order MCLM to provide its contour information).  (A173, n.9; T7, 198:1-20, 200:17-201:7).  Regardless, the trial court correctly found that there was absolutely no evidence that MCLM and PSI-TT somehow conspired to withhold contour information because: (1) there was no evidence of an agreement and (2) the actual contour information was received by Appellants thirteen years before trial.  (Tr. Op. at 41-43).

## MCLM's Repurposing of Its Spectrum and Appellants' Unrelenting Obstruction

As recognized by the trial court, the MCLM-Mobex Asset Purchase agreement was executed in May 2005 and closed in December 2005.  (Tr. Op. at 8-9; A267; T6, 13:12-14:1, 17:15-17, 84:13-84:20; T5, 97:6-20, 102:20-22).  Prior to the closing of the MCLM-Mobex Asset Purchase in December 2005, Appellants had already begun to litigate against MCLM before the FCC (opposing the transaction) and in California Superior Court, San Mateo County.  (Tr. Op. at 22-23; T7, 62:11-14, 167:2-6).  The legal fees incurred as a result of Appellants'

lawsuits, which became bicoastal after the MCLM-Mobex Asset Purchase (totaling five actions), coupled with increased competition from satellite and cellular telephone technology that replaced the two-way radio and ship-to-shore communications, not to mention ongoing monthly site rent and utility obligations of about $80,000, caused financial hardship for MCLM, ultimately driving it into bankruptcy.  (T7, 62:2-10; 63:8-64:7; T9, 7:11-8:18).  The trial court noted that despite MCLM's financial hardships, it continued to try to repurpose its spectrum from the traditional ship-to-shore and legacy analog two-way radio services to at least the following uses:

> b.    As a complement to Satellite Radio;
>
> c.    Positive Train Control;
>
> d.    Smart Grid technology (for remote meter reading and pipeline valve control, for example);
>
> e.    Homeland Security uses through "Automated Information Service B";
>
> f.    Container tracking through L-3, a defense contractor;
>
> g.    FBI tracking of stolen money;
>
> h.    Digitally switched Passport radios rom Motorola;
>
> i.    Digital billboards; and
>
> j.    To connect independent two-way radio users using the internet.

(Tr. Op. at 23-24; T7, 60:24-62:1, 91:21-95:14, 96:25-97:5, 134:25-136:13; T9, 10:23-21:5; T6, 40:21-41:3).  In an effort to sell or lease its spectrum, MCLM also

hired Spectrum Bridge, which marketed the spectrum and provided contour

information to any prospective purchaser that requested the information (including

Appellants, if they had sought it).  (Tr. Op. at 23; A247; T7, 62:20-24, 143:18-

145:24, 199:15-20; T6, 36:6-12).  As a result of MCLM's continuous marketing

efforts, it was able to obtain over a dozen transactions to repurpose its spectrum –

all of which were opposed by Appellants and are pending in a state of limbo at the

FCC or have been cancelled due to the delay caused by Appellants.  (Tr. Op. at 23-

24; T7, 62:22-64:7; T9, 10:23-22:12).  The trial court recognized the impact

Appellants have had on MCLM's ability to use its AMTS licenses during these

unending protests (and intentional obstruction by Appellant Havens).   (Tr. Op. at

23-24).  Appellants, in their oppositions and in this action, do not allege that any of

these transactions include PSI-TT or its spectrum.  These MCLM AMTS

transactions for the purchase and/or use of spectrum  included:

a.    Encana Oil and Gas (USA), Inc. – pipeline company for
      wireless radio use;

b.    Duquesne Light Company – utility company for smart grid
      technology (secure billing data collection);

c.    DCP Midstream, LP – pipeline company for critical
      communications capabilities (valve monitoring, etc.);

d.    Jackson County Rural Membership Electric Cooperative –
      utility company for smart grid technology (secure billing data
      collection and smart phone control of in-home utilities);

e.    Puget Sound Energy, Inc. – utility company for two-way radio
      use (Mr. Havens also sold spectrum to Puget Sound, but

- 28 -

impedes MCLM and Puget Sound's ability to close, thereby defeating Puget Sound's completion of its system);

f.    Enbridge Energy Company – natural gas company to monitor gas well pressure and safety;

g.    Interstate Power and Light Company – utility company for smart grid technology;

h.    Wisconsin Power and Light Company – utility company for smart grid technology;

i.    Dixie Electric Membership Corporation, Inc. – utility company for two-way radio use;

j.    Atlas Pipeline – Mid Continent, LLC – pipeline company seeking for wireless radio use;

k.    Denton County Electric – utility company seeking for two-way radio use;

l.    Southern California Regional Rail Authority – to deploy wireless braking system for safety known as PTC;

m.    Rappahannock Electric Cooperative – utility company seeking to purchase spectrum;

n.    Shenandoah Electric – utility for two-way radio use;

o.    Big Rivers Electric – utility company for two-way radio use;

p.    Pinnacle Wireless – wireless use along the Garden State Parkway and New Jersey Turnpike;

q.    New Jersey Sports and Entertainment Authority – wireless use at Giants' Stadium and Xanadu mall complex.

Each of these transactions were opposed at the FCC by Mr. Havens and his for-profit and "nonprofit" entities and those objections remain pending before the FCC or the would-be purchaser has abandoned the application out of frustration, as in

the case of Big Rivers Energy, for example. (Tr. Op. at 23-24; A657; A682; T9, 10:14-21:17). Appellants have formally opposed each transaction that MCLM entered into by filing volumes of pleadings at the FCC, placing a stranglehold on MCLM. (Tr. Op. at 23-24; A648; A657; T9, 10:14-21:17). The trial court found that Appellants have also informally interfered with MCLM's attempts to conduct business by (1) contacting its potential customers and continuously asserting that MCLM is going to lose its licenses or (2) requesting that potential customers take certain positions before the FCC that are contrary to MCLM's interests (but in Appellants' favor). (Tr. Op. at 24; A663; A666).

## PROCEDURAL HISTORY

Following the resolution of Appellants' nearly identical California Action in favor of Defendants, Appellants filed a Second Amended Complaint in the District of New Jersey. (Tr. Op. at 4; A135; MTD Op. at 6). MCLM and PSI-TT filed a motion to dismiss Appellants' Second Amended Complaint and in a December 22, 2011 Opinion, this Court dismissed each claim in the Second Amended Complaint except the Section 1 Claim. (MTD Op.). In 2011, MCLM was forced to file Chapter 11 bankruptcy in the Northern District of Mississippi (the "Bankruptcy Action"), where, in January 2013, the Bankruptcy Court entered an Order confirming MCLM's plan of reorganization. (A611). Appellants are the only objectors to that Order, in large part (if not entirely) based upon their hollow

assertion that they are a contingent creditor of MCLM due to the now-dismissed Section 1 Claim in this action.  (T7, 178:10-11).

Prior to trial, this action was carefully case managed by the trial court (*See, e.g.*, A85; A189 (Ninth Pretrial Scheduling Order); A197 (Eleventh Pretrial Scheduling Order)).  Notwithstanding the fact that Appellants identified thousands of proposed trial exhibits during the pre-trial conferences, the trial court conducted a nine-day trial of the Section 1 Claim before dismissing that cause of action as well.

<u>STANDARD OF REVIEW AND ARGUMENT</u>

I.    <u>THE JUDGMENT ENTERED IN FAVOR OF MCLM FOLLOWING A BENCH TRIAL MUST BE AFFIRMED BECAUSE APPELLANTS DID NOT ESTABLISH ANY OF THE REQUISITE ELEMENTS UNDER SECTION ONE OF THE SHERMAN ANTITRUST ACT</u>

In reviewing a non-jury trial, the Third Circuit has consistently held that "[w]e review the District Court's factual finding from the non-jury trial under a clearly erroneous standard, meaning that a finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been committed." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005) (refusing to disturb trial court's credibility determinations and citing *U.S. v. Igbonwa*, 120 F.3d 437, 440 (3d Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998)), *cert. denied*, 547 U.S. 1092 (2006).  Put differently, this Court stated, "it is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless

that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *DiFederico v. Rolm Co.*, 201 F.3d 200, 208 (3d Cir. 2000) (deferring to the trial court's credibility determinations and quoting *Coalition to Save Our Children v. Board of Educ.*, 90 F.3d 752, 759 (3d Cir. 1996)).  This deference is owed because "[i]n a case such as the one here where the witnesses on each side take diametrically opposed positions, the factfinder's task is to determine which witnesses are more credible." *Carter v. Hewitt,* 617 F.2d 961, 973 (3d Cir. 1980).  Of course, this Court also noted, "where we are confronted with mixed questions of fact and law, we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Gordon*, 423 F.3d at 201 (citing *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 641-42 (3d Cir. 1991)).

Appellants largely avoid discussion of this highly deferential standard, presumably because Appellants well know that the trial court's judgment against them was based on a thorough, argument-by-argument analysis – the trial court, in its 59-page opinion, gave each of Appellants' many theories consideration but, based upon the evidence and the testimony that the trial court found to be credible, rejected Appellants' theories.  Nevertheless, Appellants now ask this Court to

- 32 -

unwind the trial court's determination and substitute its own judgment based upon

Appellants' mischaracterization of the record evidence.[5]

As correctly set forth by the trial court in its 59-page opinion, Section

1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce among the

several states, or with foreign nations."  15 U.S.C. § 1.  In order to establish a

---

[5] Plaintiffs even argue that the trial court's opinion was "severely contaminated" by MCLM (as supposedly demonstrated by MCLM's post-trial FCC filings, but this is blatantly false.  (Ap. Br. 30-31).  First, to imply that the trial court was somehow tricked by any party to this litigation after years of careful case management, including extensive motion practice, followed by a nine-day bench trial (in which Appellants were allowed to proceed to trial with thousands of unused trial exhibits) and a thorough 59-page opinion without any post-trial motion for relief is ludicrous.  Fed. R. Civ. P. 60(b)(3).  Beyond that, all of the information that Plaintiffs allege was "shockingly dishonest" of MCLM to supposedly omit from trial was, in fact, testified to at trial.  Judge Hayden specifically questioned MCLM witness John Reardon about certain sites' discontinuance and the status of the discontinuance issue before to the FCC.  (T7, 124:9-126:5).  In response, Mr. Reardon acknowledged that several sites were "off the air" but that the FCC did not have a firm definition for "permanent discontinuance" and was undertaking  rule making procedures in that regard.  (Id.); *Amendment of Parts 1, 22, 24, 27, 74, 80, 90, 95, and 101 To Establish Uniform License Renewal, Discontinuance of Operation, and Geographic Partitioning and Spectrum Disaggregation Rules and Policies for Certain Wireless Radio Services*, WT Docket No. 10-112, *Notice of Proposed Rulemaking and Order*, 25 FCC Rcd 6996 (2010).  These rulemaking efforts led to a full record, beginning in 2010 (four years before trial) regarding MCLM's sites and issues of discontinuance – which proceedings Plaintiff Havens participated in.  (*see, e.g.*, A558 – dated November 28, 2012).  Thus, Plaintiffs' specious assertions on appeal should be viewed as a direct attack on the trial court's integrity and given no credence on this appeal.  *See, e.g., Cannon v. Cherry Hill Toyota, Inc.*, 190 F.R.D. 147, 161-62 (D.N.J. 1999) (finding that baselessly accusing adverse parties or counsel of lying was improper and "debases the judicial system").

violation of Section 1, Appellants must set forth sufficient facts proving "(1) concerted action by the Defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon*, 423 F.3d at 207; *In re: Baby Food*, 166 F.3d 112, 118 (3d Cir. 1999). Although Appellants assert (as they did at trial) that MCLM's and PSI-TT's supposed concerted actions are a *per se* violation of the Sherman Act, Appellants are unable to point to any violations by PSI-TT and MCLM together that are "in and of themselves considered unreasonable because [of] 'their pernicious effect on competition and lack of any redeeming virtue,'" such as price-fixing agreements. *In re: Baby Food*, 166 F.3d at 118 (quoting *U.S. v. Cargo Service Stations, Inc.*, 657 F.2d 676, 682 n.4 (5th Cir. 1981) and citing *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940)). The trial court correctly concluded that Appellants' cited authority is unavailing and easily distinguishable because, among other things, Appellants' cited decisions were based on record evidence (including written agreements), rather than Appellants' unsupported invented narrative. (Tr. Op. at 45); *U.S. v. Topco Assoc.*, 405 U.S. 596 (1972) (conspiracy found in *written* agreement – grocery cooperative association's bylaws – that contained territorial restraints regarding brand sales and wholesaling); *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967) (price-fixing and horizontal, territorial market division found where

evidence included corporate *written* bylaws and board meetings setting price and territory polices); *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 793 (1946) (criminal convictions for three-year conspiracy to monopolize and price fix proven by companies' documented 90% combined market share and lockstep pricing year after year); *Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.)*, 385 F.3d 350, 354-55 and n.5 (3d Cir. 2004). Thus, where there is no direct evidence of an agreement (and certainly not a written agreement (as in *Topco Assoc.*) and there is no price fixing (as in the remainder of the cases cited by Appellants), Appellants allegations must be analyzed under the rule-of-reason analysis.

As set forth herein and confirmed in the trial court's opinion, Appellants did not demonstrate through credible evidence **any** concerted action between MCLM and PSI-TT, or offer any evidence that there was a horizontal agreement to divide territory – to the contrary, the license holders bid against each other for the same territory and the FCC settled the dispute and assigned the licenses; PSI-TT's Mr. Cooper testified there was "no such agreement at all." (Tr. Op. at 17; Cooper 198:6-200:3).

A.    MCLM Has Not Engaged In Concerted Action

As long held by the Supreme Court and reiterated by the Third Circuit, "unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement **must exist** to trigger *Section 1* liability." *In re:*

*Baby Food*, 166 F.3d at 117 (emphasis added; internal quotations removed); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). Contrary to Appellants' assertions that no agreement is necessary and a mere similar course of action is sufficient, the Supreme Court has made clear that a Section 1 claim is insufficient, and "stops short of the line between possibility and plausibility of 'entitle[ment] to relief,'" if it merely alleges parallel conduct and "a bare assertion of conspiracy" – "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Gordon*, 423 F.3d at 207 (explaining that evidence of concerted action exists where "two or more distinct entities have agreed to take action against the plaintiff," and as a result "requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator").  In *Twombly*, the Court determined that a Section 1, Sherman Act claim is not demonstrated "when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action."  550 U.S. at 548.

The record and the trial court's findings are abundantly clear: Appellants have alleged mere general presumptions – but did not prove facts – supporting the allegation that MCLM "contracted, combined or conspired" with PSI-TT.  The sworn testimony of all of the witnesses in this action confirm that there is no evidence that MCLM and PSI-TT have ever jointly done anything and certainly nothing that would support Appellants' Section 1 Claim.  In fact the trial court explicitly found that there was no "factual context suggesting an agreement" – to the contrary, there was direct evidence of a failed meeting of the minds, followed by a dispute requiring FCC intervention.

Additionally, the Second Amended Complaint is devoid of any allegation and there was no evidence presented at trial that MCLM and Mobex Network committed any concerted action (other than the undisputed fact that MCLM and Mobex Network consummated the arm's-length MCLM-Mobex Asset Purchase).  (Tr. Op. at 39).  As determined by the trial court, MCLM did not exist before the negotiations began and Mobex Network ceased to exist shortly after the asset-purchase transaction was closed in December 2005.  (Tr. Op. at 8-10).  Moreover, the trial court held that the transfer of the AMTS licenses were subject to FCC approval, which was granted over Plaintiff Mr. Havens' objection (including anti-trust claims) and motion for reconsideration.  (Tr. Op. at 22).  Given that Mobex Network no longer exists (and has not existed since 2006), any

- 37 -

conspiracy theory advanced by Appellants that MCLM and Mobex Network are somehow violating the Sherman Act was properly rejected by the trial court.

Appellants' "formulaic recitation" of the elements of a Section 1 claim does not warrant reversal of the trial court's detailed findings following a nine-day trial, during which Appellants wholly failed to establish evidence of an agreement between MCLM and any Defendant, let alone an agreement which caused an anticompetitive effect in any relevant market (which, as discussed below, Appellants failed to define at trial). Further, any allegation that MCLM (individually) has violated FCC law (which MCLM vigorously denies) is futile because individual conduct is inadequate to support Appellants' theory that there has been a conspiracy between MCLM and any other Defendant.

Contrary to Appellants' baseless allegations, the trial court correctly confirmed in its opinion that there has been consistent and direct testimony that PSI-TT's and MCLM's owners do not even know each other and had no agreement, written or otherwise, between them. As to Appellants' spurious allegations regarding (decades-old) block splitting, the sworn testimony confirms that there was the opposite of a conspiratorial agreement – PSI-TT and Mr. Daniel went head-to-head for both the A- and B-Blocks and, after formal protests were filed, Mr. Daniel was assigned the A-Block and PSI-TT received the B-Block. It is this failed meeting of the minds on which Appellants based their entire conspiracy

theory, trying to analogize the supposed agreement to price sharing or bid rigging. (Ap. Br. at 45-46). As found by the trial court, since the agreement was never formed and followed, it cannot be evidence of a Section 1, Sherman Act conspiracy. (Tr. Op. at 31, 33).

As painstakingly set forth by the trial court, each of Appellants' supposed parallel conduct assertions (which the trial court identified as based merely on "equivocal" proofs) also fails because each action they identify as "proof" of a conspiracy is easily explained by business motive: (1) Defendants, who did not have infinite resources to bid on every Geographic AMTS block, bid on the blocks that overlaid their site-based licenses to protect their existing operations and allow unfettered expansion within those regions (Tr. Op. at 48, "it makes sense from a business standpoint for site-based licensees to seek geographic licenses encompassing the regions in which the site-based licenses are located"); (2) Defendants did not report each other for nonconstruction issues because the sites were constructed and Defendants did not make personal visits to the sites that would have allowed for observation of the dozens of other tenants' (and their unlabeled equipment in locked facilities) construction status (Tr. Op. at 44, "[i]t is questionable whether and how much Paging Systems and Mobex Network Services (and later MCLM) knew about the construction and operational status of each other's stations"); (3) Defendants did not need to provide additional contour

information because it was costly and unnecessary when Appellants have never

constructed anything within 120 km of a site-based station (and the FCC has never

found to the contrary) (Tr. Op. at 42, "it is not always in the site-based licensee's

economic interest to furnish information to its competitor," especially where that

competitor "began suing MCLM form its inception"); and (3) each Defendant

acted in its own commercial best interest in relation to Auctions 57 and 61 where

Appellants obtained the majority of the Geographic AMTS blocks (Tr. Op. at 47,

54, describing Appellants' auction-behavior theory as "pure speculation" and based

solely on "extravagant claims about motivation").  Accordingly, the trial court's

thorough opinion based on the record evidence makes abundantly clear that

Appellants did not meet their burden of demonstrating the threshold requirement of

concerted action under the Sherman Act for their Section 1 Claim.

> **B.    MCLM Has Always Competed Fairly And There Is No Evidence Of Anti-Competitive Effects Within The Relevant Product And Geographic Markets**

While the trial court did not reach the remaining Section 1 Claim

elements, MCLM is constrained to address those elements here in response to

Appellants' appellate arguments.  As to the second element, Appellants again failed

to meet their burden: they have not demonstrated that the alleged conspiracy

between MCLM and PSI-TT "produced adverse anti-competitive effects within the

relevant product and geographic markets."  Appellants' hollow allegations in their

- 40 -

Second Amended Complaint that the alleged conspiracy (as opposed to independent acts of either MCLM or PSI) "produced anti-competitive effects" are completely unsupported by the record evidence.  Contrary to Appellants' assertions in their appellate papers, Appellants failed to   produce expert testimony at trial that defined either a relevant product or geographic market or that the alleged concerted actions (of which there are none) impacted either.

First, it is well settled that unrealized sales expectations of a single competitor with respect to a single product in the larger marketplace is not an anti-competitive effect and is not protected by the antitrust laws.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  As explained by the Supreme Court, antitrust laws "were enacted for 'the protection of competition, not competitors,'" and it is "inimical to the purposes of these laws to award damages for the type of injury claimed here" (*i.e.*, damages to a competitor resulting from fair competition).  *Id*. (quoting *Brown Shoe Co., Inc. v. U.S.*, 370 U.S. 294, 320 (1962)).  Also, the Supreme Court has made clear that the purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  Appellants have failed to prove facts or identify how MCLM and PSI-TT have jointly created an anti-competitive effect; to the contrary, the

2244943.2

evidence demonstrates that MCLM and PSI-TT did compete against each other and Appellants.

Second, Appellants have failed to identify the "relevant product and geographic markets." According to the Third Circuit, "[t]here are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820 (3d Cir.), *cert. denied*, 131 S. Ct. 658 (2010). Here, Appellants did not identify at trial either a product market or a geographic market.

1. <u>Product Market</u>

The Supreme Court has stated that "the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co*, 370 U.S. at 325; *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 442 n.18 (3d Cir. 1997) (product market test defined by same two factors whether under Sherman Antitrust Act §1 or §2); *see also Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). The Third Circuit has held that the "interchangeability of use" test examines whether "commodities are reasonably interchangeable by consumers for the same purposes." *Queen City Pizza,* 124 F.3d at 438. Here, Appellants failed to identify through any competent evidence or

expert testimony that there is a relevant product market, let alone how the alleged concerted activity of MCLM and PSI-TT supposedly negatively affected that product market; the Third-Circuit's rule of reasonable interchangeability and cross-elasticity of demand tests were completely ignored at trial and in Appellants' appellate papers.

Appellants have the burden of defining the relevant market. *Pastore v. Bell Tel. Co. of PA*, 24 F.3d 508, 512 (3d Cir. 1994); *Tunis Bros. Co., Inc.*, 952 F.2d at 726.  The Third Circuit has made equally clear that "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient."  *Queen City Pizza*, 124 F.3d at 436-437 (setting forth a summary of case law regarding failure to identify the relevant market).  At trial, Appellants only asserted a product market of "the relevant AMTS market" without further explanation and offered testimony not on the product market, but on the uses of the product (*i.e.*, the wireless licenses could be used for PTC or C-HALO).

Here, Appellants failed to meet their burden to define a relevant product market because Mr. Havens' testimony, Appellants' expert testimony and the record evidence was conflicting, at best.  Appellants have urged the Court to accept that the relevant product market should be the supposed "sweet-spot" of the AMTS 217-218 MHz and 219-220 MHz band, while one of Appellants' experts

testified that a broader frequency market was available and the other candidly

testified, "I don't know nothing about the market. That's not my job." (T1, 144:18-

19; T1, 86:1-2 (in narrowing usable frequency from somewhere between 100-400

MHz, he stated "you would like to be somewhere in the neighborhood of 200

megahertz")). Appellants' own documents confirm that there is competition for

PTC among a number of spectrum bands, including, at least, 217-222 MHz

(AMTS, IVDS and the 220-222 MHz bands), if not more frequencies. Appellants'

own documents and expert witness testimony clearly demonstrate PTC is being

deployed in non-AMTS frequencies and the testimony of Mr. Reardon on behalf of

MCLM, further confirmed that PTC is not limited to AMTS frequencies. Mr.

Reardon's testimony further confirmed that MCLM has competed for contracts for

wireless service related to PTC (in addition to a wide variety of other uses,

including Smart Grid technology, money tracking, etc.) and that Appellants are

blocking MCLM's efforts to put its AMTS licenses to this beneficial use.

For example, Amtrak (in its comments to the FCC regarding

"spectrum needs for implementing PTC") stated, "[s]pectrum in the range of 217-

222 MHz has emerged as the *de facto* home of PTC operations for both the freight

and passenger rail segments of the industry." (A470). Amtrak notes within its

comments that "the four largest freight railroads have decided to deploy PTC in the

220MHz band." (A470, n.9). Appropriately, these four railroads named their

collaboration PTC-220, LLC.  By way of further example, the MTA also provided comments on the PTC requirements and reported to the FCC that it "issued an RFP seeking 500 kHz of spectrum in the interoperable 217-222 MHz range."  (A376). Mr. Lindsey, the self-proclaimed inventor of PTC, even confirmed that PTC can be and is deployed at 220 MHz, not just in Appellants' supposed AMTS "sweet spot." (T1, 140:8-10).  There is simply no doubt that the spectrum market for PTC is at least 217-222 MHz, of which, AMTS is a mere fraction (and MCLM only owns a portion of that AMTS fraction).

For C-HALO, the spectrum market testified to by Appellants' own expert was dramatically broader than the AMTS band.  In fact, Appellants' expert stated that C-HALO could be deployed anywhere between 200-300 MHz (not just in the Appellants' imagined AMTS "sweet spot").  (T1, 95:10-96:4).  For other uses, such as Smart Grid technology, the testimony demonstrated that the product market is far beyond AMTS, including even the 170 MHz VHF band.  (T9, 19:5-14).  Indeed, the product market remains undefined because Appellants' experts were not hired to analyze and define the product market, which they confirmed in their sworn testimony (Dr. Sengupta was not even offered or permitted to testify as to the market (T1, 64:15-22)).  (T1, 59:13-18; T1, 144:18-19).

Lastly, and as recognized by the trial court, there is no doubt that there is robust, if not overwhelming, competition from cellular and satellite companies

for many of the beneficial purposes for which AMTS could be used.  As a result, the relevant product market for purposes of the Section 1 Claim remains undefined and unbounded and Appellants' attempt to limit it to simply AMTS is unavailing.

2. <u>Geographic Market</u>

Case law from this Circuit also confirms that it is Appellants' burden to demonstrate a geographic market, defined as "the area where his customers would look to buy such a product" which "will differ depending upon the price, durability and size of the product; in practical terms, one would comparison shop in a larger geographic market for a tractor, as compared to a grocery item." *Tunis Bros.*, 952 F.2d at 726 (market for tractors found to be "6.36 miles east, 7 miles west, 11.45 miles north and 10 miles south of the Tunis Brothers location").  Here, Appellants have failed to meet the basic requirement of identifying a geographic market, only vaguely alleging harm "among the several states" or in "the relevant geographic market," without any definition.  At trial, Appellants' experts did no better, indirectly identifying the geographic market as a nationwide market for C-HALO, leaving the geographic market completely undefined for PTC and never discussing the geographic market for the myriad other uses addressed at trial (Smart Grid technology, etc.).  (T1, 80:6-17).  In their appellate papers, Appellants generally alleged (without any reference to expert testimony at the trial) that the geographic market is "nationwide" or "regional" or "both."  (Ap. Br. at 39).

- 46 -

Clearly, Appellants cannot rely upon a nationwide market for the alleged concerted action by PSI-TT because neither PSI-TT nor MCLM, either individually or together, owned licenses on a nationwide basis.  Likewise, Appellants failed to identify at trial any specific geographic region within the nation that was purportedly affected by the alleged concerted action.  Appellants and their experts' inability to identify the geographic market requires that Appellants' Section 1 Claim be dismissed.

C.    Since There Is No Evidence Of Concerted Or Illegal Action,
      Appellants Are Unable To Prove Injury As A Result Of That Action

Lastly, Appellants failed to prove any fact of damage to either the marketplace or to Appellants caused by supposed illegal, concerted action by PSI-TT and MCLM. As an initial matter, neither Mr. Havens nor Telesaurus Holdings GB, LLC own any AMTS licenses so neither could suffer any damages.

For whatever reason, Appellants have made the calculated decision to litigate with MCLM (and PSI-TT, and other license holders, and Appellants' other investors, and Appellants' attorneys) rather than enter into site leases and begin constructing stations for their AMTS licenses.  Appellants presented no evidence that any concerted action impacted their business operations in any way.  Even the allegations of block-splitting and supposedly coordinated filings by PSI-TT and Mobex Network (before MCLM purchased the AMTS site-based licenses) did not prevent Appellants from successfully bidding for its licenses at auction.

In contrast, MCLM has had actual transactions with actual third-parties to implement AMTS spectrum for beneficial uses.  What is perfectly clear is that Appellants have done everything in their power to impede MCLM's business (including implementation of MCLM's licenses for beneficial uses such as PTC) and now its confirmed bankruptcy plan.  As recognized by the trial court, Appellants own the majority of the licenses and want to own the rest, which the trial court found would require "elimination of their competitors, and not the other way around," contrary to the Sherman Act's goal to eliminate monopolization (Tr. Op. at 55).  As this Circuit has repeatedly confirmed, there is no injury to the marketplace under the Section 1 Claim "if the plaintiff cannot come up with evidence of injury to competition, not simply to the Appellants themselves."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486 (3d Cir. 1992).  Notwithstanding the fact that MCLM and PSI-TT did not engage in any concerted action that allegedly violates Section 1 of the Sherman Act, Appellants have suffered no damages as a result of any alleged concerted action between MCLM and PSI-TT.

II.    APPELLANTS' REMAINING CAUSES OF ACTION WERE PROPERLY
       DISMISSED FOLLOWING A MOTION TO DISMISS

        This Court exercises plenary review over the trial court's ruling on a

motion to dismiss for failure to state a claim.  *Fellner v. Tri-Union Seafoods, LLC*,

539 F. 3d 237, 242 (3d Cir. 2008), *cert. denied*, 566 U.S. 1182 (2009).  As

explained below, the trial court correctly dismissed Appellants other causes of

action prior to trial.

    A.    The Trial Court Correctly Found That Under Any Circuit's
          Standard, Appellants' So-Called "Cooperation Orders" Are Not
          Orders Subject to Enforcement

        Appellants assert that "[t]he Cooperation Orders and 47 C.F.R.

§80.385 (the subject of the Cooperation Orders), individually and/or collectively,

are 'Order[s] of the Commission other than for the payment of money' as that term

is defined in 47 U.S.C. 401(b)."  (A159).  Contrary to Appellants' assertions, and as

found by the trial court, the "Cooperation Orders" are not orders that can be

enforced pursuant to Section 401.  (MTD Op. at 14).  Applicable case law makes

clear that the types of FCC orders subject to judicial enforcement pursuant to

Section 401 are severely restricted.  *See, e.g., New England Tel. & Tel. Co. v.*

*Public Utilities Commission of Maine.*, 742 F.2d 1 (1st Cir. 1984) (containing a

comprehensive analysis of Section 401(b)).

        The issue in *New England Tel.* involved whether an FCC rulemaking

decision qualified as an "order" under Section 401(b).  Then Judge (now Justice)

- 49 -

Breyer concluded that a broad interpretation of Section 401(b) would unduly

interfere with the well-established practice and principle that the enforcement of

the Communications Act is "entrusted primarily to [the FCC]." *Id.* at 5. Judge

Breyer also noted that Congress intended that enforceable "orders" take the form of

"specific directives to specific parties." *Id.* at 7. Accordingly, the First Circuit

concluded that Section 401(b) may <u>not</u> be used by an allegedly aggrieved party to

enforce FCC orders promulgated through the FCC's rulemaking process. *Id.* at 9;

*see also Mallenbaum v. Adelphia Communications Corp.*, 74 F.3d 465, 468-69 (3d

Cir. 1996). In the trial court's thorough analysis, it examined the case law on this

issue and determined there was a circuit split as to what constituted an order that

could be enforced under section 401(b). (MTD Op. at 11-12). Regardless, the trial

court correctly determined that under any circuit's definition, the so-called

Cooperation Orders do not meet the minimum definition of "order" that would

bring them within section 401(b)'s enforcement power. (Id.). Appellants cite to a

Fourth Circuit opinion decided subsequent to the trial court's opinion, *Lansdowne*

*on the Potomac Homeowners Ass'n., Inc. v. OpenBand at Lansdowne, LLC*, and

suggest that it somehow relaxes the definition of and order; however, that case

simply makes clear that the court was aligning itself "with a majority of circuits to

consider the question." 713 F.3d 187, 200 (4th Cir. 2013). The *Lansdowne* court

then cited to the very cases that the trial court here analyzed before ruling that the

Cooperation Orders and not actually orders as envisioned by 401(b).  Thus, the

trial court's refusal to enforce the Cooperation Orders at issue here should not be

disturbed.

Here, the trial court recognized that the so-called Cooperation Orders

are neither specific nor concrete, and cannot be deemed to be a judicially

enforceable order under Section 401(b).  (MTD Op. 14).  First, one of the alleged

Cooperation Orders is simply a letter from the FCC clarifying rules governing the

AMTS Service.  (MTD Op. at 12-13; A149, ¶ 23; A172).  A simple reading of that

letter demonstrates that the FCC was merely clarifying the agency's regulation (47

C.F.R. § 80.385(b)) concerning "co-channel interference protection" between

geographic and site-based licensees and the language that Appellants assert

constitutes an "enforceable order" was relegated to a footnote and, as the trial court

determined, does not provide any directive to the Defendants to take specific action.

(MTD Op. at 14).

Similarly, the other two alleged Cooperation Orders – the March 20,

2009 Order and the April 19, 2010 Order (A176; A184) – are not subject to

judicial enforcement under Section 401(b).  First, simply because the March 20,

2009 and April 19, 2010 Orders are styled as "orders" does not make them orders

subject to the provisions of Section 401(b).  "The particular label placed upon [a

decision] by the Commission is not necessarily conclusive, for it is the substance

- 51 -

of what the Commission has purported to do and has done which is decisive. . . . The FCC commonly adopts rules in opinions called 'orders.'" *New England Tel.*, 742 F.2d at 8-9 (internal citations omitted). The trial court correctly determined that the March 20, 2009 Order and April 19, 2009 Order fail to provide any instructions specifically directed at the Defendants related to the relief sought by Appellants. (MTD Op. at 14).

The March 20, 2009 Order pertains to (1) Paging Systems' challenge to an application by third-party NUSCO to modify its AMTS geographic license with respect to facilities in southwestern Connecticut, and (2) Paging Systems' application to modify its own site-based license to re-locate a transmitter tower from the World Trade Center (which had been destroyed in the September 11, 2001 attacks) to Times Square. Thus, the March 20, 2009 Order was <u>not</u> issued in response to a request that Paging Systems provide specific, detailed information about its site-based stations. (MTD Op. at 13-14). Rather, the "order" was essentially a "ruling" on Paging Systems' request for relief, not a directive for Paging Systems to engage in some specific affirmative conduct. (MTD Op. at 13). And again, the language that Appellants assert as being subject to judicial enforcement under Section 401 was relegated to a footnote. (Id.).

The April 19, 2010 Order involved Mobex's and Havens' separate petitions for reconsideration of the FCC's <u>declaratory ruling</u> as set forth in Scot

- 52 -

Stone's April 8, 2009 letter.  In short, Mobex and Havens sought reconsideration of some portions of the FCC's declaratory ruling, and the April 19, 2010 Order represents the FCC's ruling on those requests.  (MTD Op. at 13).  Like the March 20, 2009 Order, the April 19, 2010 Order was not issued in response to a direct request that Defendants produce particularized information or documentation, but was simply the denial of a request for reconsideration of the FCC's prior interpretive ruling.  (MTD Op. at 13-14).

Notably, all three of the alleged Cooperation Orders cite to a prior FCC ruling – the *Fifth Report* – as the basis for the language that Appellants assert should be judicially enforced.  But the *Fifth Report* specifically states that it is being issued as part of a <u>rulemaking</u> proceeding: "In this *Fifth Report and Order*, we adopt rules that will streamline our licensing process for AMTS stations by utilizing a geographic licensing system."  *Fifth Report,* 17 FCC Rcd 6685, 6704. To the extent the authority for the alleged Cooperation Orders is a previous order in a rulemaking proceeding, that authority should not form the basis for liability under Section 401.  *New England Tel.,* 742 F.2d at 4 (Section 401(b) may not be used by an aggrieved party to enforce FCC orders promulgated through the Commission's rulemaking process.)  The relevant language from the *Fifth Report* does not provide any specific directives to Defendants.

Accordingly, the trial court correctly dismissed Appellants' Count I after its detailed analysis of the Cooperation Orders at issue and contrary to Appellants' assertion, the trial court's dismissal of this portion of Appellants' Complaint, should not be disturbed.

B.    As Determined By The Trial Court, Appellants Have No
      Private Right of Action Under Sections 206 and 207 of the
      Communications Act

In Count II of the Second Amended Complaint, Appellants assert that Sections 206 and 207 of the Communications Act permit them to seek damages for Defendants' alleged violations of the FCC's anti-warehousing rules and regulations. As noted above, the thrust of the Second Amended Complaint is Appellants' claims that Defendants engaged in spectrum warehousing based on alleged misrepresentations made to the FCC or violations of the FCC's regulations regarding spectrum licenses. (*See* A154, ¶34).  But federal case law establishes that alleged violations of FCC regulations regarding construction deadlines do not support Appellants' claim for damages under Sections 206 and 207.

As recognized by the trial court, in *Conboy v. AT&T Corp.*, 241 F.3d 242, 252-53 (2d Cir. 2001), the Second Circuit affirmed the trial court's dismissal of the plaintiff's damages claims concluding that the Communications Act did not provide for an explicit or implicit private right of action for a violation of those regulations.  In so doing, the Second Circuit explicitly recognized that "when

Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Id* at 254. The Court also noted that creation of a private right of action would be inconsistent with the public purposes of the Communications Act and that a private right of action would place the FCC's "interpretive function squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission. . . . The result would be to deprive the FCC of necessary flexibility and authority in creating, interpreting, and modifying communications policy." *Id* at 253-54.

The Ninth Circuit reached a similar conclusion in *Greene v. Sprint Communications Company*, 340 F.3d 1047 (9th Cir. 2004). The Appellants filed an action for damages alleging violation of Section 276 of the Communications Act and related regulations. The District Court, *sua sponte*, dismissed the lawsuit on the basis that there is no private right of action for violation of Section 276 or the related regulations. *Id.* at 1049. In affirming the dismissal, the Ninth Circuit agreed that Section 276 did not create any private right of action, despite Appellants' argument that private parties could sue for alleged violations of the related FCC regulations. The Ninth Circuit also rejected Appellants' argument that a private right of action should nevertheless be implied because a private remedy would be consistent with the underlying purpose of Section 276. *Id.* at 1052. In language that has particular import here, the court cited the *Conboy* court's holding

- 55 -

that "the purpose of the Telecommunications Act is not to benefit individual Appellants, but to 'protect the public interest in communications.'" *Id.*

The Ninth Circuit reaffirmed the holding of *Greene* in *North County Communications Corp. v. California Catalog & Tech.*, 594 F.3d 1149 (9th Cir. 2010). In *North County¸* the Appellants filed a lawsuit in district court seeking damages under Section 206 and 207, alleging that the Defendants (various commercial mobile radio service providers) had violated certain compensation arrangements required under the Communications Act. The Ninth Circuit affirmed the trial court's dismissal of claims on the grounds that the Appellants did not have private rights of action under Sections 206 and 207, holding that "[i]n *Greene*, we clarified that there must be an independent right to compensation for a private right of action to lie under §§ 206 and 207. . . . Similarly, because North County has failed to establish a right to specific compensation pursuant to any statute or regulation, §§ 206 and 207 cannot form the basis for its compensation claims." *Id.* at 1160. The Ninth Circuit expressly noted that private rights of action are not readily cognizable under the Communications Act. *Id.* at 1155.

Like the statutory schemes at issue in *Greene* and *North County,* here the relevant provisions of the Communications Act merely direct the FCC to promulgate rules to prevent warehousing. Section 309(j)(4) of the Communications Act, provides in relevant part that "the Commission shall (B)

include performance requirements, such as appropriate deadlines and ***penalties for performance failures***, to ensure prompt delivery of service to rural areas, ***to prevent stockpiling or warehousing of spectrum by licensees or permittees*** . . . ." 47 U.S.C. § 309(j) (emphasis added).  Section 309(j)(4), however, did not expressly create a private remedy for any purported violation of regulations to be promulgated by the FCC.  Nor can any private right of action be implied.  As noted above, Congress did not manifest any intent to allow such a private right of action, but instead established only administrative sanctions ("penalties for performance failures"), imposed at the discretion of the FCC, to remedy any violations of its regulations concerning radio licensing.  47 U.S.C. § 312.

      C.      The Trial Court Correctly Found That Appellants Cannot Invoke Section 201 of the Communications Act Because The FCC Has Not Determined that Defendants Have Engaged in <u>Any Unjust or Unreasonable Practices</u>

      Appellants suggest that they can still sue for damages because Defendants' alleged violations of the FCC's rules and regulations pertaining to spectrum warehousing constitute "unjust and unreasonable" practices under Section 201(b) of the Communications Act.  (A163, ¶58).  However, a bare allegation of violation of Section 201(b) does not create a private right of action so as to permit a litigant to sue for damages under Sections 206 or 207.  Rather, in order to invoke Section 201(b) as a basis for seeking damages under Sections 206 and 207, a litigant must demonstrate that the FCC has first determined that the

challenged practice constitutes a violation of the Communications Act for which

there is a private right of action.  The Ninth Circuit in *North County* opined that

"given the broad language of the statute, a more reasonable interpretation is that <u>it

is within the Commission's purview to determine whether a particular practice

constitutes a violation for which there is a private right to compensation</u>."  594

F.3d at 1158 (emphasis added).  The Ninth Circuit concluded that the FCC had not

determined that the challenged practices violated Section 201(b) and therefore

rejected Appellants' argument that they had stated a colorable claim for relief.  *Id.*

As in *North County*, and as determined by the trial court here, there

has been no finding by the FCC that Defendants have engaged in any unjust or

unreasonable practice in violation of Section 201(b).  (MTD Op. at 16).  As noted

above, the FCC has had ample opportunity to consider those allegations –

Appellants for years have continued to argue to the FCC that Defendants have

violated the FCC's rules and regulations regarding improper warehousing of

spectrum licenses.  The FCC, however, has squarely rejected all contentions of

improper or anticompetitive conduct on the part of Defendants.  Accordingly,

Appellants cannot demonstrate a violation of Section 201(b).  Even if Appellants

could assert a private cause of action for damages under Sections 206 and 207,

Appellants' claim would be barred by the applicable statute of limitations because

under Section 415(a) of the Communications Act, a claim for damages for alleged

- 58 -

violations of the Communications Act must be filed within two-years of the time the cause of action accrues.  For purposes of Section 415(a), a cause of action accrues with "the discovery of the right or wrong or of the facts on which such knowledge is chargeable in law."  *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1100 (3d Cir. 1995).

Appellants assert in Count II that they "were precluded from seeking and obtaining from the FCC the spectrum in the Defendants' FCC Licenses, from the time Appellants were formed, until the time the FCC eliminated any possibility of seeking such spectrum by freezing all licensing in the AMTS service for a period of time prior to the institution of its new exclusive method of AMTS licensing via the Geographic Licensing auction system."  (A165, ¶61).  According to Appellants, the FCC instituted the freeze on site-based licensing in 2000, and conducted the two auctions of AMTS Geographic Licenses in 2004 and 2005.  (A146, ¶18).  As explained above, the results of an FCC audit were made publicly available by July 22, 2004, when the FCC updated its ULS database.

Thus, information about Defendants' alleged warehousing was publicly available as early as 2004.  As shown above, Appellants filed a lawsuit in California state court pursuing state law claims for these alleged licensing violations in 2005, which demonstrates that Appellants had constructive notice of their potential claims in 2005.  This action, however, was filed in July 2008 – more

than two years after Appellants ostensibly discovered Defendants' alleged violations of the Communications Act.  Thus, Appellants' Section 206 and 207 claims are time-barred.

## CONCLUSION

For the foregoing reasons, Defendant/Respondent Maritime Communications/Land Mobile, LLC respectfully requests that this Court affirm the trial court's judgment in its favor and against Appellants on all claims in Appellants' Second Amended Complaint.

GRAHAM CURTIN, P.A.
Attorneys for Defendant/Respondent
Maritime Communications/Land Mobile,
LLC


By:   s/ Robert W. Mauriello, Jr.
      Robert W. Mauriello, Jr.


Dated:      March 25, 2015

- 60 -

<u>CERTIFICATE OF BAR MEMBERSHIP</u>

I hereby certify pursuant to Local Appellate Rule 46.1 that I was admitted to the Bar of the United States District Court of Appeals for the Third Circuit on October 18, 1995 and am presently a member in good standing of the Bar of this Court.

Dated:  March 25, 2015

/s/  Robert W. Mauriello Jr.
Robert W. Mauriello, Jr.
GRAHAM CURTIN, P.A.
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962-1991
973-292-1700
rmauriello@GrahamCurtin.com
Attorneys for Defendant/Respondent
Maritime Communications/Land Mobile, LLC

2244943.2

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL APPELLATE RULE 31.1

ROBERT W. MAURIELLO, JR., of full age, hereby certifies as follows:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,944 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

3.     This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the hard copies, and the file containing the electronic version of this brief has been scanned for viruses using Symantec Endpoint Protection, version 12.1.4013.4013 prior to electronic submission to this Court and no viruses have been detected.


  s/  Robert W. Mauriello, Jr.
       Robert W. Mauriello, Jr.


Dated: March 25, 2015

2244943.2

<u>CERTIFICATE OF SERVICE</u>

I, Robert W. Mauriello, Jr., swear under the penalty of perjury that according to law and being over the age of 18, that on March 25, 2015, I served the within brief on behalf of Defendant/Respondent Maritime Communications/Land Mobile, LLC in the above-captioned matter upon:

> Sean R. Kelly, Esq.
> Saiber LLC
> 18 Columbia Turnpike, Suite 200
> Florham Park, New Jersey 07932

via electronic filing and service as well as by overnight courier by depositing two copies in a post-paid, properly addressed wrapper.  Pursuant to Fed. R. App. P. 31, the requisite number of copies have also been sent to the Court.

Dated:  March 25, 2015

> /s/  Robert W. Mauriello Jr.
> Robert W. Mauriello, Jr.
> GRAHAM CURTIN, P.A.
> 4 Headquarters Plaza
> P.O. Box 1991
> Morristown, New Jersey 07962-1991
> 973-292-1700
> rmauriello@GrahamCurtin.com
> Attorneys for Defendant/Respondent
> Maritime Communications/Land Mobile, LLC

2244943.2